UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**14 CV 9764**

---------------------------------------------x

ROYAL PARK INVESTMENTS SA/NV,
Individually and on Behalf of All Others
Similarly Situated,

                    Plaintiff,

      vs.

WELLS FARGO BANK, N.A., as Trustee,

              Defendants.

---------------------------------------------x

: Civil Action No.
:
: CLASS ACTION
:
: CLASS ACTION COMPLAINT AND
: ALTERNATIVE VERIFIED DERIVATIVE
: ACTION FOR BREACH OF THE TRUST
: INDENTURE ACT, BREACH OF
: CONTRACT AND BREACH OF TRUST
:
:
DEMAND FOR JURY TRIAL

RECEIVED
DEC 1 1 2014
U.S.D.C. S.D.N.Y.
CASHIERS

# TABLE OF CONTENTS

**Page**

I.    SUMMARY OF THE ACTION .........................................................................1

II.   JURISDICTION AND VENUE .....................................................................13

III.  PARTIES .......................................................................................................13

IV.   FACTUAL ALLEGATIONS ..........................................................................15

    A.   The Securitization Process for the Mortgage Loans ..............................15

    B.   Wells Fargo's Duties as Trustee for the Covered Trusts .......................18

        1.   Wells Fargo's Duties to (1) Notify the Warrantors and Other
            Parties to the Governing Agreements When It Discovers a Breach
            of the R&Ws; and (2) Enforce the Warrantors' Obligations to
            Cure, Substitute or Repurchase Defective Mortgage Loans .....................19

        2.   Wells Fargo's Duties upon the Occurrence of Servicer Events of
            Termination ...............................................................................................21

        3.   Wells Fargo's Heightened Duty to Prudently Protect Plaintiff's and
            the Class's Interests as Though They Were Wells Fargo's Own
            Interests During an SEOT .........................................................................23

        4.   Wells Fargo's "Duty of Trust" to Avoid Conflicts of Interest with
            Plaintiff and the Class ..............................................................................24

        5.   Wells Fargo's Duties and Obligations Under the TIA..............................25

    C.   The Covered Trusts Suffer from Serious Defects Because Wells Fargo
        Failed to Perform the Duties Required of It Under the Governing
        Agreements, the TIA and Common Law ................................................26

        1.   Wells Fargo Discovered No Later than April 13, 2011 that the
            Covered Trusts' Warrantors Breached Their R&Ws, Thus
            Triggering Wells Fargo's Duty to Enforce the R&W Claims .................26

            a.   Prior to April 2011, Wells Fargo Learned that Some of the
                Warrantors Generally Made False R&Ws ....................................28

            b.   By April 13, 2011, Wells Fargo Absolutely Knew that the
                Warrantors Had Breached Their R&Ws Concerning the
                Mortgage Loans in the Covered Trusts..........................................31

c.     Specific Claims Made About the Specific Mortgage Loans in the Specific Covered Trusts Caused Wells Fargo to Discover Breaches of the Warrantors' R&Ws ..............................42

d.     Wells Fargo Also Learned of the Warrantors' R&W Breaches from the Bankruptcies of Mortgage Loan Borrowers ......................................................................43

(1)     ABFC 2006-OPT1 Covered Trust ......................................44

(2)     SASC 2007-BC1 Covered Trust ........................................45

2.     Wells Fargo Had Actual Knowledge of SEOTs No Later than April 13, 2011, Thus Triggering Its Duties to Act Under the Governing Agreements and the TIA ..............................................................46

a.     Shortly After the Covered Trusts Were Formed, Wells Fargo Became Aware of Widespread Loan Servicing Abuses, and by the End of October 2010, Wells Fargo Learned that the Master Servicers and Servicers Were Committing SEOTs as to the Mortgage Loans in the Covered Trusts ..............................................................49

b.     By April 13, 2011, There Was No Doubt that Wells Fargo Had Actual Knowledge that the Covered Trusts' Master Servicers and Servicers Had Committed SEOTs with Respect to the Mortgage Loans in the Covered Trusts .................58

c.     After April 2011, Wells Fargo Had Actual Knowledge that the Master Servicers and Servicers Were Continuing to Commit the Same SEOTs and Were Also Committing New and Additional SEOTs with Respect to the Mortgage Loans in the Covered Trusts ......................................................64

d.     Wells Fargo Also Knew that Successor Servicer Ocwen Was Committing SEOTs ..............................................................64

3.     Wells Fargo Has Conflicts of Interest with Plaintiff and the Class and Improperly Put Its Interests Ahead of the Interests of Plaintiff and the Class to Benefit Itself ..............................................................69

D.     Wells Fargo Failed to Discharge Its Critical Duties and Obligations Under the Governing Agreements, the TIA and Common Law and Thereby Breached and Violated the Governing Agreements, the TIA and Common Law ..............................................................72

1.   Wells Fargo Failed to Notify the Warrantors and Other Parties to the Governing Agreements of R&W Breaches and Failed to Enforce the Warrantors' Obligations to Cure, Substitute or Repurchase Mortgage Loans Breaching the Warrantors' R&Ws, as Required by the Governing Agreements and the TIA ..............................72

2.   Wells Fargo Failed to Perform Its Duties with Respect to SEOTs as Required by the Governing Agreements and the TIA ..........................74

3.   Wells Fargo Failed to Exercise All of Its Rights and Duties Under the Governing Agreements as a Prudent Person Would, as Required by the Governing Agreements and the TIA ..............................76

4.   Wells Fargo Failed to Discharge Its Common Law Duty of Trust Owed to Plaintiff and the Class ................................................76

E.   Plaintiff and the Class Have Suffered Significant Damages Due to Wells Fargo's Breaches of the Governing Agreements and Common Law and Its Violations of the TIA ..............................................77

F.   Plaintiff May Sue Wells Fargo as Trustee ............................................79

V.   CLASS ACTION ALLEGATIONS ....................................................79

VI.   DERIVATIVE ACTION ALLEGATIONS ....................................................82

COUNT I ................................................................................84

COUNT II ................................................................................86

COUNT III ................................................................................88

PRAYER FOR RELIEF ................................................................................89

JURY DEMAND ................................................................................90

Plaintiff Royal Park Investments SA/NV ("plaintiff" or "RPI") alleges the following based on information and belief and the investigation of plaintiff's counsel (except as to the allegations pertaining to plaintiff, which are based on personal knowledge), which included an investigation and review of information concerning defendant Wells Fargo Bank, N.A. ("Wells Fargo" or "defendant"), a review and analysis of information and data concerning the "Covered Trusts" at issue herein, the "Mortgage Loans" within the Covered Trusts, the "Warrantors" and originators of the Mortgage Loans, and the "Master Servicers" and "Servicers" of the Mortgage Loans, as well as interviews and consultations with experts, consultants and others knowledgeable in the field of residential mortgage-backed securities ("RMBS"). Plaintiff and plaintiff's counsel believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      SUMMARY OF THE ACTION

1.      Plaintiff brings this action on its own behalf and on behalf of a class of all RMBS investors in the following two substantially similar RMBS trusts for which defendant Wells Fargo serves as Trustee (collectively, the "Covered Trusts"):

| Covered Trust Name | Hereinafter Referred to as: |
|---|---|
| 1.  ABFC 2006-OPT1 Trust | ABFC 2006-OPT1 |
| 2.  Structured Asset Securities Corporation Mortgage Loan Trust 2007-BC1 | SASC 2007-BC1 |

2.      Alternatively, plaintiff brings this action derivatively in the right and for the benefit of the Covered Trusts against defendant Wells Fargo.

3.      Plaintiff sues defendant Wells Fargo for breach of contract and for breach of Wells Fargo's common law duty of trust in connection with the Covered Trusts. Plaintiff also sues Wells Fargo for violating the Trust Indenture Act of 1939 ("TIA"), 15 U.S.C. §77aaa, *et seq*. Plaintiff and

the class are beneficiaries of the Covered Trusts, which hold residential "Mortgage Loans."[1]  Plaintiff and the class own RMBS "certificates" in the Covered Trusts, which are essentially bonds granting plaintiff and the class the right to receive monthly principal and interest payments generated by the Mortgage Loans.

4.     As the Trustee for the Covered Trusts, Wells Fargo owes plaintiff and the class certain contractual duties and obligations.  In addition, Wells Fargo owes plaintiff and the class similar statutory duties imposed on it by the TIA.  Wells Fargo also owes plaintiff and the class a "duty of trust" under the common law, which requires Wells Fargo to avoid conflicts of interest with plaintiff and the class.

5.     Wells Fargo's contractual duties and obligations arise from and are contained within the Covered Trusts' "Governing Agreements," called either "Pooling and Servicing Agreements" ("PSAs") or "Trust Agreements" ("TAs"), as well as other agreements related thereto, such as "Mortgage Loan Purchase Agreements" ("MLPAs") and "Servicing Agreements" ("SAs").  A copy of one of the Governing Agreements, the PSA for the ABFC 2006-OPT1 Covered Trust (the "ABFC 2006-OPT1 PSA"), is attached hereto as Exhibit A.  The Governing Agreement for the other Covered Trust – the SASC 2007-BC1 Covered Trust – is substantially similar to the ABFC 2006-OPT1 PSA, and is incorporated herein by reference as if set forth fully herein.

6.     The purpose of having Trustees such as Wells Fargo for the Covered Trusts is to ensure that there is at least one independent party to the Governing Agreements – unlike plaintiff and the class – that does not face collective action, or informational or other limitations, thereby allowing

---

[1]     Each of the two Covered Trusts originally held over 4,000 residential mortgage loans that were transferred to them.  These mortgage loans transferred to the Covered Trusts are referred to herein as the "Mortgage Loans."

the Trustee to protect the interests of plaintiff and the class and administer the Covered Trusts for their benefit.

7.      The Governing Agreements, as modified by the TIA and common law, effectuate this purpose by granting Wells Fargo certain powers and obligating it to exercise those powers for the benefit of plaintiff, the class and the Covered Trusts.  For example, the Governing Agreements contain and/or reference representations and warranties ("R&Ws") from certain entities that originated and/or aggregated the Mortgage Loans that were ultimately transferred to the Covered Trusts.  These entities were the "Sellers," the "Sponsors" and/or the originators of the Mortgage Loans and the Covered Trust securitizations (collectively referred to herein as the "Warrantors").  The Warrantors' R&Ws attested to the credit quality and characteristics of the Mortgage Loans.[2]  If it turned out that any R&W was incorrect or false, the R&W was breached, and the offending Warrantor was required to promptly cure the breach, or substitute or repurchase the defective Mortgage Loan.

8.      Both the Governing Agreements and the TIA require Wells Fargo – upon discovery of a breach of any R&W – to promptly provide notice of the breach to the offending Warrantor and other parties to the Governing Agreements.  Moreover, if the offending Warrantor does not timely cure the breach, the Governing Agreements further require Wells Fargo to enforce the breaching Warrantor's obligations to either substitute or repurchase any defective Mortgage Loans.

---

[2]      As discussed more fully *infra*, the Warrantors' R&Ws attested to the credit characteristics of the Mortgage Loans and vouched for the accuracy of the data they provided about the Mortgage Loans.  Generally, these R&Ws promised that the information the Warrantors provided about the Mortgage Loans was true and correct; that the Mortgage Loans were originated in accordance with, and complied with, all applicable laws; that the Mortgage Loans were not illegal predatory, abusive or "high cost" loans; that the borrowers of the Mortgage Loans had been evaluated to confirm they had a reasonable ability to afford the Mortgage Loans; and that there was no fraud, omissions or misrepresentations in connection with the origination of the Mortgage Loans.

9.     The veracity and accuracy of the R&Ws by the Warrantors were extremely important to both the investors in the Covered Trusts and the credit rating agencies that rated the RMBS certificates, because they conveyed information concerning the quality of the Mortgage Loans, and thus the level of risk of investing in the Covered Trusts' RMBS.  The credit rating agencies relied on and assessed the quality of the Covered Trusts' Mortgage Loans and RMBS, and issued the RMBS credit ratings – nearly all of which were high "investment grade" credit ratings – based on the Warrantors' R&Ws about the Mortgage Loans.  In fact, the credit rating agencies *required* that such R&Ws be made by the Warrantors as a pre-condition to providing credit ratings for the RMBS. Given the critical importance of the Warrantors' R&Ws, the Governing Agreements obligated the Warrantors to timely cure, substitute or repurchase any Mortgage Loan that materially breached any of their R&Ws and obligated Wells Fargo to enforce the Warrantors' obligations.  In other words, the R&Ws served as insurance to plaintiff, the class and the Covered Trusts that the Mortgage Loans were as the Warrantors represented.  And, importantly, if they were not, Wells Fargo was required by the Governing Agreements to make them so, by enforcing the Warrantors' obligations to cure any breaches, or substitute new, non-breaching loans in place of defective Mortgage Loans, or repurchase the defective Mortgage Loans.

10.     As alleged more fully below, by no later than April 13, 2011, Wells Fargo "discovered," as that term is used in the Governing Agreements, that the Warrantors had breached their R&Ws as to thousands of Mortgage Loans within the Covered Trusts.  Despite Wells Fargo's discovery and knowledge of the breaches, however, Wells Fargo failed to notify the Warrantors or other parties to the Governing Agreements of the breaches.  Nor did Wells Fargo enforce the Warrantors' obligations to cure, substitute or repurchase the breaching Mortgage Loans, including many Mortgage Loans that were so obviously defective that they had already been foreclosed on,

liquidated and/or written off as losses long before April 2011.  Instead, Wells Fargo did nothing.

Wells Fargo's failure to act was a breach of the Governing Agreements and has resulted in hundreds

of millions of dollars of damages to plaintiff, the class and the Covered Trusts.  Moreover, Wells

Fargo engaged in multiple additional breaches of its continuing duties to enforce the Warrantors'

obligations under the Governing Agreements by continuing to refuse to act after learning of the

breaches, as well as failing to act after learning of new breaches, causing the claims against the

Warrantors to be lost to the statutes of limitations.  Wells Fargo's failure to act also violated the TIA,

as the TIA required Wells Fargo to perform any duties mandated by the Governing Agreements.

Moreover, under the TIA, Wells Fargo was further required to give plaintiff and the class notice of

the Warrantors' defaults/breaches, which Wells Fargo also failed to do, in violation of the TIA.

11.     In addition to Wells Fargo's obligations to notify Warrantors and others of R&W

breaches, and enforce R&W claims against Warrantors, Wells Fargo also owed other critical duties to

plaintiff, the class and the Covered Trusts under the Governing Agreements and the TIA.  The

Governing Agreements require Wells Fargo to take steps to protect plaintiff, the class and the

Covered Trusts whenever it becomes aware of loan servicing failures by the Covered Trusts' "Master

Servicers" or "Servicers" that amount to "Servicer Events of Termination" ("SEOTs") under the

Governing Agreements.  To explain, the Governing Agreements designated certain entities to be the

Master Servicers and/or Servicers of the Mortgage Loans within the Covered Trusts (these Master

Servicers and Servicers are sometimes collectively referred to herein as "Master

Servicers/Servicers").  Generally, the Master Servicers/Servicers are responsible under the Governing

Agreements to ensure that the Mortgage Loans within the Covered Trusts are properly, prudently and

legally serviced and administered for the benefit of plaintiff and the class.[3]  An SEOT occurs under the Governing Agreements whenever a Master Servicer or Servicer **fails** to ensure that the Mortgage Loans are so serviced.  The Master Servicers/Servicers also commit an SEOT whenever they discover breaches of the Warrantors' R&Ws and fail to promptly give notice of those breaches to Wells Fargo.

12.     Under the Governing Agreements and the TIA, Wells Fargo is required to act promptly whenever it becomes aware of an SEOT by the Master Servicers/Servicers.  First, Wells Fargo is required to notify the offending Master Servicer or Servicer of its SEOT and demand that it be promptly cured.  Moreover, Wells Fargo is also required to promptly give notice of uncured SEOTs to plaintiff and the class, so that they can mobilize and direct Wells Fargo on how to deal with the offending Master Servicer or Servicer and the SEOT.  Finally, Wells Fargo is allowed to take additional steps to protect plaintiff and the class if an SEOT is not cured, including terminating and replacing the offending Master Servicer or Servicer or taking over its duties, in certain circumstances.

13.     Importantly, under both the Governing Agreements and the TIA, the occurrence of an SEOT that is known to Wells Fargo dramatically increases Wells Fargo's duties to plaintiff and the class.  The occurrence of any such SEOT **requires Wells Fargo to protect plaintiff and the class by exercising all of the rights and powers vested in Wells Fargo by the Governing Agreements, <u>as a reasonably prudent person would</u> under the circumstances, and to act as if Wells Fargo is**

---

[3]     This includes, *inter alia*, ensuring the prompt and legal collection of payments from borrowers and the remittance of the same to the Covered Trusts; ensuring the proper and legal sending of notices to borrowers who were late or had defaulted on their Mortgage Loan payments; ensuring the proper maintenance and reporting of accurate information regarding the Mortgage Loans; ensuring the prudent and legal modification of Mortgage Loans when permitted and as necessary such that they benefitted plaintiff and the class; ensuring the prudent and legal institution and prosecution of foreclosure proceedings on behalf of Wells Fargo when and as necessary for the benefit of plaintiff and the class; and properly maintaining the Covered Trusts' "REO" properties (properties the Covered Trusts owned).  In short, the Governing Agreements require the Master Servicers/Servicers to do whatever a "prudent" Master Servicer/Servicer would customarily do to ensure the proper servicing and administration of the Mortgage Loans in accordance with law, for the benefit of plaintiff and the class.

*protecting its own interests*.  Essentially, when an SEOT occurs, Wells Fargo is required to act as a fiduciary for plaintiff and the class and take all prudent actions to protect them, as if Wells Fargo is protecting its own interests.  This included terminating or replacing the Master Servicers and Servicers that were committing SEOTs.

14.     It was critically important that Wells Fargo act quickly whenever it became aware of SEOTs because the proper servicing of the Mortgage Loans, and the reporting of Warrantor R&W breaches to Wells Fargo, was vital to: (1) the ongoing financial viability of the Covered Trusts; (2) ensuring the Covered Trusts had sufficient cash flows to pay expenses and to fund payments to plaintiff and the class; (3) avoiding and minimizing any losses to plaintiff, the class and the Covered Trusts from defaults, delinquencies or foreclosures of the Mortgage Loans or Warrantor R&W breaches; and (4) maintaining the credit ratings and market values of plaintiff's and the class's RMBS.  Because of this, the Governing Agreements require Wells Fargo to act as a quasi-fiduciary for plaintiff and the class whenever it becomes aware of an SEOT by a Master Servicer or Servicer.

15.     As alleged more fully below, Wells Fargo obtained actual knowledge of widespread, rampant SEOTs by the Covered Trusts' Master Servicers and Servicers no later than April 13, 2011. By April 13, 2011, Wells Fargo had actual knowledge that the Master Servicers and Servicers were engaging in numerous, widespread, improper and/or illegal foreclosure proceedings and other loan servicing misconduct with respect to the Mortgage Loans in the Covered Trusts that were SEOTs.  In fact, Wells Fargo even actively participated in the misconduct, including the making of false statements, the filing of false and illegal affidavits in foreclosure actions, and the participation in other improper or illegal loan servicing misconduct with the Master Servicers/Servicers, all of which were SEOTs.  In addition, by April 13, 2011, Wells Fargo also had actual knowledge that the Master Servicers/Servicers knew of widespread breaches of the Warrantors' R&Ws but had not reported

- 7 -

those breaches to Wells Fargo, which were also SEOTs.  These SEOTs triggered Wells Fargo's fiduciary-like duties under the Governing Agreements and the TIA to take action and protect plaintiff and the class as a prudent person would.  But Wells Fargo did not do so, as it failed to do any of the things required of it by the Governing Agreements and the TIA.  Instead, Wells Fargo did nothing and allowed the SEOTs to go on unchecked and even participated in them, thereby engaging in multiple breaches of its duties under the Governing Agreements and TIA.  In fact, despite its knowledge of these SEOTs, and numerous new, additional SEOTs that occurred repeatedly and continuously *after* April 13, 2011, Wells Fargo has steadfastly continued to fail to act, let alone act prudently, and thus has engaged in multiple additional breaches of its duties under the Governing Agreements and the TIA.  As a result, the Covered Trusts continue to suffer from pervasive SEOTs committed by the Master Servicers and Servicers.

16.    Wells Fargo's multiple failures to act have resulted in thousands of defective Mortgage Loans that breached their R&Ws not being cured, replaced or repurchased by the Warrantors, and also in Mortgage Loans being improperly, imprudently and illegally serviced, causing substantial damages to plaintiff, the class and the Covered Trusts.  Wells Fargo's failures to properly act with respect to the Warrantors' breaches of their R&Ws and the Master Servicers' and Servicers' SEOTs have resulted in, *inter alia*: (1) failures to have Mortgage Loans in breach of the Warrantors' R&Ws cured, replaced or repurchased; (2) numerous foreclosures of the Mortgage Loans being denied, reversed, invalidated and/or delayed, substantially driving up the Covered Trusts' expenses and losses; (3) numerous Mortgage Loan delinquencies being allowed to stretch on interminably without payments being remitted to the Covered Trusts, while the Master Servicers and Servicers continuously added improper and excessive fees and charges to such Mortgage Loans, which are paid to the Master Servicers and Servicers from the Covered Trusts; (4) numerous Mortgage Loans being

modified or foreclosed, or not being modified or foreclosed, in a manner that financially benefitted the Master Servicers'/Servicers' financial interests but not those of plaintiff and the class; (5) several of the Covered Trust's Master Servicers/Servicers entering into settlements with governmental regulatory authorities because of their SEOTs wherein these Master Servicers/Servicers were required, as part of the settlements, to modify and reduce mortgage loan balances on loans they serviced – including on Mortgage Loans in the Covered Trusts – which caused additional losses to plaintiff, the class and the Covered Trusts; and (6) various and numerous other instances of illegal and improper loan servicing misconduct alleged herein amounting to SEOTs that caused millions of dollars of damages to plaintiff, the class and the Covered Trusts.  All of the foregoing events and damages were caused by Wells Fargo's breaches of the Governing Agreements and violations of the TIA.

17.     As previously alleged, these uncured SEOTs required Wells Fargo to use a heightened "prudent person" duty of care, like that of a fiduciary, and to exercise all of Wells Fargo's rights and powers under the Governing Agreements for the benefit of the plaintiff and the class.  ***This heightened duty of care applies not only to the Master Servicers'/Servicers' SEOTs, but also to all of the Warrantors that breached their R&Ws***.  Thus, Wells Fargo was also required to enforce the R&W claims against the Warrantors as a prudent person would, and seek to fully recover for those claims as though Wells Fargo was seeking to recover for itself.

18.     Wells Fargo, however, ignored these duties and obligations owed to plaintiff, the class and the Covered Trusts under the Governing Agreements and the TIA, and did not exercise its rights and powers under the Governing Agreements, or exercise the degree of care and skill required of a prudent person in the conduct of his/her own affairs.  As a result, Wells Fargo breached the Governing Agreements and violated the TIA, and caused plaintiff, the class and the Covered Trusts to

suffer over $740 million in damages caused by the loss and non-prosecution of the R&W claims against the Warrantors (which are now time barred) and the Master Servicers'/Servicers' uncured SEOTs, which continue unabated.  Plaintiff, the class and the Covered Trusts are entitled to recover damages caused by these breaches of the Governing Agreements by Wells Fargo, and for its violations of the TIA.

19.     Wells Fargo's failure to act also breached its common law "duty of trust" owed to plaintiff and the class.  Under this duty, Wells Fargo was required to avoid conflicts of interest with plaintiff and the class.  Wells Fargo's failure to act as required under the Governing Agreements was a result of the fact that Wells Fargo had fundamental conflicts of interest with plaintiff and the class.

20.     To explain, Wells Fargo had ongoing and prospective business relationships with the loan originators, Warrantors, Master Servicers and Servicers to the Covered Trusts (and the entities related to them).  These were the decision-makers that selected RMBS trustees for RMBS trusts, and they had selected Wells Fargo to be the Trustee of the Covered Trusts, as well as the trustee for hundreds of other RMBS trusts.  Wells Fargo derived significant income from such relationships, and it desired to continue profiting therefrom.  Thus, Wells Fargo did not want to disrupt its business relationships with these entities, or anger them, by seeking to enforce R&W claims against the Warrantors or declaring SEOTs against the Master Servicers/Servicers, as it would endanger Wells Fargo's RMBS trustee business and the income derived therefrom, as well as future prospects for such financial gain.

21.     Moreover, Wells Fargo had yet another conflict of interest with plaintiff and the class.  Wells Fargo itself was participating in the Master Servicers' and Servicers' SEOTs with respect to the Mortgage Loans in the Covered Trusts.  Disclosing such SEOTs would also expose Wells Fargo's participation in that misconduct and thereby expose Wells Fargo to liability from plaintiff and the

class under the Governing Agreements and the TIA.  In addition, during the occurrence of an SEOT, Wells Fargo had to protect plaintiff and the class as a prudent person would, which required much more effort and expense on Wells Fargo's part than it wanted to expend.  If it let the SEOTs go on uncured then Wells Fargo could avoid this additional effort it did not want to undertake.  Thus, Wells Fargo chose to remain silent and do nothing in the face of known SEOTs that were occurring as to the Mortgage Loans in the Covered Trusts.

22.    In addition, Wells Fargo had a conflict of interest with plaintiff and the class because Wells Fargo itself also serviced loans for other RMBS trusts and trustees, and was engaging in the same types of misconduct that the Covered Trusts' Master Servicers/Servicers were.  Because it desired to keep its own loan servicing misconduct hidden, Wells Fargo made the decision to not "rat out" the Master Servicers and Servicers to the Covered Trusts or disclose their SEOTs for fear that Wells Fargo's loan servicing misconduct would be exposed by a retaliating Master Servicer or Servicer.

23.    Similarly, Wells Fargo was also a warrantor of mortgage loans to numerous other RMBS trusts.  Wells Fargo, along with the Covered Trusts' Warrantors, were engaged in the systemic issuance of false R&Ws concerning mortgage loans transferred to RMBS trusts and wanted to keep that misconduct hidden in order to avoid liability.  Therefore, Wells Fargo chose to refrain from providing notices of R&W breaches by the Covered Trusts' Warrantors, or remedying the breaches by enforcing the Warrantors' obligations, in an attempt to keep the industry's practice of systemic R&W breaches concealed.

24.    Because of the foregoing conflicts of interest with plaintiff and the class, Wells Fargo deliberately chose to refuse to perform its duties under the Governing Agreements and the TIA and thereby put its own interests ahead of plaintiff's and the class's, and benefitted therefrom, breaching

its common law duty of trust to plaintiff and the class.  Moreover, Wells Fargo has engaged in multiple additional breaches of its duty of trust by continuing to put its interests ahead of those of plaintiff and the class and continuing to refuse to perform its duties under the Governing Agreements, thereby allowing Warrantor R&W breaches to go unremediated and to be lost to the statutes of limitations, and allowing Master Servicer/Servicer SEOTs to go on uncured.

25.     Numerous media reports and RMBS experts have confirmed these conflicts of interest. For example, in December 2010, law professor Kurt Eggert appeared before the U.S. Senate's Banking, Housing and Urban Affairs Committee and testified that ***RMBS trustees like Wells Fargo were not likely to be of "much help for investors," because "a trustee may derive much of its income from" those that set up the trusts and appoint the trustees***.  In addition, an article in the *Yale Journal of Regulation* stated: "***[T]here is often a very close relationship between the servicer and the trustee; many originators and servicers have a 'pet' or 'pocket' trustee that they use for most of their deals***."  Moreover, in a June 16, 2013 article, *The New York Times* reported the following:

> ***[W]hen mortgages soured, trustees declined to pursue available remedies for investors, such as pushing a [Warrantor] to buy back loans that did not meet quality standards . . . because trustees are hired by the big banks that package and sell the securities[.] [Therefore] their allegiances are divided.  Sure, investors are paying the fees, but if a trustee wants to be hired by sellers of securities in the future, being combative on problematic loan pools may be unwise***.

The article concluded that "***they [RMBS trustees like Wells Fargo] are a dog that could have barked but didn't***."

26.     As a result of Wells Fargo's failures to act with respect to Master Servicer/Servicer loan servicing SEOTs, the Mortgage Loans have experienced numerous illegal, invalid and improper foreclosures causing lengthy and expensive delays and delinquencies, the imposition of excessive and improper Master Servicer/Servicer fees, and the disposition of Mortgage Loans that financially benefitted the Master Servicers/Servicers but negatively impacted the interests of plaintiff and the

class.  As a further result of Wells Fargo's failures to enforce the R&W claims (and the Master Servicers'/Servicers' SEOTs of failing to notify Wells Fargo of Warrantor R&W breaches), the Covered Trusts are also full of defective Mortgage Loans that have experienced historically unprecedented numbers of defaults, delinquencies, foreclosures, liquidations and losses.

27.     Wells Fargo's failures to act as required by the Governing Agreements and the TIA have caused plaintiff, the class and the Covered Trusts to suffer over $740 million in damages, caused failures and shortages in the payment of principal and interest to plaintiff and the class, and caused steep declines in the value of plaintiff's and the class's RMBS.  Indeed, due to Wells Fargo's inaction, *all of RPI's RMBS in the Covered Trusts are now nearly or completely worthless*. Accordingly, Wells Fargo is liable to plaintiff and the class for damages caused by its breaches of the Governing Agreements and its duty of trust, and its violations of the TIA.

## II.      JURISDICTION AND VENUE

28.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. §1331 for violations of the TIA, and supplemental jurisdiction over the breach of contract and breach of trust claims.  The Court also has diversity jurisdiction pursuant to 28 U.S.C. §1332(a).

29.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), as Wells Fargo has offices within this District and its contacts with this District are sufficient to confer personal jurisdiction.

## III.     PARTIES

30.     Plaintiff RPI is a limited liability company incorporated under the laws of Belgium, with its principal place of business in Brussels, Belgium.  RPI acquired RMBS in the Covered Trusts on or about the dates indicated below, and has continuously held such RMBS since then:

| Covered Trusts | Tranche/Class | Initial Face Amount of Certificate | Date Acquired |
|---|---|---|---|
| ABFC 2006-OPT1 | M4 | $5,000,000 | February 12, 2010 |
| SASC 2007-BC1 | M6 | $1,136,000 | February 12, 2010 |

31.     The foregoing RMBS were initially rated "investment grade" by the credit rating agencies.  However, because of Wells Fargo's failures to act as alleged herein, each of the foregoing RMBS are now near or total losses, having been written down to the point that they are worthless or virtually worthless, and each RMBS is now in default.

32.     The above RMBS that RPI acquired were originally included within collateralized debt obligations ("CDOs") in which RPI acquired interests on or about May 12, 2009 from the initial purchasers of the CDOs.  The initial purchasers assigned to RPI all right, title and interest (including litigation and claim rights) the initial purchasers had in these CDOs.  The initial purchasers had acquired the CDOs at or about the time they were initially offered to the investing public in 2006 and 2007.  Subsequently, after the CDOs were assigned to RPI, they were liquidated in 2010 and RPI acquired the RMBS within the CDOs along with all rights, title and interest in such RMBS.  Given that the CDOs were *liquidated in full*, and thus the CDOs were selling *all* rights and interests in the RMBS within them, RPI also obtained all litigation rights and claims that the CDOs' initial purchasers had in the RMBS.  Furthermore, pursuant to New York General Obligations Law §13-107, RPI obtained all the rights and causes of action against Wells Fargo held by all of the previous holders of RPI's RMBS.

33.     Defendant Wells Fargo is a national association with its main office in South Dakota and its principal place of business in California.  Wells Fargo conducts substantial business in this District.  Wells Fargo serves as trustee for hundreds of RMBS trusts formed under the laws of the

State of New York, including the Covered Trusts.  Wells Fargo has served as the Trustee for each of the Covered Trusts since they were formed in 2006 and 2007.

## IV.   FACTUAL ALLEGATIONS

### A.   The Securitization Process for the Mortgage Loans

34.   The Warrantors that sold the Mortgage Loans that were ultimately transferred into the Covered Trusts engaged in a nearly identical securitization process that was repeated thousands of times by them and others during 2006 and 2007, the time period when the Mortgage Loans were originated, warranted and transferred to the Covered Trusts.  Investor demand for RMBS was skyrocketing during this period, and the Warrantors and other RMBS securitizers were hard pressed to meet that demand.  RMBS securitizations proliferated during 2006 and 2007, and were extremely profitable for all involved in their sale.  Hundreds of billions of dollars of RMBS were packaged and sold to the investing public, and billions of dollars in profits were pocketed by the Warrantors, Master Servicers/Servicers and other securitizers, including Wells Fargo.  In addition, Wells Fargo also profited handsomely, and continues to profit, from the explosion in RMBS trusts caused by the skyrocketing sales, as it is an RMBS trustee to hundreds of RMBS trusts, including the Covered Trusts.

35.   RMBS securitizations involve the conversion of thousands of illiquid residential mortgage loans like the Mortgage Loans into bond-like instruments – the RMBS certificates at issue herein – which trade over the counter in capital markets.

36.   The first step in creating RMBS is the "origination" of mortgage loans, that is, the lending of money to borrowers to purchase residences.  The Mortgage Loans that were ultimately transferred to the Covered Trusts were originated by lenders that then sold them to the Warrantors, or were originated by the Warrantors themselves, and then ultimately transferred to the Covered Trusts.

37.     Typically, after aggregating the Mortgage Loans, the Warrantors then grouped the Mortgage Loans into large pools, which they then sold and transferred to the Covered Trusts' "Depositors" for ultimate transfer to the Covered Trusts and Wells Fargo as Trustee.  In many cases, the Depositors were shell companies related to the Warrantors and/or Master Servicers/Servicers. These sales from the Warrantors to the Depositors were typically accomplished via agreements called "Mortgage Loan Purchase Agreements" or similarly titled agreements (collectively, the "MLPAs").

38.     The Governing Agreements refer to and incorporate the MLPAs.  In the Governing Agreements and/or MLPAs, the Warrantors: (i) make numerous R&Ws concerning the credit quality and characteristics of the Mortgage Loans and vouch for the accuracy of all data they provide about the Mortgage Loans; (ii) promise to cure, substitute or repurchase Mortgage Loans that do not comply with those R&Ws; and (iii) typically state that the Trustee will ultimately have the right to enforce the R&Ws against the Warrantors.

39.     After the Mortgage Loans are sold and transferred from the Warrantors to the Covered Trusts' Depositors, the Depositors then transfer the Mortgage Loans, along with the rights to enforce the Warrantors' R&Ws, to the Trustee for the benefit of plaintiff and the class, and in exchange, the Trustee transfers the RMBS certificates to the Depositors.

40.     The Depositors then sell the RMBS certificates to securities underwriters, in many cases another entity related to the Warrantors, Depositors and Master Servicers/Servicers.  The Depositors remit the money from those underwriter sales to the Warrantors so that they can purchase additional loans and repeat the RMBS securitization process.  Meanwhile, the securities underwriter markets and sells the RMBS certificates to investors such as plaintiff and the class and retains a portion of the purchase price as its fee.

41.     After the Covered Trusts' securitizations are closed and their RMBS certificates are sold to investors, the Mortgage Loans must be serviced.  Thus, the Governing Agreements designate certain entities to be the Master Servicers and/or Servicers of the Mortgage Loans and require that they service the Mortgage Loans legally, and with the same degree of skill and care as *"prudent"* loan servicers.  Whenever a Master Servicer/Servicer fails to ensure the legal and "prudent" servicing of the Mortgage Loans, a "Servicer Event of Termination," or SEOT, occurs and the Trustee is required to take certain actions to protect plaintiff and the class when it becomes aware of the event.

42.     Plaintiff's and the class's RMBS certificates entitle them to the cash flows generated by the Mortgage Loans.  The Covered Trusts, as with other RMBS trusts, are structured such that the risk of loss is divided among different "classes" or "tranches" of RMBS in each Covered Trust.  Each class or tranche of the Covered Trusts has a different level of credit risk and reward (the interest or yield), including different levels and types of credit enhancement or protection, and different priorities to payment from the cash flows generated by the Mortgage Loans (the payment priority and distribution is called the payment "waterfall").  Because the classes/tranches have different credit enhancements and different priorities of claim to the cash flow, they are assigned different credit ratings by the credit rating agencies and they sell at different yields or coupons.  However, nearly all of the classes/tranches of the RMBS are required to be rated as "investment grade" securities by a credit ratings agency before they can be sold.  As previously alleged, the credit ratings agencies require that the Warrantors make R&Ws, and they base their credit ratings of the RMBS certificates on such R&Ws.

43.     All of the classes/tranches of the RMBS certificates, as well as the plaintiff, the class and all of the Covered Trusts, are dependent on the Trustee to act as required under the Governing Agreements in order to ensure that the Covered Trusts and RMBS perform as expected and designed,

- 17 -

and are profitable. Thus, the Trustee must act promptly to properly discharge its duties and obligations under the Governing Agreements. Here, Wells Fargo utterly failed to discharge its duties mandated by the Governing Agreements and the TIA. Therefore, it breached the Governing Agreements and further violated the TIA, thus entitling plaintiff, the class and the Covered Trusts to damages. Wells Fargo exacerbated this problem by having numerous improper conflicts of interest with plaintiff and the class which motivated Wells Fargo to refrain from discharging its duties.

### B.    Wells Fargo's Duties as Trustee for the Covered Trusts

44.    The Governing Agreements set forth Wells Fargo's powers and its duties to plaintiff and the class. The Covered Trusts are governed by PSAs (Pooling and Servicing Agreements) or TAs (Trust Agreements), and related agreements such as the MLPAs (Mortgage Loan Purchase Agreements) and/or SAs (Servicing Agreements), which the PSAs and TAs reference and incorporate when relevant. The Governing Agreements for each Covered Trust are substantially similar to one another and impose substantially similar duties on Wells Fargo. Accordingly, the ABFC 2006-OPT1 PSA (Exhibit A hereto) is used as a representative example of the Governing Agreements for both of the Covered Trusts.

45.    While the Governing Agreements set forth the powers and responsibilities of Wells Fargo, the TIA supplements the Governing Agreements. The TIA was enacted in 1939 because Congress recognized that previous abuses by trustees had adversely affected investors and the national interest. In enacting the TIA, Congress desired to ensure that there were certain minimum federal protections available to investors, which are deemed to be incorporated into the Governing Agreements. Those minimum protections are discussed *infra* at ¶¶59-62.

46.    When the Covered Trusts were formed, the Covered Trusts' Depositors transferred the Mortgage Loans to Wells Fargo along with "***all the right, title and interest . . . in and to . . . each Mortgage Loan . . . and . . . the rights of the Depositor under each . . . Mortgage Loan Purchase***

*Agreement" "for the benefit of the Certificateholders*."    ABFC 2006-OPT1 PSA §2.01.

Furthermore, Wells Fargo "*acknowledge[d] the receipt of*" all of the foregoing assets "*and [further]*

*declare[d] that it holds . . . all such assets . . . in trust for the exclusive use and benefit of all present*

*and future Certificateholders*," *i.e.*, plaintiff and the class.  *Id.* §2.02.

> **1.      Wells Fargo's Duties to (1) Notify the Warrantors and Other Parties to the Governing Agreements When It Discovers a Breach of the R&Ws; and (2) Enforce the Warrantors' Obligations to Cure, Substitute or Repurchase Defective Mortgage Loans**

47.      The Governing Agreements refer to the MLPAs ("Mortgage Loan Purchase

Agreements"), and similar related agreements, along with the numerous R&Ws contained in such

agreements, which were made by the Warrantors about the Mortgage Loans in the Covered Trusts.

The Warrantors' R&Ws attested to the credit quality of the Mortgage Loans conveyed to the Covered

Trusts and warranted the accuracy of the data the Warrantors provided about such Mortgage Loans.

The Warrantors also attested to other characteristics of the Mortgage Loans and their origination.  The

following are examples of the R&Ws the Warrantors made: (1) that the data and other information the

Warrantors conveyed concerning the Mortgage Loans in schedules, exhibits, and other compilations

of data in connection with the transfer of the Mortgage Loans to the Covered Trusts was "true and

correct"; (2) that the Mortgage Loans complied with and were originated in compliance with all

federal, state and local laws; (3) that the Mortgage Loans were not "'high cost,'" "predatory" or

"abusive" loans as defined by law; (4) that each mortgaged property had an appraisal that conformed

to certain standards and was performed by a qualified appraiser; (5) that the borrowers had been

evaluated to confirm that they had a reasonable ability to make timely payments on the Mortgage

Loans; (6) that each Mortgage Loan was originated pursuant to certain underwriting guidelines; (7)

that each Mortgage Loan was a "'qualified mortgage'" within the meaning of §860G of the Internal

Revenue Code; and (8) that there was no fraud or misrepresentation involved in the origination of the

Mortgage Loans. *See, e.g.*, ABFC 2006-OPT1 MLPA §3.01(a), (j), (k), (l) (Exhibit B hereto); *see also* "Flow Sale and Servicing Agreement" to the ABFC 2006-OPT1 Covered Trust, §3.03 (a), (h), (i), (ee), (kk), (ddd)(6) (attached as Exhibit C hereto). The Warrantors made numerous other R&Ws concerning the Mortgage Loans in the Covered Trusts. *See generally* Ex. B §3.01(a)-(s); *see also* Ex. C §3.03(a)-(lll).

48. The Warrantors' R&Ws are specifically referenced in the Governing Agreements, along with the Warrantors' obligations to cure, substitute and/or repurchase any defective Mortgage Loans. *See* ABFC 2006-OPT1 PSA §2.03(a).

49. Importantly, the Governing Agreements also provide that whenever Wells Fargo discovers a breach of a Warrantor's R&W concerning a Mortgage Loan that materially affects plaintiff and the class, Wells Fargo "***shall promptly notify***" the breaching Warrantor and other parties to the Governing Agreement. ABFC 2006-OPT1 PSA §203(a). Thereafter, the breaching Warrantor is required to promptly "cure such breach." *Id*. If the Warrantor fails to cure the breach within a specified time, then "the Trustee ***shall enforce*** such [Warrantor's] obligation . . . under the [MLPA] and cause such [Warrantor] to repurchase such Mortgage Loan" or "substitute" a new loan in its place. *Id*.

50. The foregoing duties of Wells Fargo are contained in §2.03(a) of the ABFC 2006-OPT1 PSA, which provides:

> ***Upon discovery . . . of [a] breach by the [Warrantors] of any representation or warranty under the related . . . Mortgage Loan Purchase Agreement or [other agreements containing R&Ws, such as Exhibit C to the complaint], as applicable, in respect of any Mortgage Loan which materially adversely affects the value of such Mortgage Loan . . . or the interest therein of the Certificateholders, the Trustee shall promptly notify the applicable [Warrantor], . . . the Servicer and the NIMS Insurer of such . . . breach and request that . . . the related [Warrantor] . . . cure such breach within 90 days from the date the [Warrantor] . . . was notified of such breach. . . . [I]f the [Warrantor] . . . does not cure such breach in all material respects during such period, the Trustee shall enforce such [Warrantor's]***

*obligation . . . under the applicable . . . Mortgage Loan Purchase Agreement or [other agreement] . . . and cause such [Warrantor] . . . to repurchase such Mortgage Loan from the Trust Fund . . . .   In lieu of repurchasing any such Mortgage Loan as provided above, the [Warrantor] . . . may cause such Mortgage Loan to be removed from the Trust Fund . . . and substitute one or more Eligible Substitute Mortgage Loans . . . .*

### 2.    Wells Fargo's Duties upon the Occurrence of Servicer Events of Termination

51.    Wells Fargo also has obligations under the Governing Agreements and TIA whenever it learns of Servicer Events of Termination (or SEOTs) by a Master Servicer or Servicer.[4]  Under the Governing Agreements, an SEOT by a Master Servicer or Servicer occurs whenever there is any

*failure by the Servicer [or Master Servicer, as applicable] . . . duly to observe or perform, in any material respect, any . . . covenants, obligations or agreements of the Servicer [or Master Servicer] as set forth in this Agreement, which failure continues unremedied for a period of 30 days, after the date . . . on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer [or Master Servicer], by the Trustee . . . .*

ABFC 2006-OPT1 PSA §7.01(a)(ii).

52.    The chief obligation of the Master Servicers and Servicers under the Governing Agreements is to ensure that the Mortgage Loans in the Covered Trusts are properly, legally and prudently serviced and administered.   Indeed, the Governing Agreements acknowledge "*the Certificateholders' reliance on the Servicer[s]*" and Master Servicers to properly service the Mortgage Loans.  ABFC 2006-OPT1 PSA §3.01.  Thus, *the Governing Agreements require the Master Servicers and Servicers (as well as any sub-servicers they use) to ensure that they service the Mortgage Loans "in accordance with . . . the normal and usual standards of practice of*

---

[4]    The Governing Agreements to the two Covered Trusts refer to the Master Servicers' or Servicers' SEOTs in different nomenclature.  As alleged herein, the ABFC 2006-OPT1 PSA calls them "Servicer Events of Termination."  The Trust Agreement for the SASC 2007-BC1 Covered Trust refers to such events as "Events of Default."  Both of the terms are used to describe the same failures by the Master Servicers or Servicers to service, or ensure the proper servicing of, the Mortgage Loans as required by the Governing Agreements.  Thus, the term "SEOTs" is used interchangeably herein to include both "Servicer Events of Termination" and "Events of Default."

***prudent* mortgage servicers**." *Id.* The Master Servicers and Servicers are also required to service the

Mortgage Loans **legally**. *See, e.g.*, *id.* §2.05(ii) (Servicer represents and covenants that its

"consummation of the transactions contemplated" by the Governing Agreements "***will not . . . result***

***in the violation of any law, rule, [or] regulation***."); *id.* §3.01 ("The Servicer . . . shall service and

administer the Mortgage Loans in accordance with ***Applicable Regulations***."); *id.* §1.01 (***The***

***definition of "Applicable Regulations***": "As to any Mortgage Loan, ***all federal, state and local laws,***

***statutes, rules and regulations applicable thereto***."). If a Master Servicer or Servicer fails to do so,

an SEOT occurs. *Id.* §7.01(a)(ii).

53.    In order to properly, legally and "prudently" service the Mortgage Loans pursuant to

the Governing Agreements, the Master Servicers and Servicers must, *inter alia*: (1) ensure that the

payments by borrowers are properly and legally collected and promptly submitted to the Covered

Trusts; (2) ensure that timely and legal notices are sent to borrowers; (3) ensure that appropriate

insurance is in place when required; (4) ensure that accurate information about the Mortgage Loans is

maintained; (5) ensure that the Covered Trusts' "REO" properties[5] are properly maintained; and

(6) ensure that the Mortgage Loans are legally, prudently and properly modified or foreclosed when

necessary. *See generally* ABFC 2006-OPT1 PSA, Art. III, §§3.01-3.31.

54.    In addition, Master Servicers and Servicers also commit an SEOT whenever they

discover breaches of the Warrantors' R&Ws but fail to promptly notify Wells Fargo and the other

parties to the Governing Agreements. *See, e.g.,* ABFC 2006-OPT1 PSA §2.03(d) ("***Upon discovery***

***by the . . . Servicer . . . that any Mortgage Loan does not constitute a 'qualified mortgage' within***

***the meaning of Section 860G(a)(3) of the [Internal Revenue] Code, the party discovering such fact***

---

[5]    "REO" properties are "real estate owned" by the Covered Trusts. These properties typically
have been vacated or abandoned and foreclosed on or otherwise taken back from defaulted
borrowers.

*shall within two Business Days give written notice thereof to the other parties [to the Governing Agreements, including the Trustee].*").[6]

55.     Because the failure to properly service the Mortgage Loans, or report breaches of the Warrantors' R&Ws, is so harmful to plaintiff, the class and the Covered Trusts, when Wells Fargo becomes aware of an SEOT it is required by the Governing Agreements to act quickly.  Thus, upon becoming aware of an SEOT, Wells Fargo is required by the Governing Agreements and TIA: (1) to notify the offending Master Servicer or Servicer of its SEOT and require its cure (ABFC 2006-OPT1 PSA §7.01(a)(ii)); and (2) to give notice of uncured SEOTs to plaintiff and the class.  *Id.* §7.04(b); *see also* 15 U.S.C. §77ooo(b).  In addition, if the offending Master Servicer or Servicer does not cure the SEOT within the prescribed period of time, the Governing Agreements give Wells Fargo the power to terminate and replace the offending Master Servicer or Servicer, or take over its servicing duties.  *See* ABFC 2006-OPT1 PSA §§7.01(b), 7.02(a).

### 3.     Wells Fargo's Heightened Duty to Prudently Protect Plaintiff's and the Class's Interests as Though They Were Wells Fargo's Own Interests During an SEOT

56.     Moreover, once Wells Fargo becomes aware that a Master Servicer or a Servicer is committing an SEOT, Wells Fargo's duty of care to plaintiff and the class – under both the Governing Agreements and the TIA – is significantly increased.  In the case of a known SEOT, the Governing

---

[6]     *See also id.* §2.05(viii) (Servicer represents and warrants that "[n]o information . . . or report delivered to the Trustee by the Servicer in connection with the transactions contemplated hereby ***contains . . . any untrue statement . . . or omits . . . [any material information]***").  Here, with respect to the ABFC 2006-OPT1 Covered Trust, the Servicer was Option One Mortgage Corporation ("Option One"), which was also a Warrantor of the Mortgage Loans in the Covered Trust.  Thus, Option One did submit "untrue statement[s]" to Wells Fargo when it made the false R&Ws regarding the Mortgage Loans.  Under the Governing Agreements, Servicer/Warrantor Option One was, "[u]pon discovery" of its own R&W breaches, required to give notice of such breaches to Wells Fargo.  *See id.* §2.05(xvi) ("Upon discovery by . . . the Servicer . . . of a breach of any of the representations and warranties set forth in this Section 2.05, the party discovering such breach ***shall give prompt written notice . . . to the other parties [which includes Wells Fargo].***").

Agreements mandate that Wells Fargo "*shall exercise such of the rights and powers vested in it by [the Governing] Agreement, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs*." ABFC 2006-OPT1 PSA §8.01(a).[7]  In other words, when Wells Fargo learns of an SEOT, it must act essentially like a fiduciary to plaintiff and the class and "*shall exercise" all* of Wells Fargo's rights and powers as Trustee under the Governing Agreements – including the right to terminate or replace the offending Master Servicers/Servicers – and *prudently* protect plaintiff's and the class's interests as though those interests were Wells Fargo's very own.  *Id.*

57.     Moreover, this heightened duty is not limited or applied only to Master Servicers'/Servicers' SEOTs.  Instead, under the Governing Agreements, once an SEOT exists, "*[Wells Fargo] shall exercise" **all*** of the "*rights and powers vested in it by th[e] [Governing] Agreement[s]*," not just those pertaining to the Master Servicers/Servicers.  *Id.*  *Thus, Wells Fargo's heightened duty of care also requires it to prudently enforce the R&W claims against the Warrantors as though Wells Fargo were seeking to protect its own interests*.

### 4.    Wells Fargo's "Duty of Trust" to Avoid Conflicts of Interest with Plaintiff and the Class

58.     Wells Fargo also has a common law "duty of trust" to plaintiff and the class.  Wells Fargo, as "'the trustee[,] is at all times obligated to avoid conflicts of interest with the beneficiaries [of the Covered Trusts, i.e., plaintiff and the class].'"  *Knights of Columbus v Bank of N.Y. Mellon*, No. 651442/2011, slip op. at 15 (N.Y. Sup. Ct., N.Y. Cnty. Apr. 26, 2013) (quoting *AMBAC Indem. Corp. v. Bankers Trust Co*., 573 N.Y.S.2d 204, 206-08 (Sup. Ct. 1991)).  Under this duty to avoid conflicts of interest, Wells Fargo is prohibited from advancing its own interests at the expense of

---

[7]     As discussed *infra*, the TIA also requires the same heightened prudent person standard of care when a default of any kind occurs.  *See* 15 U.S.C. §77ooo(c).

plaintiff and the class, or benefitting from such actions at any time, including before, during and after any default. *Id.*

### 5.    Wells Fargo's Duties and Obligations Under the TIA

59.    The TIA imputes certain terms into the Governing Agreements to protect investors. The TIA imposes two sets of duties and obligations on Wells Fargo – one set "prior to default," and the other set "in case of default," much like the Governing Agreements.

60.    Under the TIA, prior to a default, a Trustee must perform "such duties as are specifically set out in" the Governing Agreements.  15 U.S.C. §77ooo(a)(1).  This reflects the Governing Agreements' pre-default provisions that require Wells Fargo to "perform such duties and only such duties as are specifically set forth in this Agreement."  ABFC 2006-OPT1 PSA §8.01(a). Thus, prior to a default, the TIA requires Wells Fargo to perform all the duties assigned to it by the Governing Agreements.

61.    In addition, under the TIA, a Trustee must "give to the indenture security holders . . . notice of all defaults known to the trustee, within ninety days after the occurrence thereof."  15 U.S.C. §77ooo(b) (citing 15 U.S.C. §77mmm(c)).  Thus, Wells Fargo is required to inform plaintiff and the class of any SEOTs *and any other "defaults," i.e., the Warrantors' breaches of their R&Ws, within 90 days*.

62.    Moreover, whenever Wells Fargo is aware of a default, it is required under the TIA (like the Governing Agreements) to exercise a fiduciary-like duty of care toward plaintiff and the class:  ***Wells Fargo is required to exercise "such of the rights and powers vested in it by [the Governing Agreements], and to use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs*."  15 U.S.C. §77ooo(c).  Thus, upon the occurrence of a Master Servicer or Servicer SEOT, or the Warrantors' R&W breaches alleged herein, Wells Fargo was obligated to exercise a fiduciary-like "prudent

person" duty of care to protect plaintiff and the class, and exercise *all* of the "rights and powers vested in it by" the Governing Agreements as though Wells Fargo was protecting its own interests.

63.     As set forth herein, Wells Fargo is liable to plaintiff and the class for failing to discharge the duties required of it by the Governing Agreements, the TIA and the common law.  In addition, all of Wells Fargo's duties mandated by the Governing Agreements, the common law, and the TIA as alleged herein were continuing in nature, and required Wells Fargo to continuously discharge such duties as long as Wells Fargo was Trustee of the Covered Trusts.  When Wells Fargo discovered R&W breaches by the Warrantors and learned of SEOTs by the Master Servicers/Servicers, as alleged herein, Wells Fargo was required to act prudently, quickly and continuously to protect plaintiff and the class.  Wells Fargo utterly failed to act as required, thereby breaching the Governing Agreements and common law, and violating the TIA, causing plaintiff, the class and the Covered Trusts to suffer over $740 million in damages.

**C.     The Covered Trusts Suffer from Serious Defects Because Wells Fargo Failed to Perform the Duties Required of It Under the Governing Agreements, the TIA and Common Law**

**1.     Wells Fargo Discovered No Later than April 13, 2011 that the Covered Trusts' Warrantors Breached Their R&Ws, Thus Triggering Wells Fargo's Duty to Enforce the R&W Claims**

64.     The Warrantors (and loan originators) to the Covered Trusts are set forth below:

**Covered Trusts' Warrantors**

| | Covered Trust | Warrantors | Loan Originators Identified in Prospectuses or by Credit Rating Agencies |
|---|---|---|---|
| 1. | ABFC 2006-OPT1 | • Bank of America, N.A. ("Bank of America")<br>• Option One<br>• Ownit Mortgage Solutions, Inc. ("Ownit")* | • Option One |
| 2. | SASC 2007-BC1 | • Lehman Brothers Holdings Inc. ("Lehman")<br>• Option One (and various of its affiliates) | • BNC Mortgage, Inc. ("BNC")*<br>• Option One<br>• Lehman Brothers Bank, FSB ("Lehman Bank")* |
| \* Ownit was partially owned and controlled by Merrill Lynch.  In addition, both BNC and Lehman Bank were owned and controlled by Lehman. | | | |

65.     The Covered Trusts were formed and settled in 2006 and 2007.  Shortly thereafter, the global financial collapse occurred.  Later, most blamed the collapse on the residential lending industry and "Wall Street," claiming that they had corrupted lending standards and caused pervasive lending misconduct to occur because of Wall Street's insatiable demand for mortgage loans to securitize.  ***The former Chairman of the Federal Reserve, Alan Greenspan, told Congress in October 2008 that "'[t]he evidence strongly suggests'" that "'excess demand from [RMBS] securitizers'" and "'subprime mortgage originations'" were "'undeniably the original source of the [global financial] crisis*.'"**  Facts then began to publicly emerge revealing endemic misconduct within the lending industry at the time the Mortgage Loans were originated, warranted and transferred to the Covered Trusts.  Many of the revelations disclosed that the Warrantors and loan originators to the Covered Trusts were involved in such misconduct, which would have rendered their R&Ws highly suspect.

### a. Prior to April 2011, Wells Fargo Learned that Some of the Warrantors Generally Made False R&Ws

66.     After the Covered Trusts were formed and their RMBS were sold to investors, numerous news stories were published, numerous private and governmental lawsuits were filed, and abundant congressional testimony was taken.  The foregoing events occurred in 2007 and 2008 and revealed that many of the Warrantors to the Covered Trusts routinely engaged in lending practices that might have rendered their R&Ws false as to the Mortgage Loans in the Covered Trusts.  A summary of the events are set forth in Appendix 1 to this Complaint.  These events revealed that lending misconduct was widespread during the time period when the Mortgage Loans were originated, warranted and transferred to the Covered Trusts.  The events further revealed that Warrantors and loan originators to the Covered Trusts had engaged in, or were accused of engaging in: widespread lending misconduct, including the issuance of extremely risky, highly questionable, predatory and/or illegal loans; making loans to borrowers who could not afford them; committing, or acquiescing in the commission of, mortgage fraud; and abandoning the underwriting guidelines they represented that they and other lenders followed.  *See* Appendix 1 hereto.  These events occurring during 2007 and 2008 also revealed that many of the Warrantors and loan originators to the Covered Trusts were routinely making loans based on applications that contained inflated appraisals, falsified borrower incomes, suspect qualifying documentation, and other fraudulent information.  *Id.*  Thus, Wells Fargo was put on notice in 2007 and 2008 that the Covered Trusts' Warrantors' R&Ws were suspect, although Wells Fargo did not discover at that time that the Warrantors had breached their R&Ws as to the Mortgage Loans in the Covered Trusts.

67.     However, by the beginning of 2009, it became clear that the Warrantors and the loan originators for the Covered Trusts had engaged in conduct that would have rendered at least several of the Warrantors' R&Ws about the Mortgage Loans in the Covered Trusts false, including R&Ws

that: (1) the borrowers of the Mortgage Loans had been evaluated to confirm they could afford the Mortgage Loans; (2) the Mortgage Loans were lawfully originated; (3) the Mortgage Loans were not "predatory" or "abusive"; (4) proper appraisals were performed; (5) the Mortgage Loans were originated pursuant to certain underwriting guidelines; (6) there were no fraud or misrepresentations in connection with the origination of the Mortgage Loans; and (7) all of the data provided about the Mortgage Loans was true and correct.

68.     This is so because, by the beginning of 2009, the widespread lending abuses described above, when coupled with the extremely poor performance of the Mortgage Loans in the Covered Trusts, made it clear that the Warrantors had materially breached their R&Ws concerning many Mortgage Loans in the Covered Trusts, thus causing Wells Fargo to have actual knowledge of such breaches. Indeed, by January 2009, the Covered Trusts had shockingly high Mortgage Loan default rates.[8] These historically unprecedented default rates were so incredibly high that it caused Wells Fargo to have actual knowledge that the Warrantors' R&Ws were false. After all, if the R&Ws were accurate, the Mortgage Loans would not have defaulted at rates that had never been seen before. The Covered Trusts had Mortgage Loan default rates that were much, much higher than historical averages. For example, *the ABFC 2006-OPT1 Covered Trust had Mortgage Loan default rates __in excess of 46%,__ while the SASC 2007-BC1 Covered Trust had default rates __in excess of 38%__*. The Covered Trusts had also already sustained extraordinarily heavy losses by January 2009 – *over $142 million in just a few years of existence* – another indicator that the Warrantors' R&Ws were breached, because if the R&Ws were true, such heavy losses would not have occurred. Wells Fargo was aware of all this information because it either prepared the monthly reports containing this

---

[8]     The term "default rates," as used in this Complaint, refers to the percentage of the Mortgage Loans' aggregate principal balance for each Covered Trust that is delinquent, in bankruptcy, in foreclosure or REO at that particular point in time.

information for the Covered Trusts or had access to such information.  The chart below sets forth the

Mortgage Loan default rates and the cumulative realized losses for the two Covered Trusts reported in

January 2009:

| Covered Trusts' Mortgage Loan Default Rates and Cumulative Realized Losses Reported in January 2009 | | |
|---|---|---|
| **Covered Trust** | **Mortgage Loan Default Rates** | **Cumulative Realized Losses** |
| ABFC 2006-OPT1 | 46.12% | $ 79,173,142.55 |
| SASC 2007-BC1 | 38.91% | $ 63,147,239.57 |
| **Covered Trusts' Total Realized Losses:** | | **$ 142,320,382.12** |

69.     Thus, as early as January 2009, Wells Fargo was aware that there were breaches of

the Warrantors' R&Ws as to many of the Mortgage Loans in the Covered Trusts that materially

affected the value of the Mortgage Loans and plaintiff's and the class's interests, although Wells

Fargo may not then have realized the full magnitude of the breaches.  Even so, additional events

occurred from February 2009 through April 2011 that repeatedly alerted Wells Fargo to the fact that

the Warrantors' R&Ws were materially false (and, thus, that the Warrantors were in breach).  Those

events also alerted Wells Fargo to new and additional Warrantor R&W breaches.  These events are

set forth in Appendix 2 hereto, and they revealed that the Warrantors and the loan originators to the

Covered Trusts had engaged in, *inter alia*, the routine abandonment of their underwriting guidelines,

the routine fabrication of borrower and loan information, massive breaches of their R&Ws, and

predatory and abusive lending.  *See* Appendix 2 hereto.[9]  These additional events caused Wells

Fargo to discover that the Warrantors to the Covered Trusts had breached their R&Ws concerning

the Mortgage Loans.

---

[9]     Indeed, in February 2009, investors filed a class action lawsuit alleging that Covered Trust Warrantor Lehman had lied about the Mortgage Loans in the SASC 2007-BC1 Covered Trust. Appendix 2 at 1 (first bullet point).

**b.**     **By April 13, 2011, Wells Fargo Absolutely Knew that**
**the Warrantors Had Breached Their R&Ws**
**Concerning the Mortgage Loans in the Covered Trusts**

70.     By April 13, 2011, Wells Fargo absolutely ***knew,*** without a doubt, that the Warrantors

had breached their R&Ws as to the Mortgage Loans in the Covered Trusts.  This is so primarily

because of two Government-issued reports – the "FCIC Report" and the "Senate Report," which were

released on January 27, 2011 and April 13, 2011, respectively.  First, on January 27, 2011, the 633-

page FCIC Report[10] was made available to the public, and between February 11 and 13, 2011, the

FCIC also made public nearly 2,000 pages of supporting documentary evidence and more than 300

witness interviews.  The FCIC Report was supported by voluminous evidence and confirmed in detail

---

[10]     The FCIC Report was authored by the Financial Crisis Inquiry Commission ("FCIC").  The
FCIC was created to "examine the causes, domestic and global, of the . . . financial and economic
crisis in the United States" that began in 2008.  The FCIC was established as part of the Fraud
Enforcement and Recovery Act (Public Law 111-21) passed by Congress and signed by the
President in May 2009.  The FCIC was composed of private citizens with experience in areas such as
housing, economics, finance, market regulation, banking and consumer protection.  The FCIC's
statutory mandate set out 22 specific topics for inquiry and called for the examination of the collapse
of major financial institutions that failed or would have failed if not for exceptional assistance from
the government.  These topics included, *inter alia*:

- fraud and abuse in the financial sector, including fraud and abuse toward consumers
  in the mortgage sector;

- federal and state financial regulators, including the extent to which they enforced, or
  failed to enforce, statutory, regulatory, or supervisory requirements;

- credit rating agencies in the financial system, including reliance on credit ratings by
  financial institutions and federal financial regulators, the use of credit ratings in
  financial regulation, and the use of credit ratings in the securitization markets;

- lending practices and securitization, including the "originate-to-distribute" model for
  extending credit and transferring risk;

- the legal and regulatory structure of the United States housing market;

- the legal and regulatory structure governing investor and mortgagor protection; and

- the quality of due diligence undertaken by financial institutions.

most if not all of the prior news accounts and events indicating that there were widespread lending abuses that resulted in widespread breaches of the Warrantors' R&Ws regarding the Mortgage Loans in the Covered Trusts.

71.     The FCIC Report confirmed the systemic breakdown in residential loan underwriting standards during the time period when the Mortgage Loans were originated, warranted and transferred to the Covered Trusts.  The FCIC Report described in detail the lending abuses that emerged and that were virtually universal during that time period.  Significantly, ***for the first time, the FCIC Report also revealed evidence of a pervasive, deliberate and intentional <u>fraud</u> that was being committed by RMBS securitizers with respect to mortgage loans being transferred to RMBS trusts like the Covered Trusts.***  ***<u>The FCIC Report revealed that RMBS trusts like the Covered Trusts were intentionally filled with Mortgage Loans that breached the Warrantors' R&Ws.  The FCIC Report also specifically identified several of the Covered Trusts' Warrantors and loan originators as being active participants in this fraud and conveyed that this fraudulent practice had occurred industry-wide</u>***.

72.     More specifically, the FCIC Report confirmed the extraordinary numbers of R&W breaches that had occurred with respect to mortgage loans that were originated at the same time the Covered Trusts' Mortgage Loans were originated.  The FCIC found, in light of the pervasive lending abuses that occurred during the period that "***in the years [thereafter], [loan] representations and warranties would prove to be inaccurate***."  FCIC Report at 77.

73.     The FCIC Report supported its findings by citing to evidence of massive R&W breaches.  The FCIC reported that various warrantors, ***including Covered Trust Warrantor Bank of America***, had breached their R&Ws concerning billions of dollars of mortgage loans they sold to "government-sponsored entities" Fannie Mae and Freddie Mac (sometimes collectively referred to

herein as the "GSEs").  The FCIC Report revealed that **Bank of America faced over $7.3 billion in R&W claims from the GSEs (which Bank of America ultimately settled by paying more than $2.5 billion)**.  FCIC Report at 225.  The FCIC Report also revealed that defendant **Wells Fargo faced $3.5 billion in repurchase claims** from the GSEs because of its pervasive R&W breaches.  *Id*. at 224-25.  The FCIC Report also stated that "during the three years and eight months ending August 31, 2010, **Freddie [Mac] and Fannie [Mae] required sellers to repurchase 167,000 loans totaling $34.8 billion**."  *Id*. at 224.  This showed that R&W breaches were endemic.  Indeed, the sheer magnitude of the repurchase claims reported by the FCIC indicated that warrantors and loan originators routinely issued false R&Ws in the normal course of their businesses.  The FCIC Report further reported that "[a]s of mid-2010, **court actions embroiled almost all major loan originators and underwriters [and] there were more than 400 lawsuits related to breaches of representations and warranties**."  *Id.* at 225. [11]  Given the FCIC Report's revelation of the pervasive falsity of R&Ws issued at the same time the Mortgage Loans were similarly warranted, Wells Fargo obtained knowledge that the Mortgage Loans in the Covered Trusts were similarly affected.

74.    The FCIC Report also specifically noted that RMBS trustees and servicers, such as Wells Fargo and the Covered Trusts' Master Servicers/Servicers, were essentially assisting warrantors in defending R&W claims by refusing to provide information to investors from which the breaches could be established.  *See* FCIC Report at 225.  The FCIC Report pointed to the situation of the GSEs and stated: "**Frustrated with the lack of information from the securities' servicers and trustees, in many cases large banks, on July 12, 2010, the GSEs through their regulator, the**

---

[11]    The FCIC Report further revealed that "private mortgage insurance" ("PMI") companies – which insured lenders against defaults by borrowers – were finding extensive breaches of R&Ws concerning mortgage loans they had insured.  FCIC Report at 225.  The FCIC reported that, "[a]s of October 2010, the seven largest PMI companies, which share 98% of the market, had rejected about 25% of the claims (or $6 billion of $24 billion) brought to them, **because of violations of origination guidelines, improper employment and income reporting, and issues with property valuation**."  *Id.*

*Federal Housing Finance Agency, issued 64 subpoenas to various trustees and servicers in transactions in which the GSEs lost money*." *Id.* Given the large number of subpoenas issued and the limited number of RMBS trustees and servicers, plaintiff alleges on information and belief that Wells Fargo and the Covered Trusts' Master Servicers/Servicers were among the parties subpoenaed for refusing to provide information to the GSEs. Of course, if Wells Fargo and the Master Servicers/Servicers were uncooperative, they were acting against the best interests of RMBS holders, *i.e.*, the GSEs, contrary to their mandate under RMBS governing agreements.

75.     *The FCIC also "conclude[d] that there was untrammeled growth in risky mortgages [and that] [u]nsustainable, toxic loans polluted the financial system and fueled the housing bubble," while government regulators "failed to . . . establish and maintain prudent mortgage lending standards and to protect against predatory lending*." FCIC Report at 101. The FCIC Report confirmed that "*[l]ending standards collapsed, and there was a significant failure of accountability and responsibility throughout each level of the lending system*." *Id.* at 125. In addition, testimony released in connection with the FCIC Report confirmed "***systemic***" misconduct which led to uniformly false loan R&Ws at the time the Mortgage Loans were originated, warranted and transferred to the Covered Trusts. In testimony given to the FCIC, former Clayton Holdings, Inc. ("Clayton") executive D. Keith Johnson testified that he had previously worked at lender Washington Mutual Bank ("WaMu") as well as at WaMu's subsidiary, Long Beach Mortgage Company ("Long Beach"), prior to working for Clayton. When Johnson moved to Clayton, he was exposed to the lending practices of nearly all of the lenders in the residential loan industry because Clayton was hired by nearly all of the RMBS securitizers to sample and test mortgage loans that securitizers were originating or purchasing from numerous lenders throughout the nation and then re-selling and transferring to RMBS trusts, including the Covered Trusts. WaMu and Long Beach were two of the

- 34 -

worst lenders during 2005-2007, as they routinely engaged in egregiously fraudulent lending practices, as documented in the Senate Report discussed *infra*. Johnson testified in an interview with the FCIC on September 2, 2010, concerning the lending practices he observed both before and after he worked at WaMu/Long Beach and Clayton:

> *I had a really unique perspective working in an environment that turned out bad loans, Long Beach, right?*  <u>*Then I go to Clayton and I'm dealing with the top factories in the world.  And you know what?  They're just like Long Beach. There's no difference.  I mean, this was not a one-off situation; it was systemic*</u>. *And* <u>*all of them*</u> *– a lot of them had quality control departments internal, but eventually* <u>*all of those internal quality control departments became compromised*</u>.

76.     The FCIC Report further revealed that, in 2005, federal examiners and agencies conducted a "confidential . . . study of mortgage practices at six lenders that together had originated . . . *almost half the national total*" of mortgage loans in 2005.  FCIC Report at 172. ***The study "'showed a very rapid increase in the volume of these irresponsible loans, very risky loans*,'"** according to Sabeth Siddique, then head of credit risk at the Federal Reserve Board's Division of Banking Supervision and Regulation. *Id*. **For "[a] large percentage of the[] loans" reviewed, "the underwriting standards . . . had deteriorated**."  *Id*.  The lenders involved in making these "'irresponsible loans, very risky loans,'" included Covered Trust Warrantor Bank of America, a Warrantor for the ABFC 2006-OPT1 Covered Trust, ***and defendant Wells Fargo itself***!  *Id.*

77.     The FCIC Report also confirmed that the Warrantors to the Covered Trusts were deeply involved in lending abuses which resulted in pervasive breaches of their R&Ws.  For example, the FCIC Report revealed that the ***U.S. Government's Office of the Comptroller of the Currency ("OCC") found that, after sampling 50 of Covered Trust Warrantor Bank America's loans, nearly one-third of the loans should have been reported to government authorities because of fraudulent or criminal activity***.  FCIC Report at 162.  In addition, the FCIC Report also stated that the Federal Reserve was warned as early as October 2004 that ***Covered Trust Warrantor Lehman "w[as]***

- 35 -

*providing such bad loans that the very survival of the firm[] was put in question," including numerous loans with "'false appraisals and false income.'"* *Id*. at 15.  Even defendant Wells Fargo was not immune.  ***Darcy Parmer, a former quality assurance and fraud analyst for defendant Wells Fargo, reported to the FCIC that she was aware of "'hundreds and hundreds and hundreds of fraud cases'"*** in Wells Fargo's home equity loan division.  *Id*. at 162.  She also told the FCIC that "***at least half the loans she flagged for fraud were nevertheless funded, over her objections***."  *Id.*

78.    The FCIC Report also confirmed the industry-wide use of falsely inflated appraisals during the period when the Mortgage Loans were originated, which also resulted in false R&Ws.  According to the FCIC Report, "***[a]s the housing market expanded, another problem emerged, in subprime and prime mortgages alike: inflated appraisals***."  FCIC Report at 91.  Testimony released with the FCIC Report confirmed the customary use of falsely inflated appraisals – which was a breach of the Warrantors' R&Ws – during the time the Mortgage Loans were originated.  Jim Amorin, the President of the Appraisal Institute, testified to the FCIC on April 23, 2009, that "***[i]n many cases, appraisers are ordered or severely pressured to doctor their reports and to convey a particular, higher value for a property, or else never see work from those parties again. . . . [T]oo often state licensed and certified appraisers are forced into making a 'Hobson's Choice***.'"

79.    ***<u>Most importantly, the FCIC Report specifically revealed for the first time that it was a customary and regular business practice of RMBS securitizers, including some of the Warrantors and loan originators to the Covered Trusts, to deliberately transfer thousands of mortgage loans that did not comply with applicable laws or underwriting guidelines (and therefore breached the R&Ws made about them) into RMBS trusts offered and sold to investors.</u>  This widespread intentionally fraudulent practice occurred during the exact same time period when the Mortgage Loans were originated, warranted and transferred to the Covered Trusts***.  This startling revelation –

that RMBS securitizations like the Covered Trusts had been ***deliberately filled with loans that breached their R&Ws*** – was based on Clayton's "Trending Reports," which were provided to the FCIC.  As previously alleged, Clayton was hired by virtually every RMBS securitizer – ***including several Warrantors to the Covered Trusts*** – during 2006 and 2007 to perform due diligence on mortgage loans that were being securitized, warranted and transferred to RMBS trusts.  Clayton tested samples of the loans during the period from January 2006 through June 2007 to determine whether the loans complied with the applicable lending laws and underwriting guidelines (laws and guidelines that were designed to prevent the making of loans to borrowers who could not afford them), or were otherwise defective.  ***Clayton's Trending Reports revealed that large percentages of the sampled loans for several of the Warrantors and loan originators did not comply with lending laws or the applicable underwriting guidelines, or were otherwise defective, i.e., the loans were in breach of R&Ws made about them***.  ***Incredibly, even after being informed of the specific defective loans, these Warrantors and loan originators to the Covered Trusts did not remove all of the defective loans, but rather, "waived" a large portion of them in, i.e., transferred the breaching loans into the RMBS trusts, warranted them as being fine and then sold them to investors***!  These same Warrantors and loan originators also did no further testing of the remaining loans in the pools – thousands of loans – ***even though it was highly probable from a statistical perspective that they would have the same defect rates as the sampled loans***.  Instead, they bought the unsampled loans sight unseen, falsely warranted that the loans were free of defects, and dumped them into the RMBS trusts they were selling to investors like plaintiff and the class.  The following chart summarizes the FCIC's findings concerning some of the Covered Trusts' specific Warrantors and loan originators and their deliberate inclusion of defective loans breaching their R&Ws into RMBS trusts:

| Covered Trust Loan Warrantor and/or Loan Originator Identified by FCIC Report | Covered Trust Involving Identified Warrantor or Loan Originator | Percentage of Loans in Test Samples that Breached R&Ws | Percentage of Loans that Breached R&Ws but Were "Waived" into the RMBS Trusts and Sold to Investors |
|---|---|---|---|
| Bank of America | ABFC 2006-OPT1 | 30% | 27% |
| Ownit (through its part owner Merrill Lynch) | ABFC-2006-OPT1 | 23% | 32% |
| Lehman | SASC 2007-BC1 | 26% | 37% |

80. The FCIC Report, via the Clayton Trending Reports, also made it clear that the inclusion of defective, breaching mortgage loans into RMBS trusts was not limited only to those warrantors and loan originators specifically identified in the FCIC Report. Rather, the FCIC Report made clear that this fraudulent behavior was ubiquitous. Clayton's Trending Reports included information about "*All Others*" that originated loans for RMBS trusts, or in other words, those lenders and warrantors that had not been specifically identified in Clayton's reports. Such information showed that all the other unidentified loan originators and warrantors had also deliberately transferred defective mortgage loans into RMBS trusts. On information and belief, and based on the evidence in the FCIC Report (including the Clayton Trending Reports and D. Keith Johnson's testimony that these abuses were "systemic"), plaintiff alleges that all of the Covered Trust Warrantors and loan originators were intentionally transferring defective mortgage loans into RMBS trusts – including the Covered Trusts – which breached their R&Ws. Indeed, the FCIC Report revealed that false R&Ws permeated virtually every RMBS trust created during the time period the Covered Trusts were formed. Thus, Wells Fargo learned from the FCIC Report (and also later, from the April 2011 Senate Report) that the Warrantors had breached their R&Ws concerning the Mortgage Loans in the Covered Trusts, particularly after comparing the soaring default rates of the

- 38 -

Mortgage Loans in the Covered Trusts in April 2011 to historical averages, and from the Covered Trusts' huge losses by then. *See infra* ¶87 (chart).

81.     On April 13, 2011, the Senate Report was publicly released.[12]  The Senate Report confirmed (again) for Wells Fargo that the lending industry in general, and the Warrantors to the Covered Trusts in particular, had uniformly breached their R&Ws.  The 635-page Senate Report was supported by thousands of pages of documentary evidence and the testimony of numerous witnesses subpoenaed by the Senate Subcommittee on Investigations.  The Senate Report not only confirmed the FCIC Report's findings, but also provided amplified additional evidence that the Warrantors had breached their R&Ws.  The Senate Report also provided an inside look at a lending industry run amok during the period the Mortgage Loans were originated, warranted and transferred to the Covered Trusts, exposing an industry that uniformly and intentionally churned out tens of thousands of defective mortgage loans in breach of the R&Ws made about them, leading to the inescapable conclusion that the Mortgage Loans in the Covered Trusts suffered from extensive breaches of the Warrantors' R&Ws.

82.     First, the Senate Report re-confirmed that from 2005 through 2007 "*[l]enders introduced new levels of risk into the U.S. financial system by selling . . . home loans with . . . poor underwriting*," and that "*a host of financial institutions . . . knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans*."  Senate Report at 12, 50.

---

[12]     The Senate Report was issued by U.S. Senators Carl Levin and Tom Coburn for the United States Senate Permanent Subcommittee on Investigations concerning their inquiry into key causes of the financial crisis.  The Senate Report examined four aspects of the financial crisis: (1) high-risk mortgage lending; (2) regulatory inaction; (3) inflated credit ratings that misled investors; and (4) the role played by investment banks in creating and selling structured finance products such as RMBS that foisted billions of dollars of losses on investors while the banks profited from betting against the mortgage market.

83.     In addition, due in part to a lack of proper regulatory oversight by the Government, the Senate Report also found that, shortly after the Mortgage Loans in the Covered Trusts were originated, warranted and transferred to the trusts, there existed

> *a mortgage market saturated with risky loans, and financial institutions [and investors] that were supposed to hold predominantly safe investments . . . instead held portfolios* <u>*rife with high risk, poor quality mortgages*</u>*.  When those loans began defaulting in record numbers and mortgage related securities plummeted in value, financial institutions around the globe suffered hundreds of billions of dollars in losses, triggering an economic disaster*.

Senate Report at 5.

84.     These conclusions caused Wells Fargo to know that the Covered Trusts were also "*rife with high risk, poor quality mortgages*" in breach of the Warrantors' R&Ws.

85.     The Senate Report also identified *Covered Trust Warrantor and loan originator Option One – which had provided R&Ws for Mortgage Loans in both Covered Trusts – and pointed out that investment bank Goldman Sachs had identified breaches of Option One's R&Ws and "recovered substantial funds" from it for such breaches*.  Senate Report at 487 & n.2053.  The Senate Report also revealed that *Deutsche Bank had identified Option One as a "crap" lender that issued defective loans*.  *Id.* at 339 & n.1285.

86.     The Senate Report made it exceedingly clear that the Mortgage Loans in the Covered Trusts were subjected to the same misconduct.  Therefore, by no later than April 13, 2011, the date of the Senate Report's release, and based on the tsunami of previously reported information, including the FCIC Report and the volumes of evidence it disclosed, Wells Fargo "discovered," as that term is used in the Governing Agreements, that there were pervasive and material breaches of the Warrantors' R&Ws concerning thousands of Mortgage Loans within the Covered Trusts.

87.     Further supporting the conclusion that Wells Fargo discovered by April 2011 that thousands of Mortgage Loans in the Covered Trusts breached the Warrantors' R&Ws is the fact that,

by that time, the Mortgage Loans in the Covered Trusts had continued to default at rates never seen

before, and the Covered Trusts' losses were skyrocketing to levels that could only have been caused

by massive breaches of the Warrantors' R&Ws.  Indeed, by April 2011, the Covered Trusts'

Mortgage Loan default rates ranged from 47% to over 53%.[13]  In addition, the Covered Trusts' losses

had mushroomed from approximately $142 million in January 2009 (*see supra* ¶68), to **over $456**

**million by April 2011**, due in large part to Wells Fargo's failure to enforce the Warrantors' R&W

breach obligations.  These default rates and losses were known to Wells Fargo because it either

prepared the monthly reports containing this information or it had access to such information.  The

Covered Trusts' default rates and losses reported in April 2011 were as follows:

| Covered Trusts' Mortgage Loan Default Rates and Cumulative Realized Losses Reported in April 2011 | | |
|---|---|---|
| **Covered Trust** | **Mortgage Loan Default Rates** | **Cumulative Realized Losses** |
| ABFC 2006-OPT1 | 53.02% | $235,483,975.68 |
| SASC 2007-BC1 | 47.42% | $221,363,447.14 |
| **Covered Trusts' Total Realized Losses:** | | **$456,847,422.82** |

88.     Even after April 2011, there were hundreds of additional events that came to light that

publicly and repeatedly re-informed Wells Fargo that the Warrantors had systematically breached

their R&Ws concerning the Mortgage Loans in the Covered Trusts, and further educated Wells

Fargo about new and additional breaches.  These events are far too numerous to list in this

---

[13]     It should be noted that the foregoing Mortgage Loan default rates actually *understate the aggregate default rates for all of the Mortgage Loans that were originally within the Covered Trusts*.  To explain, the foregoing default rates are derived from the monthly Covered Trust reports which disclose the default rates *for only those Mortgage Loans still remaining within the Covered Trusts*.  In other words, these default rates *do not include all those Mortgage Loans that were originally within the Covered Trusts that had been in default and were already liquidated and therefore removed from the Covered Trusts before the specific report was issued*.  Thus, the actual aggregate default rates for all of the Mortgage Loans that were originally in the Covered Trusts is actually *much, much higher*.

Complaint, but they all corroborated the fact that the Warrantors had breached their R&Ws concerning thousands of Mortgage Loans in the Covered Trusts.[14]

> ### c. Specific Claims Made About the Specific Mortgage Loans in the Specific Covered Trusts Caused Wells Fargo to Discover Breaches of the Warrantors' R&Ws

89.     Two lawsuits also specifically informed Wells Fargo of breaches of the Warrantors' R&Ws as to Mortgage Loans in the two Covered Trusts.  First, on February 23, 2009, investors filed a lawsuit alleging that Covered Trust Warrantor Lehman and others had made misrepresentations about the Mortgage Loans in the SASC 2007-BC1 Covered Trust.  *See* Complaint, *In re Lehman Bros. Secs. and ERISA Litig.*, Nos. 09 MD 2017 (LAK) and 08-cv-6762 (S.D.N.Y. Feb. 23, 2009). The complaint in that action alleged that Covered Trust Warrantor Lehman and other defendants had falsely represented that the Mortgage Loans in the SASC 2007-BC1 Covered Trust were originated pursuant to specific underwriting guidelines.  This lawsuit put Wells Fargo on direct notice and caused it to discover that Lehman (and potentially Option One, the other Warrantor for this Covered Trust) had breached its R&Ws as to numerous Mortgage Loans in the SASC 2007-BC1 Covered Trust.

90.     In addition, on September 2, 2011, a lawsuit was filed by purchasers of the RMBS in the ABFC 2006-OPT1 Covered Trust.  The lawsuit alleged that numerous misrepresentations had been made about the specific Mortgage Loans in that specific Covered Trust by Covered Trust Warrantor Bank of America and others.  *See* Complaint, *Fed. Hous. Fin. Agency v. Bank of America*

---

[14]     For example, in August 2014, ***Covered Trust Warrantor Bank of America agreed to pay over $16 billion to the U.S. Department of Justice*** to settle charges that Bank of America and its subsidiaries – which included Merrill Lynch, and thus ***Covered Trust Warrantor Ownit*** (which was partially owned by Merrill Lynch) – misled investors about the mortgage loans in RMBS trusts sold to investors.  As part of the settlement, ***Bank of America admitted that data about the loans it provided to investors was false, and that it had misrepresented that the loans were originated in conformance with specific underwriting guidelines***.  These admissions by Bank of America revealed that it systematically breached its R&Ws.

*Corp., et al.*, No. 11-cv-6195 (S.D.N.Y. Sept. 2, 2011). The lawsuit alleged that Bank of America and others had misrepresented that numerous Mortgage Loans in the ABFC 2006-OPT1 Covered Trust had been originated pursuant to specific underwriting guidelines, and that Bank of America and others had falsified data about such Mortgage Loans. These allegations indicated that the R&Ws about the Mortgage Loans in the ABFC 2006-OPT1 Covered Trust made by Warrantor Bank of America (and probably Ownit and Option One, the other Warrantors to this Covered Trust) were false, and thus they had breached their R&Ws.

91.     The foregoing lawsuits, involving the ***specific Covered Trusts at issue herein***, the ***specific Mortgage Loans within the Covered Trusts***, and the ***specific Warrantors*** making R&Ws about those Mortgage Loans, caused Wells Fargo to discover that the Warrantors had breached their R&Ws as to the Mortgage Loans in the two Covered Trusts.

> **d.    Wells Fargo Also Learned of the Warrantors' R&W Breaches from the Bankruptcies of Mortgage Loan Borrowers**

92.     In addition to all of the foregoing information that Wells Fargo was aware of, Wells Fargo was also aware of additional ***specific information about the specific Mortgage Loans in the specific Covered Trusts*** from the bankruptcies of the borrowers of the Mortgage Loans, which also indicated that the Warrantors had breached their R&Ws. This information, which Wells Fargo learned over time, as Mortgage Loan borrowers steadily went bankrupt after the Covered Trusts were established, indicated that fraud or misrepresentations had occurred in connection with the origination of many of the Mortgage Loans, that borrowers were given Mortgage Loans they could not afford, that the Mortgage Loans were not originated in accordance with the applicable underwriting guidelines, and that the Mortgage Loans were not legally originated, as either predatory lending or mortgage fraud had occurred. Plaintiff's counsel has obtained information concerning Mortgage Loans within the Covered Trusts from bankruptcy filings by the borrowers. Wells Fargo

was aware of this information since it made appearances in, monitored, and/or made claims or filed or defended actions in the bankruptcies by or against the Mortgage Loan borrowers. This information from the bankruptcies, as set forth below, shows that the Warrantors breached their R&Ws. The cumulative effect of this information over time caused Wells Fargo to discover, in or about April 2011, that the Warrantors had breached their R&Ws as to numerous Mortgage Loans within the Covered Trusts.

**(1)      ABFC 2006-OPT1 Covered Trust**

93.      A borrower obtained a Mortgage Loan for $351,500 in 2006 from Warrantor and loan originator Option One, which was contained within the ABFC 2006-OPT1 Covered Trust. The borrower had income of $4,000 per month in 2006 – the year he obtained the Mortgage Loan – according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $4,675, far in excess of the borrower's monthly income***. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay his Mortgage Loan, and his Mortgage Loan was not originated under any lender's underwriting guidelines, contrary to Option One's R&Ws. The foregoing also indicates that the Mortgage Loan was made in violation of predatory or abusive lending laws since the borrower clearly could not afford the Mortgage Loan, also contrary to Option One's R&Ws. In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan in the first place appears to also violate mortgage fraud laws, and contradicts Option One's R&W that there was no fraud or misrepresentations in connection with the Mortgage Loan, as well as Option One's R&W that the Mortgage Loan data it provided was true and correct. The fact that the foregoing breaches of Warrantor Option One's

R&Ws occurred is corroborated by the additional fact that the borrower declared bankruptcy after obtaining the Mortgage Loan at issue.

**(2)     SASC 2007-BC1 Covered Trust**

94.     Two borrowers obtained a Mortgage Loan for $360,000 in 2006 from Warrantor and loan originator Option One, which was contained within the SASC 2007-BC1 Covered Trust. ***The borrowers had income of $2,916 per month in 2006 according to their sworn bankruptcy filings. However, the borrowers' monthly debt payments were at least $5,250, far in excess of the borrowers' monthly income***. The borrowers' monthly debt payments were in addition to the borrowers' monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, these borrowers could not afford to repay their Mortgage Loan, and the Mortgage Loan was not originated under any lender's underwriting guidelines, contrary to Warrantor Option One's R&Ws. The foregoing also appears to show that the Mortgage Loan was made in violation of predatory lending laws, also contrary to Option One's R&Ws, since the borrowers clearly could not afford the Mortgage Loan. In addition, the apparent misrepresentation of the borrowers' income and/or debts that must have occurred to "qualify" the borrowers for the Mortgage Loan in the first place appears to also violate mortgage fraud laws, and contradicts Option One's R&W that there was no fraud or misrepresentation in connection with the Mortgage Loan, as well as Option One's R&W that the Mortgage Loan data it provided was true and correct. The fact that the foregoing breaches of Option One's R&Ws occurred is corroborated by the additional fact that the borrowers declared bankruptcy after obtaining the Mortgage Loan at issue.

95.     As the foregoing demonstrates, Mortgage Loans in the Covered Trusts were extended to borrowers who, in light of their extremely heavy pre-existing debt loads and/or lack of income, clearly had no ability to repay the Mortgage Loans. The foregoing information also reveals that: (1) the Mortgage Loans were obtained by providing falsified information; (2) lenders ignored their stated

underwriting guidelines; and (3) illegal mortgage fraud and/or predatory or abusive lending by either lenders or borrowers, or both, had occurred.  These events revealed breaches of the Warrantors' R&Ws to Wells Fargo.

96.     The foregoing examples are not isolated or extreme, or aberrations or outliers.  In fact, there are a large number of Covered Trust Mortgage Loan borrowers that went bankrupt or defaulted on their Mortgage Loans under similar circumstances.  The cumulative effect of all these bankruptcies occurring over time was that Wells Fargo discovered widespread breaches of the Warrantors' R&Ws by April 2011.

97.     Despite Wells Fargo's discovery and actual knowledge of systemic R&W breaches concerning Mortgage Loans in the Covered Trusts by the Warrantors by no later than April 2011, Wells Fargo did not notify the Warrantors and other parties to the Governing Agreements of the breaches.  Nor did Wells Fargo enforce the Warrantors' obligations to cure, substitute or repurchase thousands of defective Mortgage Loans as required by the Governing Agreements and the TIA.  Moreover, Wells Fargo's continuing failure to act, after learning of the breaches, and of new breaches, has resulted in Wells Fargo engaging in both a continuing breach of the Governing Agreements and TIA, as well as numerous additional new breaches of its duties under the Governing Agreements and the TIA after April 2011.  Wells Fargo's breaches have caused the loss of hundreds of millions of dollars in meritorious R&W claims that are now barred by the statute of limitations.  By these breaches, Wells Fargo has caused plaintiff, the class and the Covered Trusts to suffer massive damages.

### 2.     Wells Fargo Had Actual Knowledge of SEOTs No Later than April 13, 2011, Thus Triggering Its Duties to Act Under the Governing Agreements and the TIA

98.     As previously alleged, Wells Fargo was also required by the Governing Agreements and the TIA to act as a quasi-fiduciary whenever it became aware of SEOTs by the Covered Trusts'

Master Servicers or Servicers.  That is, whenever the Master Servicers/Servicers failed to ensure that the Mortgage Loans in the Covered Trusts were being serviced "prudent[ly]" and in accordance with the law an SEOT occurred.  In addition, an SEOT occurred whenever Wells Fargo learned that the Master Servicers/Servicers knew of Warrantor R&W breaches but did not report them to Wells Fargo. When Wells Fargo learned of these SEOTs, it was required to notify the offending Master Servicer or Servicer and require a cure of the default, and also notify plaintiff and the class of unsecured SEOTs, and take other actions if necessary.  ***Most importantly, Wells Fargo was required to essentially act as a fiduciary for plaintiff and the class when an SEOT occurred, and exercise all of its powers under the Governing Agreements as a "prudent person" would, to seek to protect plaintiff's and the class's interests as if they were Wells Fargo's very own interests.***  These powers included terminating and replacing the offending Master Servicer or Servicer or taking over its responsibilities. However, as alleged more fully below, even though Wells Fargo obtained actual knowledge of rampant Master Servicer/Servicer SEOTs with respect to the Mortgage Loans in the Covered Trusts by no later than April 13, 2011, Wells Fargo breached the Governing Agreements and violated the TIA by failing to take any of the actions required of it or allowed by the Governing Agreements and the TIA.  Moreover, even though numerous new SEOTs have occurred after April 13, 2011, Wells Fargo has continued to fail to act, and thus has committed numerous additional breaches of its duties under the Governing Agreements and the TIA.

99.     The Master Servicers and Servicers to the Covered Trusts as designated in the Governing Agreements, and their successors, if any, are set forth in the chart below.  To plaintiff's knowledge, Wells Fargo has not notified any of these Master Servicers or Servicers and demanded that they cure their SEOTs.  Nor have any of these Master Servicers or Servicers been terminated or

replaced by Wells Fargo due to any of the SEOTs alleged herein.  Wells Fargo has also failed to

notify plaintiff and the class of such SEOTs:

**Covered Trusts' Master Servicers and Servicers**

| Covered Trust | Master Servicer (and successors, if any) | Original Servicer(s) (and successors, if any) |
|---|---|---|
| ABFC 2006-OPT1 | • None | • **Option One** (Option One's servicing rights were acquired by **American Home Mortgage Servicing, Inc. ("AHM Servicing")** in May 2008; in 2012 AHM Servicing's servicing rights were acquired by **Ocwen**.)* |
| SASC 2007-BC1 | • **Aurora Loan Services LLC ("Aurora")** (Aurora was acquired by **Nationstar Mortgage LLC ("Nationstar")** in 2012) | • **JP Morgan Chase Bank National Association ("JPMorgan")**<br>• **Option One** (until May 2008); **AHM Servicing** (from May 2008 until 2012); **Ocwen** (from 2012 to present)<br>• **Aurora** (acquired by **Nationstar** in 2012) |
| * "Ocwen" refers to Ocwen Financial Corporation and all of its affiliates, subsidiaries and predecessor companies, including Ocwen Federal Bank FSB and Ocwen Loan Servicing LLC. | | |

100.     Due to the large number of defective Mortgage Loans in breach of the Warrantors'

R&Ws that remained in the Covered Trusts because of Wells Fargo's failures to enforce the

Warrantors' obligations to cure, substitute or replace them, a flood of defaults started occurring in

late 2007 and early 2008, which in turn led to a flood of subsequent foreclosure proceedings.  Under

the Governing Agreements, the Master Servicers/Servicers were responsible for instituting and

prosecuting foreclosures on behalf of Wells Fargo and were required to conduct such foreclosures

*legally and "prudent[ly]."*  Another RMBS trustee has characterized an RMBS trustee's and the

master servicers'/servicers' duties with respect to servicing and foreclosing on loans as follows: "***our

legal duty [is] to protect the interests of***" RMBS investors.

**a.    Shortly After the Covered Trusts Were Formed, Wells Fargo Became Aware of Widespread Loan Servicing Abuses, and by the End of October 2010, Wells Fargo Learned that the Master Servicers and Servicers Were Committing SEOTs as to the Mortgage Loans in the Covered Trusts**

101.    Beginning in late 2009 and continuing thereafter, Wells Fargo became aware of several loan servicing issues involving some of the Covered Trust Master Servicers/Servicers.  For example, in November 2009, it was reported that *__Covered Trust Servicer AHM Servicing, which serviced Mortgage Loans for both of the Covered Trusts, had reached a settlement with the Commonwealth of Massachusetts, wherein it agreed to modify thousands of defaulting Mortgage Loans that were originated and initially serviced by Covered Trust Servicer (and Warrantor) Option One__*.

102.    On August 2, 2010, *__Covered Trust Master Servicer/Servicer Aurora – a Master Servicer and Servicer for the SASC 2007-BC1 Covered Trust__ – was sued in a class action alleging that Aurora duped borrowers into paying over $100 million to Aurora through its use of false promises of loan modifications and/or an opportunity to cure their defaults.  After receiving the money, Aurora reneged on its promises and foreclosed on the borrowers without any such modifications or opportunities to cure*.  *See* Complaint, *Chao, et al. v. Aurora Loan Serv., LLC*, No. 10-cv-03383-PVT (N.D. Cal. Aug. 2, 2010).

103.    In addition, on August 9, 2010, *__a Florida judge found that JPMorgan – a Servicer for the SASC 2007-BC1 Covered Trust – and its lawyers had "committed fraud on th[e] Court" in connection with a foreclosure proceeding__*.  Order at 5, *JP Morgan Chase Bank, N.A. v. Pocopanni, et al.*, No. 16-2008-CA-3989 (Fla. Cir. Ct., Duval Cnty. Aug. 9, 2010).  The court, after taking live testimony, found that JPMorgan and its attorneys knowingly and falsely represented to the court that JPMorgan owned and held the note and mortgage, when in fact JPMorgan was only the servicer of

the loan. ***The court held that JPMorgan "made representations to this Court . . . that are known to be false" and that such misrepresentations "amount[ed] to a 'knowing deception' . . . and are therefore fraud."*** *Id.* The court dismissed JPMorgan's complaint with prejudice and invited the defendant borrowers to amend their motion for attorneys' fees and costs.

104.     Furthermore, on August 30, 2010, the Attorney General of Texas charged ***AHM Servicing – a Servicer for both of the Covered Trusts*** – "***with using illegal debt collection tactics and improperly misleading struggling homeowners***." The Attorney General's news released stated:

> *According to state investigators, AHMS [i.e., AHM Servicing] collections agents used aggressive and unlawful tactics to collect payments from Texas homeowners who had difficulty meeting their payment obligations. The defendant also failed to credit homeowners who properly submitted their payments on time*.

> *In other cases, AHMS agents falsely claimed that homeowners did not make payments so the agents could justify profitable late fees or escrow accounts. The defendant also failed to properly credit homeowners after AHMS agents withdrew funds from the homeowners' checking accounts.  Because of the defendant's unlawful conduct, homeowners defaulted on their loans, leading to foreclosure proceedings*.

> Additionally, the defendant claimed to have a "Home Retention Team" to assist distressed homeowners.  Many customers found that AHMS could not qualify homeowners and that they were of no help to halt the foreclosure process.  *Some homeowners who actually obtained loan modifications found that their monthly payments increased rather than decreased, which worsened their problem with foreclosure*.

> *Today's enforcement action charges AHMS with multiple violations of the Texas Debt Collection Act and the Texas Deceptive Trade Practices Act (DTPA). The State is also seeking civil penalties of up to $20,000 per violation of the DTPA*.

105.     The foregoing events put Wells Fargo on notice that most of the Covered Trust Master Servicers and Servicers were engaged in business practices that amounted to SEOTs, although at that time Wells Fargo did not yet have sufficient knowledge to conclude that SEOTs were occurring as to the specific Mortgage Loans in the Covered Trusts.

- 50 -

106.     In addition, starting in 2008 and 2009, all RMBS trustees, including Wells Fargo, were beginning to experience serious foreclosure issues.  Wells Fargo and the other RMBS trustees were having difficulties foreclosing on defaulted mortgage loans because of widespread loan servicing errors and deliberate misconduct.  Courts were denying, delaying, halting, dismissing and even invalidating many foreclosures because of egregiously shoddy foreclosure practices or fraudulent conduct by loan servicers.  Because of these improper practices, RMBS trustees were having difficulties establishing that they owned or possessed the notes and mortgages on behalf of the RMBS trustees at the time they filed suit or foreclosed, as required by law.  In addition, RMBS trustees were facing long delays in foreclosures caused by faulty, or in many cases, false or fraudulent mortgage documents created and filed by the master servicers and servicers, as well as their assertions of erroneous or deliberately false facts.  Over time, and by the end of October 2010, it became apparent that loan servicers, including the Covered Trusts' Master Servicers and Servicers, were systematically filing fraudulent affidavits that were not legally notarized in many cases, and were also creating bogus mortgage and note assignments, as well as filing foreclosure complaints and other court documents that contained blatantly false allegations and assertions.  Such loan servicing practices were clearly not proper, legal or "prudent," as required by the Governing Agreements.

107.     In fact, Wells Fargo has experienced hundreds, if not thousands, of denials, dismissals, reversals, delays and invalidations of its foreclosure proceedings filed by its servicers, and numerous motions for relief from bankruptcy stays being denied or delayed, because of misconduct by its loan servicers.  By the end of October 2010, it was apparent that Wells Fargo's loan servicers, including the Covered Trusts' Master Servicers and Servicers, were not foreclosing legally or "prudent[ly]" as required by the Governing Agreements.  Instead, they were engaging in slipshod behavior, committing grossly negligent or intentional errors, filing defective documents, submitting patently

insufficient or false evidence, making inconsistent or deliberately fraudulent representations in

pleadings and affidavits, and otherwise engaging in illegal, improper and deceptive behavior,

including ignoring and violating court orders, violating foreclosure and bankruptcy laws, and acting

in bad faith, all of which were SEOTs.[15]

---

[15]     *See, e.g.*, *In re Nosek,* 386 B.R. 374, 383 (Bankr. D. Mass. 2008) (***Wells Fargo and its servicer sanctioned $250,000 each for "repeated misrepresentations" and other misconduct by servicer***), *aff'd in part and vacated in part*, 406 B.R. 434 (D. Mass. 2009) (sanctions vacated as to Wells Fargo but upheld as to servicer); *Wells Fargo Bank, N.A. v. Farmer*, 867 N.Y.S.2d 21, 2008 N.Y. Misc. LEXIS 3248, at *15 (Sup. Ct. 2008) (***Wells Fargo's renewed motion for order of reference denied with prejudice, as Wells Fargo and its servicer failed to provide information ordered by the court***); *Wells Fargo Bank, N.A. v. Reyes*, 867 N.Y.S.2d 21, 2008 N.Y. Misc. LEXIS 3509, at *4, *15 (Sup. Ct. 2008) (***The court dismissed Wells Fargo's foreclosure complaint with prejudice and set a hearing on sanctions because of Wells Fargo's counsel's "'frivolous conduct*.'" Wells Fargo falsely alleged in a verified complaint that the mortgage was assigned to it when in fact Wells Fargo was "not the owner and has never been the owner of the REYES' Mortgage***."); *Wells Fargo Bank, N.A. v. Hunte*, 910 N.Y.S.2d 409, 2010 Misc. LEXIS 810, at *5, *16 (Sup. Ct. 2010) (***Wells Fargo's foreclosure complaint dismissed with prejudice and hearing set to determine whether to sanction Wells Fargo's counsel for engaging in "frivolous conduct;" court also denied Wells Fargo's motion for judgment of foreclosure and sale with prejudice because the borrower had already paid the loan off and Wells Fargo "executed a satisfaction of the instant mortgage more than ten months ago***"); *Newitt v. Wells Fargo Bank, N.A.,* No. 213-2011-CV-00173, 2011 N.H. Super. LEXIS 60, at *11 (Super. Ct. July 14, 2011) (***court grants borrowers' petition to stay Wells Fargo's foreclosure of a Mortgage Loan in the ABFC 2006-OPT1 Covered Trust because of what appears to be either an obviously defective or potentially fraudulent assignment*** from an assignor which had previously sworn under oath that it owned no mortgage loans which it could have assigned at the time of the assignment); *Wells Fargo, et al. v. Michelotti*, No. 11-0015FD (Or. Cir. Ct., Hood River Cnty. Sept. 8, 2011) (***judgment entered against Wells Fargo in ejectment action involving Covered Trust Servicer AHM Servicing because of suspect and invalid assignments of trust deed***); *Rigby v. Wells Fargo Bank, N.A.,* 84 So. 3d 1195, 1196 (Fla. Dist. Ct. App. 2012) (***summary judgment in favor of Wells Fargo reversed***; ***Wells Fargo failed to provide any evidence establishing it was assigned the note before or at the time it commenced the foreclosure action as required by law***; in fact, Wells Fargo produced evidence showing that it was not assigned the note until ***after*** it filed the foreclosure action; in addition, affidavits by Wells Fargo did not prove Wells Fargo held note at commencement of action, as required by law); *Drouin v. Am. Home Mortg. Servicing, Inc.,* No. 11-cv-596-JL, 2012 U.S. Dist. LEXIS 69549, at *11-*13 (D.N.H. May 18, 2012) (citing the *Newitt* action, *supra*, and ***denying Wells Fargo's motion to dismiss action***; like the *Newitt* case, ***Wells Fargo and Covered Trust Servicer AHM Servicing attempted to use an obviously defective or fraudulent assignment from an assignor that did not own any mortgage loans to assign***); *Lindsey v. Wells Fargo Bank, N.A.,* 139 So. 3d 903, 905 (Fla. Dist. Ct. App. 2013) (***summary judgment in favor of Wells Fargo reversed*** because affidavits filed in support of ***Wells Fargo's motion "did not attest to Wells***

108.     Indeed, Wells Fargo was aware that SEOTs were being committed *as to the very Mortgage Loans in the Covered Trusts*.  For example, on July 14, 2011, a New Hampshire court stayed the foreclosure of a Mortgage Loan in the ABFC 2006-OPT1 Covered Trust because of dubious and obviously fraudulent assignment documents that were submitted by Wells Fargo and/or

*Fargo's ownership of the note" and Wells Fargo relied on "unsworn" testimony, and other evidence that contradicted its claims of ownership of the note and mortgage*); *Yarney v. Ocwen Loan Servicing, LLC*, 929 F. Supp. 2d. 569, 572, 581 (W.D. Va. 2013) (*court granted summary judgment in favor of borrower and against Wells Fargo and Covered Trust Servicer Ocwen; court held that Wells Fargo and Ocwen improperly attempted to collect payments from a borrower after she had already settled the debt with Wells Fargo; court further held that Ocwen improperly billed the borrower for "forced placement" of insurance for the property at issue, mailed the borrower bogus payoff quotes, and falsely reported the borrower's account to credit bureaus as delinquent*); *Kurian v. Wells Fargo Bank,* 114 So. 3d 1052 (Fla. Dist. Ct. App. 2013) (*summary judgment in favor of Wells Fargo reversed*, as Wells Fargo failed to prove it provided borrowers with a timely acceleration notice letter; *notice letter attached to Wells Fargo's own complaint indicated Wells Fargo failed to provide timely notice*); *Wells Fargo Bank, N.A. v. Erobobo*, 972 N.Y.S.2d 147, 2013 N.Y. Misc. LEXIS 1790 (Sup. Ct. 2013) (*Wells Fargo's motion for summary judgment denied because assignment of note and mortgage was effected late, in violation of the trust's PSA; further, the PSA indicated that chain of ownership of note and mortgage should have included an assignment from Covered Trust Warrantor Option One to the trust's depositor and then to Wells Fargo, while Wells Fargo produced a conflicting and potentially fraudulent assignment from Option One directly to Wells Fargo*); *Focht v. Wells Fargo Bank, N.A.,* 124 So. 3d 308, 311 (Fla. Dist. Ct. App. 2013) (*appeals court reverses summary judgment in favor of Wells Fargo*, holding that *Wells Fargo, contrary to its allegations, did not introduce any evidence establishing that it was the owner or holder of the note at the time it filed suit as required by law; in fact, evidence showed that Wells Fargo was not assigned note until nine months after action was filed*; *in addition, Wells Fargo's complaint also falsely alleged that it had lost or destroyed the original note but subsequently Wells Fargo mysteriously produced the purported original note*); Decision at 4-5, *Wells Fargo Bank, N.A. v. Naimke, et al.*, No. 27305 (Ohio Ct. App. Oct. 29, 2014) (*Summary judgment in favor of Wells Fargo was reversed because of defective affidavits from the servicer, which incredibly averred that notice of default was sent to the borrowers over one year <u>before</u> the borrowers defaulted!  In addition, the court held that "[t]here is no evidence in the record that [Wells Fargo] provided the [borrowers] with a notice of default after they failed to make [a loan] payment," as required by the note*.); Order at 2-3, *Wells Fargo Bank, N.A. v. Allen, et al.*, No. 17640/10 (N.Y. Sup. Ct., Queens Cnty. Oct. 30, 2014) (*court vacated summary judgment order in Wells Fargo's favor, as well as order of reference and default judgment, and set a hearing "for plaintiff [Wells Fargo] to be examined concerning the veracity of the affidavits submitted by it in support of its prior motion"*; *borrower submitted evidence to the court indicating that Wells Fargo's prior affidavits were false and thus the court was compelled to determine "whether summary judgment, a default judgment and an order of reference were procured from this Court based upon the submission of false affidavits"*).

Covered Trust Servicer AHM Servicing.  *See Newitt*, 2011 N.H. Super. LEXIS 60.  The Court found that the note and mortgage at issue were assigned by Sand Canyon Corporation to Wells Fargo on February 23, 2010.  However, at that time, Sand Canyon did not own any mortgages that it could assign, evidenced by the fact that the president of Sand Canyon had previously sworn under oath that, effective April 30, 2006, "'***Sand Canyon . . . d[id] not own <u>any</u> residential real estate mortgages***.'"  *Id*. at \*2.  The court held that since Sand Canyon did not own any notes or mortgages after April 30, 2006, "***[t]he assignment from Sand Canyon to Wells Fargo [in 2010] of an interest which Sand Canyon did not possess" was not "any assignment at all***."  *Id*. at \*10-\*11.  The upshot was that Wells Fargo and/or AHM Servicing had obviously created and/or submitted to the court a bogus assignment from an entity that had no right to assign the note and mortgage.  This either fraudulent or deceptive conduct was a clear SEOT affecting one of the very Mortgage Loans in one of the Covered Trust.  Thus, Wells Fargo knew SEOTs were occurring as to the actual Mortgage Loans in the Covered Trusts.

109.    The foregoing cases, and others, also illustrate that not only was Wells Fargo acutely aware of its loan servicers' SEOTs, ***Wells Fargo was also acquiescing and actively participating in such misconduct***, as Wells Fargo itself was frequently accused of or found to have engaged in slipshod, deceptive or fraudulent conduct, bad faith, and other improper or sanctionable misconduct in connection with its foreclosures.[16]

---

[16]     *See supra* n.15; *see also In re Stewart*, 391 B.R. 327 (Bankr. E.D. La. 2008) (***Wells Fargo sanctioned***); *In re Fitch*, 390 B.R. 834 (Bankr. E.D. La. 2008) (***same***); *Wells Fargo Bank, N.A. v. Meyers,* 913 N.Y.S.2d 500, 503-04, 2010 N.Y. Misc. LEXIS 6088, at \*7-\*8 (Sup. Ct. 2010) (court held that ***Wells Fargo "has acted in bad faith," produced a witness that "had no personal knowledge" of the relevant facts, failed to submit any "evidence . . . to demonstrate" Wells Fargo's claims were "correct," and "has provided conflicting" and "inconsistent" information and positions; court sanctioned Wells Fargo by forcing modification, and dismissed action***), *rev'd,* 108 A.D.3d 9 (2013) (reversed on sanctions but agreed with trial court's decision that Wells Fargo did not act in good faith); *In re Jones*, No. 03-16518, Adv. No. 06-1093, 2012 Bankr. LEXIS 1450,

110.    Wells Fargo was also aware that, in October and November 2010, a New York state court had issued scores of orders delaying foreclosures by Wells Fargo and many other RMBS

---

at *8, *16, *21, *29 (Bankr. E.D. La. Apr. 5, 2012) (*court awarded punitive damages in excess of $3.1 million against Wells Fargo, in addition to previously assessed compensatory damages and sanctions; court held that punitive damages were merited because Wells Fargo "willfully violated the automatic [Bankruptcy] stay," "exhibited reckless disregard for the stay," "'charged [the] Debtor's account with unreasonable fees and costs; failed to notify Debtor that any of these postpetition charges were being added . . . [and] failed to seek Court approval for same; and [improperly] paid itself out of the estate funds delivered to it for other debt'"; court further held that Wells Fargo's "own representatives . . . admitted that it routinely misapplied payments . . . and improperly charged fees," and that "Wells Fargo's conduct is clandestine"; therefore the court held that "Wells Fargo's actions [are] . . . highly reprehensible"*), *aff'd*, 489 B.R. 645 (E.D. La. 2013); *Wells Fargo Bank, N.A. v. Ruggiero,* 972 N.Y.S.2d 147, 2013 N.Y. Misc. LEXIS 2247, at *17-*18 (Sup. Ct. 2013) (*The court sanctioned Wells Fargo, holding that "[t]he Record before this Court . . . is replete with persuasive indicia of [Wells Fargo's] lack of good faith, evidenced by conflicting information, a refusal to honor agreements, unexcused delay, unexplained charges, and misrepresentations, and sets forth, in no small measure, a failure to deal honestly, fairly, and openly. More to the point, . . . plaintiff [Wells Fargo] . . . [acted] under false pretenses, without any justifiable basis, and disingenuously . . . ."*); *U.S. Bank, N.A. v. Sarmiento,* 991 N.Y.S.2d 68, 81 (2d Dep't 2014) (*Appellate Department affirmed trial court's order sanctioning an RMBS trustee for failing to act in good faith, based on numerous instances of misconduct by servicer Wells Fargo*; sanction consisted of barring the collection of interest or fees accrued on the loan during an extended period of time when Wells Fargo engaged in misconduct, preventing the RMBS trustee from recovering any attorneys' fees or costs, and directing the RMBS trustee to review again (for the fifth time) whether borrower was entitled to a loan modification; the court documented numerous instances of misconduct and misrepresentations by Wells Fargo, holding that the RMBS trustee, through *Wells Fargo, "created an atmosphere of disorder and confusion that rendered it impossible for Sarmiento or the Supreme Court to rely upon the veracity" of Wells Fargo's representations*); *Wells Fargo Bank, N.A. v. Froimson*, No. 99720, 2014 Ohio App. LEXIS 4380, at *5 (Ohio Ct. App. Oct. 9, 2014) (*summary judgment in favor of Wells Fargo reversed due to patent deficiencies in the evidence it presented; court held that such evidence consisted of documents printed from a website and an affidavit that made no attempt to verify the documents or otherwise make the documents admissible; court held that "Wells Fargo has failed to submit evidentiary quality materials"*); *Wells Fargo Bank, N.A. v. Spivak*, No. 2913 EDA 2013, 2014 Pa. Super. LEXIS 3953, at *3 (Super. Ct. Oct. 31, 2014) (*summary judgment in favor of Wells Fargo reversed because of Wells Fargo's failure to provide borrower with notice required by law; court also noted that Wells Fargo was forced to discontinue a prior action against the borrower due to defective assignments of the note and mortgage, and incredibly "Wells Fargo served [the borrower] with [a] Notice in October 2010 – approximately two years earlier, before instituting its prior action, and before [Wells Fargo] had any ownership interest in the Note or the property"!*).

- 55 -

trustees and loan servicers because of these very same loan servicing issues. *See* Exhibit D hereto (numerous orders from Justice Tanenbaum of the Supreme Court of New York).[17]

111.    By October 2010, a flood of news stories and other events began publicly revealing these illegal, improper and abusive practices (and others) by the Covered Trust Master Servicers/Servicers. *See* Appendix 3 hereto for a sample of some of the stories and events involving the Master Servicers/Servicers to the Covered Trusts and Wells Fargo that were reported during October 2010.  By October 2010, the public became aware of what was called the "robo-signing" scandal, which involved the mass signing and filing of false affidavits and other false documents in foreclosure proceedings by either fictitious persons or persons without personal knowledge of the facts asserted in the affidavits, which were also improperly and illegally notarized.  Robo-signing also included the filing of fraudulently altered note and mortgage assignments.  These public revelations showed that many of the Covered Trust Master Servicers and Servicers (and even Wells Fargo) were engaged in the robo-signing scandal.  They also revealed that Master Servicers/Servicers and Wells Fargo had been sued, or were being investigated, by multiple federal and state governmental agencies for loan servicing misconduct.  Moreover, it was revealed that ***Covered Trust Servicer JPMorgan was forced to halt or delay 56,000 foreclosures and Wells Fargo had to submit revised documents for 55,000 of its foreclosures***, obviously because of their robo-signing misconduct, which drastically increased the time to foreclose and the expense to the Covered Trusts.  *See* Appendix 3 at 1 (sixth bullet point).

112.    The upshot of these public revelations – when they were coupled with Wells Fargo's firsthand experience with its master servicers and servicers, including the Covered Trusts' Master

---

[17]    Similarly, the *Mortgage Daily* reported in 2011 that New York Supreme Court Justice F. Dana Winslow "***dismissed or froze 20 percent of his [foreclosure] cases [in 2010] due to evidence disputes***."

Servicers/Servicers, and the dismal performance of the Mortgage Loans in the Covered Trusts – was that Wells Fargo had actual knowledge by the end of October 2010 that the Master Servicers and Servicers were engaged in pervasive SEOTs concerning the Mortgage Loans in the Covered Trusts. Indeed, by October 2010, the effects of the Master Servicers'/Servicers' SEOTs were graphically reflected in the Covered Trusts' continuing, extremely high Mortgage Loan default rates and mushrooming losses.  In October 2010, the Mortgage Loan default rates were at unprecedented levels (47% to 56%), while the Covered Trusts' cumulative realized losses by October 2010 ***increased to more than $409 million***, as set forth below.  Wells Fargo was aware of this information because it either prepared monthly reports containing this information or had access to such information:

| Covered Trusts' Mortgage Loan Default Rates and Cumulative Realized Losses Reported in October 2010 | | |
|---|---|---|
| **Covered Trust** | **Default Rates** | **Cumulative Realized Losses** |
| ABFC 2006-OPT1 | 56.41% | $208,840,553.27 |
| SASC 2007-BC1 | 47.10% | $200,903,283.03 |
| **Covered Trusts' Total Realized Losses:** | | **$409,743,836.30** |

113.    Nonetheless, even after October 2010, additional public events occurred that repeatedly confirmed for Wells Fargo that the Master Servicers and Servicers were continuing to commit the same, as well as new and additional, SEOTs as to the Mortgage Loans in the Covered Trusts.  *See* Appendix 4 hereto for a summary of such events.  Several of these events specifically identified Wells Fargo – which also serviced loans – as an active participant in the misconduct amounting to SEOTs.  *See id.* at 1 (second, third and fourth bullet points) (New Jersey identifies Wells Fargo as involved in robo-signing); *see also generally id.*

114.    By April 13, 2011, however, there was absolutely no doubt that Wells Fargo had actual knowledge of Master Servicer/Servicer SEOTs as to the Mortgage Loans in the Covered Trusts.

> **b.    By April 13, 2011, There Was No Doubt that Wells Fargo Had Actual Knowledge that the Covered Trusts' Master Servicers and Servicers Had Committed SEOTs with Respect to the Mortgage Loans in the Covered Trusts**

115.    On April 13, 2011, major events never seen before transpired in the loan servicing industry conclusively establishing that the Master Servicers and Servicers to the Covered Trusts were systematically engaging in the commission of SEOTs under the Governing Agreements, and that such misconduct extended to the Mortgage Loans in the Covered Trusts.  On April 13, 2011, the U.S. Government released a report on an investigation it had conducted on loan servicers entitled the "Interagency Review of Foreclosure Policies and Practices" (hereinafter the "Government Foreclosure Report").  On the same day, it also took sweeping legal action against 14 loan servicers (which included two of the Covered Trusts' Master Servicers/Servicers *and Wells Fargo*) comprising nearly 70% of the loan servicing industry and nearly 36.7 million mortgage loans.  ***The Government's investigation found "foreclosure-processing weaknesses that [had] occurred industrywide*****.**"  Government Foreclosure Report at 1.  The Government stated that it was taking action against the 14 loan servicers because it had identified "***unsafe and unsound [foreclosure] practices and violations of applicable . . . law" by them***.  *Id.* at 3.  Among the 14 offending loan servicers were ***Covered Trust Master Servicers/Servicers Aurora and JPMorgan, and as previously noted, Wells Fargo***.  Aurora (through its parent company, Aurora Bank FSB), JPMorgan, Wells Fargo and other loan servicers had entered into "consent cease and desist orders" or "consent orders" with the U.S. Treasury's OCC, the Federal Reserve, the Office of the Thrift Supervision ("OTS") and/or the Federal Deposit Insurance Corporation ("FDIC"), wherein they all essentially admitted to (*i.e.*, they did not deny or contest) facts that conclusively established that they had systematically failed to service mortgage loans in accordance with the standards set forth in the Governing Agreements, and therefore had committed widespread SEOTs.  Acting Comptroller of the Currency,

John Walsh, stated the following concerning the Government's investigations: "*We found significant deficiencies* . . . . *This is a very serious problem that servicers are going to have to do substantial work . . . to fix*."

116.   In the 14 consent orders, the loan servicers, including Aurora, JPMorgan and Wells Fargo, did not dispute the Government's findings that they had engaged in the following illegal and improper loan servicing practices (or misconduct substantially similar to it) that were ***not*** prudent:

- engaging in "unsafe or unsound practices in residential mortgage servicing and . . . foreclosure proceedings";

- filing false affidavits in foreclosure proceedings in "which the affiant represented that the assertions in the affidavit were made based on personal knowledge . . . when . . . they were not based on . . . personal knowledge";

- filing false affidavits in foreclosure proceedings which were not legally or "properly notarized";

- "fail[ing] [to] devote to [their] foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training";

- "fail[ing] [to] sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services"; and

- engaging in "unsafe or unsound banking practices."

117.   It was stunning that nearly 70% of the loan servicing industry had essentially admitted that they systematically engaged in widespread robo-signing, the filing of false affidavits, the filing of false foreclosure documents, improper notarizations, and other illegal conduct.  It was even more stunning that they essentially admitted that they had committed SEOTs by agreeing with the Government to form action plans to "***ensure compliance with . . . [the loan] servicing guides of . . .***

*investors*," an admission that they had not previously been complying with their duties mandated by the Governing Agreements.[18]

118.    In light of the above information, Wells Fargo unquestionably had actual knowledge no later than April 13, 2011 that SEOTs had been committed by the Master Servicers and Servicers with respect to Mortgage Loans within the Covered Trusts.  Indeed, Wells Fargo had **unique and direct knowledge of** the improper loan servicing practices by the Master Servicers and Servicers to

---

[18]    The improper servicing practices were so widespread and so severe that the Government required sweeping reforms by the master servicers and servicers, including:

- submitting plans to the Government to strengthen their board of directors' oversight of loan servicing;

- submitting a "comprehensive action plan" describing how they would comply with the consent orders and properly service loans;

- submitting a compliance program designed to ensure the proper servicing and foreclosure of mortgage loans;

- submitting policies and procedures to ensure the proper supervision of third-party vendors and outside law firms;

- submitting a plan to ensure proper controls over and supervision of MERS, used by the servicers in connection with loan servicing, foreclosures and title transfers;

- retaining an independent outside consultant to conduct a review of the servicers' past foreclosure practices and submitting a report to the Government concerning such review;

- submitting a plan to ensure the proper functioning of the servicers' MIS systems and the accuracy of loan data;

- submitting a plan to ensure proper, timely and effective communications with borrowers and to prevent the impedance or discouragement of loan modifications;

- submitting a risk assessment and management plan concerning the servicers' loan servicing operations; and

- submitting a quarterly progress report detailing all actions taken to comply with the consent orders.

the Covered Trusts by no later than April 13, 2011. ***Wells Fargo obtained this unique knowledge because, as previously alleged, <u>it was one of the loan servicers that was then engaged in such misconduct and in fact consented, on April 13, 2011, to the entry of a consent cease and desist order against it by the U.S. Government. Moreover, in the consent order, Wells Fargo did not dispute or contest, and thus admitted, that it too had engaged in "unsafe or unsound practices in residential mortgage servicing and in [Wells Fargo's] initiation and handling of foreclosure proceedings," filed false affidavits that were not based on personal knowledge or properly or legally notarized, failed to devote adequate oversight to policies, controls, procedures, management and training in connection with its foreclosure processes, and failed to sufficiently oversee outside counsel and third-party providers handling foreclosure-related services, all of which resulted in "unsafe or unsound banking practices."***</u> Wells Fargo was thus engaged in the same SEOTs as the Master Servicers and Servicers to the Covered Trusts, and Wells Fargo well knew from its own participation in such misconduct that SEOTs were occurring industrywide.

119.    If Wells Fargo needed further confirmation that the Master Servicers and Servicers to the Covered Trusts had committed SEOTs as to the Mortgage Loans, the Government Foreclosure Report provided it.  The Government Foreclosure Report, written by the Federal Reserve, OCC and OTS, found that the loan servicing industry in general had engaged in "***violations of applicable federal and state law requirements***" and "***notary practices which failed to conform to state legal requirements***."  Government Foreclosure Report at 3.  These findings demonstrated absolute SEOTs by the loan servicing industry.

120.    The Government Foreclosure Report also specifically focused on facts that gave Wells Fargo actual knowledge of numerous other SEOTs committed by the Master Servicers and Servicers with respect to the Mortgage Loans in the Covered Trusts.  For example, the Government Foreclosure

Report revealed the following "*industrywide*" practices by the servicers that amounted to SEOTs under the Governing Agreements:

- "*violations of applicable federal and state law requirements," such as violations of the Service Members Civil Relief Act, the bankruptcy laws, and "notary practices which failed to conform to state legal requirements*";

- "*inadequate* organization and staffing of foreclosure units";

- "*inadequate* policies, procedures, and independent control infrastructure covering all aspects of the foreclosure process";

- "*inadequate* monitoring and controls" over third-party vendors;

- "*lack of sufficient audit trails*" between information contained in affidavits and "the servicers' internal records";

- "*inadequate* quality control and audit reviews to ensure compliance with legal requirements";

- "*inadequate* identification of financial, reputational, and legal risks" by "boards of directors and senior management";

- *false affidavits*;

- *false mortgage documents*;

- *improper notarizations*; and

- "*weaknesses in quality-control procedures at all servicers, which resulted in servicers not . . . ensuring accurate foreclosure documentation, including documentation pertaining to the fees assessed . . . .*"

Government Foreclosure Report at 3, 11.

121.     *The Government Foreclosure Report also specifically found that the "industrywide" misconduct "pose[d] a variety of risks to [RMBS] investors*," *id.* at 6, *because master servicers and servicers had failed to satisfactorily "evaluat[e] and test[] compliance with applicable . . . pooling and servicing agreements*."  *Id.* at 11.  This finding unequivocally communicated that the loan servicing industry – which included the Covered Trusts' Master Servicers/Servicers – was engaging in SEOTs under the Governing Agreements.

122.    Thus, between the consent orders entered into by most of the loan servicing industry, including Covered Trust Master Servicers/Servicers Aurora and JPMorgan and defendant Wells Fargo on April 13, 2011 – consenting to conduct that demonstrated that they had failed to service loans legally or "prudent[ly]" and thus had committed SEOTs – and the Government Foreclosure Report's simultaneous finding that such SEOTs "*occurred industrywide*," Wells Fargo had actual knowledge of SEOTs committed by the Master Servicers and Servicers concerning the Mortgage Loans in the Covered Trusts *no later than April 13, 2011*.  The Covered Trusts' ridiculously high Mortgage Loan default rates (47% to 53%) and large losses (over $456 million) by April 2011, *see supra* ¶87 (chart), further confirmed the existence of the Master Servicers' and Servicers' SEOTs.

123.    However, notwithstanding Wells Fargo's actual knowledge of these SEOTs, Wells Fargo never did any of the things required of it under the Governing Agreements.  Wells Fargo's failures to act with respect to these known SEOTs breached the Governing Agreements and violated the TIA, and caused plaintiff and the class to suffer millions of dollars in damages, as foreclosures were stopped, withdrawn, dismissed, reversed, denied, delayed or invalidated due to the Master Servicers' and Servicers' misconduct, which Wells Fargo was aware of and deliberately participated in.  In addition, millions of dollars in bogus and excessive fees and costs were improperly charged to the Covered Trusts by the Master Servicers and Servicers during these delays caused by their misconduct.  Moreover, Wells Fargo also knew that the Master Servicers and Servicers had engaged in other SEOTs by April 2011 – such as their failure to notify Wells Fargo of the Warrantors' R&W breaches as alleged above.  This is so because, by April 2011, Wells Fargo had discovered the Warrantors' R&W breaches, as previously alleged, and many of those same Warrantors were also Servicers and therefore they obviously knew of their own R&W breaches.  This also caused plaintiff, the class and the Covered Trusts to suffer massive damages.  Wells Fargo also knew no later than

April 13, 2011 of the Master Servicers'/Servicers' practice of servicing the Mortgage Loans for their own financial benefit instead of plaintiff's and the class's – which was also an SEOT – yet failed to act as required by the Governing Agreements and the TIA.  This also caused plaintiff, the class and the Covered Trusts to suffer additional substantial damages.

> **c.  After April 2011, Wells Fargo Had Actual Knowledge that the Master Servicers and Servicers Were Continuing to Commit the Same SEOTs and Were Also Committing New and Additional SEOTs with Respect to the Mortgage Loans in the Covered Trusts**

124.  Incredibly, even ***after*** the U.S. Government's sweeping actions on April 13, 2011 against the loan servicing industry, ***loan servicers thereafter continued to engage in the same SEOTs and also engaged in new SEOTs***.  And, even though Wells Fargo had actual knowledge of these continuing and new SEOTs, it did nothing, and has continued to do nothing, allowing the SEOTs to go on unabated and uncured to the present.  Wells Fargo thereby breached the Governing Agreements and violated the TIA numerous additional times after April 2011 by failing to fulfill its continuing duties under the Governing Agreements and TIA as to the SEOTs it learned of in and prior to April 2011, and by failing to act when new SEOTs occurred after April 2011.  News and public information concerning the Master Servicers'/Servicers' and Wells Fargo's numerous continuing and new SEOTs after April 13, 2011 are summarized in Appendix 5 hereto.  Given the repeated, egregious, public nature of these numerous SEOTs, and Wells Fargo's participation therein, Wells Fargo had actual knowledge of the new and continuing SEOTs also.  *See* Appendix 5 hereto.

> **d.  Wells Fargo Also Knew that Successor Servicer Ocwen Was Committing SEOTs**

125.  Starting in 2011 and continuing thereafter, many master servicers and servicers began selling their loan servicing rights to Covered Trust Servicer Ocwen (as well as to Covered Trust

Master Servicer/Servicer Nationstar). For example, by 2012, Ocwen had become Servicer to both of the Covered Trusts (and Nationstar became a Master Servicer and Servicer to the SASC 2007-BC1 Covered Trust). *See supra* ¶99 (chart of Master Servicers/Servicers and their successors). Ocwen (as well as Nationstar) was a "non-bank" loan servicer and it was purchasing massive amounts of loan servicing rights from the much more heavily regulated "bank" master servicers and servicers during 2011, 2012 and 2013. Regulators were becoming increasingly concerned that Ocwen was growing too quickly to properly service the many loans it was acquiring. In addition, Ocwen (as well as Nationstar), as a non-bank servicer, faced much less regulatory scrutiny than bank servicers, and Ocwen had already compiled a thoroughly infamous track record of loan servicing abuses. Thus, in February 2014, the Superintendent of the New York State Department of Financial Services ("NYFS"), Benjamin Lawsky, halted Ocwen's attempted purchase of $39 billion in loan servicing rights from defendant Wells Fargo. Lawsky put a halt to the sale and ordered Ocwen to provide information sufficient to demonstrate that Ocwen could satisfactorily handle the increased loan servicing load in light of previous loan servicing misconduct Lawsky's office had discovered and taken Ocwen to task for, and for which Lawsky had subsequently been required to appoint a monitor to oversee Ocwen's conduct. *See* Appendix 6 hereto at 5 (Sept. 1, 2011 actions by NYFS against Ocwen); Appendix 7 hereto at 2 (Dec. 5, 2013 actions by NYFS against Ocwen).[19]

126. In any event, well prior to Ocwen's acquisition of the rights to service the Mortgage Loans in the Covered Trusts in 2012, Wells Fargo had actual knowledge that Ocwen was an awful loan servicer that had a long history of loan servicing abuses amounting to SEOTs. *See, e.g.,* Appendix 6 hereto. Wells Fargo also knew that Ocwen's history of SEOTs continued after Ocwen

---

[19]     Shortly after Lawsky halted the Wells Fargo loan servicing rights sale to Ocwen and asked Ocwen for information, Ocwen announced that the deal was on indefinite hold. To date, the acquisition has not been consummated and it appears to have been abandoned by Ocwen.

began servicing the Mortgage Loans.  *See* Appendix 7 hereto.  Indeed, Wells Fargo had personally experienced Ocwen's egregious loan servicing misconduct.  *E.g.*, *Yarney*, 929 F. Supp. 2d 569 (court granted summary judgment in favor of borrower and against Wells Fargo and Ocwen because Ocwen made misrepresentations to borrower and engaged in misconduct that violated federal laws).  As shown in Appendices 6 and 7 hereto, Ocwen was found by governmental agencies, juries, courts and news reporters to have engaged in numerous instances of outrageous, illegal and sanctionable misconduct meriting punitive damages in some cases for its loan servicing abuses, demonstrating that it routinely engaged in SEOTs.

127.    The repeated misconduct by Ocwen alone should have alerted Wells Fargo to the fact that Ocwen had a pattern and practice of committing SEOTs.  However, if there was any doubt, it was erased by December 2013.  At that time, Ocwen entered into a consent order with the U.S. Government's Consumer Financial Protection Bureau ("CFPB"), 49 States and the District of Columbia.  Pursuant to the consent order, Ocwen did not dispute or contest any of the facts alleged against it by multiple government agencies, and it agreed to provide borrowers with an astounding ***$2 billion in principal reduction and further refund $127.3 million to nearly 185,000 borrowers it had improperly foreclosed on***.  The misconduct covered by the consent order extended for an unlimited period of years, up to and including December 2013, and covered every State in the nation except one, demonstrating that Ocwen had engaged in enterprise-wide SEOTs on a nationwide scale right up to the time it entered into the consent order in December 2013.  Richard Cordray, the Director of the CFPB, stated in a conference call that "***[w]e believe that Ocwen violated federal consumer financial laws at every stage of the mortgage servicing process***," a clear SEOT.  The huge size of the relief agreed to by Ocwen (over $2 billion), the comprehensive misconduct "at every stage" of the process, the broad geographic scope (49 of 50 States and the District of Columbia), the expansive temporal

range of the misconduct (years), and the huge number of borrowers affected, confirmed that Ocwen's misconduct occurred nationwide and was an enterprise-wide phenomenon, which infected all of its loan servicing operations, including those provided to the ABFC 2006-OPT1 and SASC 2007-BC1 Covered Trusts.  The CFPB stated that Ocwen had engaged in "*years of systemic*" misconduct amounting to SEOTs, including:

- *Failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements*;

- *Charging borrowers unauthorized fees for default-related services*;

- *Imposing force-placed insurance on consumers when Ocwen knew or should have known that they already had adequate home-insurance coverage*; . . .

- *Providing false or misleading information in response to consumer complaints*.

*       *       *

- *Failing to provide accurate information about loan modifications and other loss mitigation services*;

- *Failing to properly process borrowers' applications and calculate their eligibility for loan modifications*;

- *Providing false or misleading reasons for denying loan modifications*;

- *Failing to honor previously agreed upon trial modifications with prior servicers*; . . .

- *Deceptively seeking to collect payments under the mortgage's original unmodified terms after the consumer had already begun a loan modification with the prior servicer*.

- *Engaged in illegal foreclosure practices* . . . .

- *Providing false or misleading information to consumers about the status of foreclosure proceedings where the borrower was in good faith actively pursuing a loss mitigation alternative also offered by Ocwen*; and

- ***Robo-signing foreclosure documents, including preparing, executing, notarizing, and filing affidavits in foreclosure proceedings with courts and government agencies without verifying the information***.

128.    These "systemic" illegal and improper practices (which Ocwen did not deny), and which had gone on for "years" in 49 States and the District of Columbia, clearly imparted to Wells Fargo actual knowledge that Ocwen was engaging in SEOTs as to the Covered Trusts' Mortgage Loans.

129.    However, even after this massive settlement, Ocwen ***continued to commit SEOTs***. *See*, *e.g.*, Appendix 7 at 3-7 (summary of continuing SEOTs).  These events caused Wells Fargo to have actual knowledge of new and continuing SEOTs by Ocwen as to the Mortgage Loans in the Covered Trusts even after December 2013.  In fact, these SEOTs, and other new ones, have continued unabated to the present.

130.    As the numerous foregoing events demonstrate, the original Master Servicers and Servicers to the Covered Trusts and their successors engaged in, and have continued to engage in, obvious, numerous, repeated, systemic SEOTs as to the Mortgage Loans in the Covered Trusts.  Such misconduct is so ingrained in their cultures that they do not know of any other way to "service" mortgage loans.  Indeed, as recently as May 29, 2014, Ira Rheingold, Director of the National Association of Consumer Advocates in Washington, D.C., stated: "'***You've got a lot of people trying to clean up the servicing industry, but the truth is we are seeing the same servicing problems over and over* . . . .**'"  Given this widespread, repetitious and brazen misconduct, which shows no signs of abating and which has caused long delays in foreclosures of the Mortgage Loans in the Covered Trusts and outright denials of Wells Fargo's attempts to foreclose, along with extremely long delinquencies, and excessive and improper fees and expenses added by the Master Servicers/Servicers during their induced delays, the Covered Trusts have experienced huge losses and persistently high Mortgage Loan default rates.  These large losses and unprecedented default rates corroborated and

confirmed to Wells Fargo that the Mortgage Loans have suffered, and are continuing to suffer, from pervasive SEOTs by the Master Servicers and Servicers.  The chart below sets forth the continuing high Mortgage Loan default rates (35% to 41%) and the Covered Trusts' massive cumulative realized losses, which exceeded $740 million by October 2014.  Wells Fargo was well aware of this information because it prepared monthly reports containing this information, or had access to such information:

| Covered Trusts' Mortgage Loans Default Rates and Cumulative Realized Losses Reported in October 2014 | | |
|---|---|---|
| Covered Trust | Mortgage Loan Default Rates | Cumulative Realized Losses |
| ABFC 2006-OPT1 | 41.81% | $ 356,579,379.40 |
| SASC 2007-BC1 | 35.92% | $ 384,203,750.73 |
| Covered Trusts' Total Realized Losses: | | $ 740,783,130.13 |

### 3. Wells Fargo Has Conflicts of Interest with Plaintiff and the Class and Improperly Put Its Interests Ahead of the Interests of Plaintiff and the Class to Benefit Itself

131.   As previously alleged, Wells Fargo also owes a common law "duty of trust" to plaintiff and the class.  As such, Wells Fargo is required to avoid conflicts of interest with plaintiff and the class.  This means that Wells Fargo is not permitted to put its interests ahead of plaintiff's and the class's, nor is Wells Fargo permitted to benefit therefrom.

132.   Wells Fargo provides and has provided RMBS trustee services to the RMBS industry for some time and has derived substantial income from the RMBS trusts set up and/or "sponsored" by the Warrantors, loan originators, Master Servicers and Servicers to the Covered Trusts, and their related companies.  The Warrantors and loan originators to the Covered Trusts (and their related companies) handpicked Wells Fargo for the RMBS trustee position, as they knew that Wells Fargo would not cause trouble for them by making significant R&W claims against them, to plaintiff's and the class's detriment.  Similarly, the Master Servicers and Servicers (and their related companies) also

handpicked Wells Fargo because they knew Wells Fargo would not accuse them of committing SEOTs, or replace them, as they too provided substantial RMBS trustee business to Wells Fargo.  The relationship between Wells Fargo and the Warrantors, loan originators and Master Servicers/Servicers is exactly the type of relationship that the *Yale Journal of Regulation* warned of: "***[T]here is often a very close relationship between the servicer and the tr[u]stee; many originators and servicers have a 'pet' or 'pocket' trustee that they use for most of their deals***."  Wells Fargo, the "pet" or "pocket" Trustee for the Warrantors and Master Servicers/Servicers to the Covered Trusts, put its financial interests ahead of plaintiff's and the class's, and refrained from discharging its duties under the Governing Agreements and the TIA.

133.    Because the Warrantors and Master Servicers/Servicers to the Covered Trusts and their related companies were a source of substantial income for Wells Fargo, Wells Fargo did not seek to enforce the Warrantors' obligations to cure, substitute or repurchase Mortgage Loans in the Covered Trusts which breached their R&Ws, or declare SEOTs against the Master Servicers and Servicers or replace them.  By doing so, Wells Fargo put its own interests ahead of plaintiff's and the class's interests, and benefitted by doing so.

134.    Wells Fargo also had another conflict with plaintiff and the class.  Wells Fargo refrained from discharging its duties under the Governing Agreements and the TIA with respect to the Master Servicer/Servicer loan servicing SEOTs, because Wells Fargo itself was acquiescing in and participating in their misconduct as to the Mortgage Loans in the Covered Trusts.  By informing plaintiff and the class of such SEOTs, as it was required to do by the Governing Agreements and the TIA, Wells Fargo would have also revealed its own participation in such wrongdoing and its failure to abide by the Governing Agreements, and thereby subjected itself to liability to plaintiff and the class. In addition, disclosing the SEOTs would have also forced Wells Fargo to act as a prudent person

under the Governing Agreements and required it to expend significantly more time and effort to correct the SEOTs, which Wells Fargo did not want to do, as it required much more effort than Wells Fargo wanted to expend and would tax its limited resources.  Given these conflicts of interest, Wells Fargo chose to protect its interests instead of plaintiff's and the class's, and refrained from doing anything that might reveal the SEOTs, or Wells Fargo's participation therein.

135.    Further, Wells Fargo had a conflict of interest with plaintiff and the class because it was also a loan servicer involved in the very same misconduct as its fellow Master Servicers/Servicers and the rest of the loan servicing industry.  Thus, Wells Fargo would not notify plaintiff and the class of SEOTs as to the Mortgage Loans or remove or replace the Covered Trusts' Master Servicers/Servicers because Wells Fargo did not want to "rat out" its industry colleagues and then face retaliatory revelations of its own loan servicing misconduct.

136.    Similarly, Wells Fargo was also a loan originator and a warrantor of mortgage loans, and had made numerous R&Ws about its loans to numerous other RMBS trusts and trustees.  Wells Fargo and the Covered Trusts' Warrantors were all engaged in an industry-wide scheme to issue false R&Ws concerning mortgage loans transferred to RMBS trusts and wanted to keep that misconduct hidden in order to avoid liability.  Therefore, Wells Fargo chose to refrain from noticing R&W breaches against the Covered Trusts' Warrantors, or enforcing the repurchase or replacement rights under the Governing Agreements, in an attempt to keep the industry's practice of systemic R&W breaches concealed.

137.    Because of the foregoing conflicts of interest, Wells Fargo refused to perform its duties required by the Governing Agreements and the TIA for the benefit of plaintiff and the class, and instead put its own interests ahead of plaintiff's and the class's, which benefitted Wells Fargo but injured plaintiff and the class.

**D.    Wells Fargo Failed to Discharge Its Critical Duties and Obligations Under the Governing Agreements, the TIA and Common Law and Thereby Breached and Violated the Governing Agreements, the TIA and Common Law**

138.    Despite its discovery and actual knowledge of information requiring Wells Fargo to act to protect plaintiff and the class under the Governing Agreements and the TIA, Wells Fargo failed to act as required and thus breached the Governing Agreements and violated the TIA. Moreover, by failing to avoid conflicts of interest with plaintiff and the class, Wells Fargo breached its common law duty of trust owed to plaintiff and the class.  Wells Fargo's failures to act, and its breaches and violations alleged herein, were grossly negligent and willful misconduct.

**1.    Wells Fargo Failed to Notify the Warrantors and Other Parties to the Governing Agreements of R&W Breaches and Failed to Enforce the Warrantors' Obligations to Cure, Substitute or Repurchase Mortgage Loans Breaching the Warrantors' R&Ws, as Required by the Governing Agreements and the TIA**

139.    As alleged above, Wells Fargo discovered breaches of the Warrantors' R&Ws concerning thousands of Mortgage Loans in the Covered Trusts that adversely affected the value of the Mortgage Loans and plaintiff's and the class's interests no later than April 13, 2011.  Yet Wells Fargo failed to notify the Warrantors or other parties to the Governing Agreements, and failed to enforce the Warrantors' obligations to cure, substitute or repurchase the defective Mortgage Loans, as required by the Governing Agreements.  Wells Fargo discovered the breaches of the Warrantors' R&Ws concerning the Mortgage Loans through:

- The numerous news reports, congressional testimony and other information that publicly indicated that the lending industry in general was engaging in widespread lending abuses during the time the Mortgage Loans were originated, warranted and transferred to the Covered Trusts, thus making it highly likely that any R&Ws by the Warrantors concerning the Mortgage Loans were false;

- The numerous news stories, reports, lawsuits and governmental investigations and actions concerning most of the specific Warrantors to the Covered Trusts indicating that their R&Ws were systematically false;

- Wells Fargo's participation in and monitoring of bankruptcy proceedings by the borrowers of the Mortgage Loans in the Covered Trusts, from which Wells Fargo learned of specific R&W breaches by the Warrantors as to the Mortgage Loans;

- The lawsuits filed by others against the Warrantors detailing the high numbers of defective loans that breached their R&Ws;

- The lawsuits alleging misrepresentations concerning the specific Mortgage Loans in the specific Covered Trusts, which indicated that the Warrantors' R&Ws had been breached as to the Mortgage Loans;

- The Covered Trusts' historically unprecedented, extremely high, and prolonged Mortgage Loan default rates and huge realized losses;

- The OCC's "Worst Ten in the Worst Ten" report, identifying the areas of the United States with the highest foreclosure rates – rates that were from 13 to 22 times higher than historical averages – from loans originated or warranted by several of the Covered Trusts' Warrantors and/or loan originators;

- Numerous governmental investigations of and actions against the Warrantors for lending abuses which rendered their R&Ws false;

- The FCIC Report detailing: (1) the huge numbers of loans warrantors were being required to repurchase because of systemic breaches of their R&Ws; (2) the fact that some of the Covered Trusts' Warrantors and loan originators ***intentionally*** put defective loans that breached their R&Ws into RMBS trusts just like the Covered Trusts as a matter of course; and (3) the routine practice of warrantors of engaging in lending abuses and fraud that guaranteed their R&Ws would be false; and

- The Senate Report demonstrating that the lending industry in which the Covered Trusts' Warrantors participated was engaged in systematic lending abuses which rendered any R&Ws by those Warrantors false.

140.    After discovering the breaches of the R&Ws by the Covered Trusts' Warrantors, Wells Fargo breached the Governing Agreements and TIA, and was grossly negligent and engaged in willful misconduct, by failing and refusing to act as required by the Governing Agreements and the TIA.  Moreover, after learning of the R&W breaches, as well as new breaches of the Warrantors' R&Ws, Wells Fargo has engaged in numerous continuing as well as new and additional breaches of the Governing Agreements and TIA by failing to perform its continuing duties to enforce the Warrantors' R&Ws.  Wells Fargo's failures to act caused the loss, to the statutes of limitations,  of

hundreds of millions of dollars of meritorious R&W claims against the Warrantors, and thereby caused substantial damages to plaintiff, the class and the Covered Trusts.

### 2. Wells Fargo Failed to Perform Its Duties with Respect to SEOTs as Required by the Governing Agreements and the TIA

141. As previously alleged, Wells Fargo obtained actual knowledge that the Master Servicers and Servicers committed SEOTs with respect to the Mortgage Loans in the Covered Trusts no later than April 13, 2011, yet failed to: (1) notify the Master Servicers and Servicers and require them to cure such SEOTs; (2) give notice of the SEOTs to plaintiff and the class; and (3) take other prudent actions to remedy the SEOTs, such as terminating and replacing the defaulting Master Servicers or Servicers or assuming their duties. All of these failures to act breached the Governing Agreements and the TIA. As previously alleged, Wells Fargo had actual knowledge of the SEOTs through:

- Numerous news reports, congressional testimony and governmental investigations and actions publicly indicating that there were systemic loan servicing abuses, including foreclosure fraud and robo-signing, throughout the loan servicing industry and the nation, and that many of the Master Servicers/Servicers were involved in such misconduct;

- Numerous news reports about and governmental investigations directed at many of the specific Master Servicers and Servicers to the Covered Trusts concerning their improper loan servicing practices;

- Wells Fargo's firsthand experience with, observance of, and participation in, loan servicers' SEOTs through the many cases in which Wells Fargo was an RMBS trustee in foreclosure actions and bankruptcy proceedings wherein the loan servicers and/or Wells Fargo made false statements, filed false affidavits and documents, and engaged in other misconduct that delayed, invalidated or led to dismissals of Wells Fargo's foreclosures and sanctions against Wells Fargo and/or its servicers;

- Wells Fargo's knowledge that the Master Servicers and Servicers were engaging in SEOTs by failing to report Warrantor R&W breaches to Wells Fargo;

- Wells Fargo's awareness that loan servicers' abuses were systemic and were similarly affecting all RMBS trustees;

- Numerous governmental enforcement actions against many of the specific Master Servicers and Servicers to the Covered Trusts for loan servicing abuses;

- The disclosure of deposition transcripts of employees of the Master Servicers and Servicers that indicated that they had engaged in pervasive robo-signing, fraud and loan servicing abuses;

- The large number of Mortgage Loans in the Covered Trusts that were extremely delinquent because of delays caused by the Master Servicers' and Servicers' SEOTs;

- The huge losses being suffered by the Covered Trusts due to the Master Servicers' and Servicers' robo-signing, foreclosure frauds and delays (during which they improperly imposed additional excessive fees and costs on the Covered Trusts);

- The FCIC Report (Appendix 4 at 3-4) and Legal Services of New Jersey Report (*see id.* at 1-2) confirming nationwide SEOTs by many of the Master Servicers and Servicers to the Covered Trusts;

- The April 13, 2011 consent orders entered into by several of the Master Servicers and Servicers to the Covered Trusts **and by Wells Fargo**, in which they all essentially admitted that they committed enterprise-wide SEOTs, and the Government Foreclosure Report, which confirmed "**industrywide**" SEOTs by the Master Servicers and Servicers to the Covered Trusts **and Wells Fargo**;

- Wells Fargo's intimate knowledge of industrywide SEOTs through its own participation in such misconduct, and Wells Fargo's entering into a consent order on April 13, 2011 concerning its **own** loan servicing misconduct;

- Covered Trust Servicer Ocwen's entry into a consent order with the CFPB, 49 States and the District of Columbia wherein it essentially admitted to company-wide SEOTs (*see supra* ¶¶127-128) as well as the many loan servicing abuses it engaged in (*see generally* Appendices 6 and 7);

- The billions of dollars in settlement relief paid by many of the Covered Trusts' Master Servicers and Servicers to settle private and government claims that they engaged in company-wide loan servicing misconduct amounting to SEOTs; and

- The numerous and continuing news reports and governmental actions after April 2011 indicating that the Master Servicers and Servicers to the Covered Trusts were and are continuing to engage in loan servicing misconduct amounting to SEOTs (*see generally* Appendix 5).

142.   Even after obtaining actual knowledge of SEOTs as to Mortgage Loans in the Covered Trusts, and even after obtaining actual knowledge that such SEOTs were continuing to the present, and that new SEOTs were also occurring, Wells Fargo was and is grossly negligent and

engaged and continues to engage in willful misconduct by refusing to do any of the things required of it by the Governing Agreements or TIA.  Therefore, Wells Fargo has breached the Governing Agreements and TIA numerous times by repeatedly failing to fulfill its duties with respect to previous, existing, new and continuing SEOTs, as it has allowed SEOTs, as well as new SEOTs, to continue unabated.

> **3.    Wells Fargo Failed to Exercise All of Its Rights and Duties Under the Governing Agreements as a Prudent Person Would, as Required by the Governing Agreements and the TIA**

143.    As alleged above, when Wells Fargo became aware of the Master Servicers' and Servicers' SEOTs and the Warrantors' breaches of their R&Ws alleged herein, Wells Fargo was required to use all of its rights and powers under the Governing Agreements to protect plaintiff's and the class's interests, as a ***prudent*** person would and as though Wells Fargo were attempting to protect its own interests.  Wells Fargo failed to act as required by the Governing Agreements by:

- Failing to enforce the Warrantors' obligations to cure, substitute or repurchase Mortgage Loans that breached the Warrantors' R&Ws after discovering such breaches, as a reasonable and prudent person would do in trying to protect his/her own interests; and

- Failing to discharge its contractual and statutory duties after obtaining knowledge of uncured SEOTs, and failing to protect plaintiff's and the class's interests as a reasonable and prudent person would do in trying to protect his/her own interests.

144.    Wells Fargo has continued its failure to act prudently while the SEOTs have continued unabated, and after it learned of the Warrantors' R&W breaches, and thus Wells Fargo has engaged in numerous continuing and additional breaches of its duties under the Governing Agreements and the TIA.  Such failures were grossly negligent and amounted to willful misconduct.

> **4.    Wells Fargo Failed to Discharge Its Common Law Duty of Trust Owed to Plaintiff and the Class**

145.    As alleged above, Wells Fargo did not perform the duties required of it by the Governing Agreements and TIA because Wells Fargo desired to economically benefit currently and

in the future from its ongoing business relationships with the Covered Trusts' Warrantors, loan originators, and Master Servicers and Servicers, from which Wells Fargo derived significant RMBS trustee business.  Wells Fargo also refrained from performing its duties under the Governing Agreements and TIA because discharging such duties required Wells Fargo to expend substantial amounts of time – more than Wells Fargo wanted to expend – to remedy the breaches and SEOTs, and would have further revealed that Wells Fargo was participating in the SEOTs with the Covered Trusts' Master Servicers/Servicers and/or was allowing such SEOTs to go on unremedied, exposing Wells Fargo to liability to plaintiff and the class under the Governing Agreements.  Wells Fargo also refrained from acting because it did not want to expose its fellow Master Servicers'/Servicers' and Warrantors' misconduct and breaches, and then face retaliatory disclosures of its own loan servicing misconduct or R&W breaches.

146.     By deliberately refraining from performing its duties mandated by the Governing Agreements and TIA, Wells Fargo failed to avoid conflicts of interest with plaintiff and the class and benefitted thereby, breaching its duty of trust to plaintiff and the class.  Wells Fargo's failures to act were grossly negligent and amounted to willful misconduct.  Wells Fargo's continuing and repeated failures to properly discharge its duty of trust also resulted in new and additional breaches of its duty of trust up to and through the present.

> **E.     Plaintiff and the Class Have Suffered Significant Damages Due to Wells Fargo's Breaches of the Governing Agreements and Common Law and Its Violations of the TIA**

147.     Because Wells Fargo has failed to act as required by the Governing Agreements as alleged herein, plaintiff, the class and the Covered Trusts have suffered over $740 million in damages.

148.     Wells Fargo's failure to enforce the R&W claims against the Warrantors for thousands of breaching Mortgage Loans has caused plaintiff, the class and the Covered Trusts to suffer

significant damages in the form of hundreds of millions of dollars in R&W claims that could have been successfully asserted against the Warrantors but were not.  Wells Fargo's failure to assert these claims was a breach of the Governing Agreements and the TIA for which Wells Fargo could foresee that plaintiff, the class and the Covered Trusts would be damaged.  Moreover, Wells Fargo's continuing failure to act on those R&W claims, causing the claims to become time-barred, resulted in breaches of the Governing Agreements and TIA, and caused damages that were foreseeable to Wells Fargo as well.

149.    Wells Fargo's failure to act as required by the Governing Agreements when SEOTs occurred has also caused plaintiff, the class and the Covered Trusts to suffer millions of dollars in additional damages.  Such damages were also a foreseeable consequence to Wells Fargo of its failure to act.

150.    Wells Fargo's failures to act prudently during the SEOTs and R&W breaches as alleged herein also caused plaintiff, the class and the Covered Trusts to suffer damages.  If Wells Fargo had acted prudently as required by the Governing Agreements and the TIA, most, if not all, of the foregoing damages and losses to plaintiff, the class and the Covered Trusts could have been avoided or recouped.  It was foreseeable to Wells Fargo that plaintiff and the class would suffer such massive damages if it failed to act prudently as required by the Governing Agreements and the TIA.

151.    Similarly, Wells Fargo's decision to repeatedly refuse to act and instead to put its own financial interests ahead of plaintiff's and the class's because of its conflicts of interest, caused plaintiff, the class and the Covered Trusts to suffer damages which were foreseeable to Wells Fargo.

152.    By virtue of its breaches of the Governing Agreements and its common law duties, and its violations of the TIA, Wells Fargo has caused at least $740 million in damages to plaintiff, the class and the Covered Trusts for which Wells Fargo is responsible.

### F.     Plaintiff May Sue Wells Fargo as Trustee

153.     The Governing Agreements provide certain limitations on the rights of RMBS holders like plaintiff and the class that are not applicable to this lawsuit.  More specifically, the Governing Agreements may limit in part the rights of RMBS holders like plaintiff and the class to bring lawsuits relating to the Governing Agreements against the Depositor, the Securities Administrator, the Master Servicer or Servicer, or any successor to such parties.

154.     However, the Governing Agreements do not so limit suit against Wells Fargo.  In fact, the Governing Agreements provide that "[n]o provision of this Agreement shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own misconduct."  ABFC 2006-OPT1 PSA §8.01(a).

155.     Additionally, under the TIA and New York law, these so-called "no action" clauses do not apply to actions by RMBS owners like plaintiff and the class against trustees like Wells Fargo for Wells Fargo's own wrongdoing.  This is not a situation where plaintiff and the class are demanding that Wells Fargo initiate a suit in its own name to enforce their rights and obligations under the Governing Agreements.  Rather, this is an instance where plaintiff and the class are bringing a direct action *against* Wells Fargo for breaching its statutory, contractual and common law duties under the Governing Agreements, common law and the TIA.  Because this is not an "action, suit or proceeding" that Wells Fargo is capable of bringing in its own name as Trustee under the Governing Agreements, the "no action" clause of the Governing Agreements does not apply and does not bar plaintiff and the class from proceeding with this lawsuit.

## V.     CLASS ACTION ALLEGATIONS

156.     Plaintiff brings this action as a class action on behalf of a class consisting of all current and former investors who acquired RMBS certificates in the Covered Trusts (the "class") and who held such certificates at or after the time when Wells Fargo discovered breaches of the Warrantors'

R&Ws or Wells Fargo had actual knowledge of SEOTs by the Master Servicers and Servicers to the Covered Trusts, and suffered damages as a result of Wells Fargo's breaches of the Governing Agreements, TIA and common law.  Excluded from the class are Wells Fargo, the loan originators, the Warrantors, the Master Servicers and the Servicers to the Covered Trusts, and their officers and directors, their legal representatives, successors or assigns, and any entity in which they have or had a controlling interest.

157.    The members of the class are so numerous that joinder of all members is impracticable.  While the exact number of class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are at least hundreds of members of the proposed class.  Record owners and other members of the class may be identified from records maintained by Wells Fargo, Depository Trust Company or its nominees, custodian banks, or others, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

158.    Plaintiff's claims are typical of the claims of the members of the class as: (1) they all acquired RMBS certificates in the Covered Trusts and held them at or after the time when Wells Fargo discovered breaches of R&Ws concerning the Mortgage Loans by the Warrantors or Wells Fargo had actual knowledge of Master Servicer and Servicer SEOTs and failed to act as required by the Governing Agreements, common law and the TIA; (2) all the claims are based upon the Governing Agreements, substantially in the same form as the ABFC 2006-OPT1 PSA (*see* Ex. A), the TIA and the same common law; (3) Wells Fargo's alleged misconduct was substantially the same with respect to all class members; and (4) all class members suffered similar harm as a result.  Thus, all members of the class are similarly affected by Wells Fargo's statutory, contractual and common law breaches and violations that are alleged herein.

159.    Plaintiff will fairly and adequately protect the interests of the members of the class and has retained counsel competent and experienced in class action and RMBS litigation.

160.    Common questions of law and fact exist as to all members of the class and predominate over any questions solely affecting individual members of the class.  Among the predominating questions of law and fact common to the class are:

(a)    Whether Wells Fargo breached its contractual duties under the Governing Agreements and its common law duties owed to plaintiff and the class by:

(i)    failing to notify the Covered Trusts' Warrantors and other parties to the Governing Agreements of R&W breaches and failing to enforce R&W claims against those Warrantors when Wells Fargo discovered breaches of their R&Ws;

(ii)    failing to discharge its duties under the Governing Agreements when Wells Fargo obtained actual knowledge of SEOTs;

(iii)    failing to exercise the rights and powers vested in Wells Fargo by the Governing Agreements, and failing to use the same degree of care and skill as a prudent person would under the circumstances in the conduct of his or her own affairs, after obtaining actual knowledge of SEOTs; and

(iv)    failing to avoid conflicts of interest with plaintiff and the class while advancing its own interests at the expense of plaintiff and the class, and benefitting therefrom;

(b)    Whether Wells Fargo violated the TIA by:

(i)    prior to default, failing to perform the duties specifically assigned to it under the Governing Agreements;

(ii)    failing to inform plaintiff and the class of defaults under the Governing Agreements within 90 days after their occurrence; and

- 81 -

           (iii)     during a default, failing to exercise its rights and powers under the Governing Agreements as a prudent person would; and

           (c)     Whether and to what extent members of the class have suffered damages as a result of Wells Fargo's breaches of its statutory, contractual and common law duties and the proper measure of damages.

161.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable. There will be no difficulty in the management of this action as a class action.

## VI.   DERIVATIVE ACTION ALLEGATIONS

162.    Alternatively, plaintiff brings this case as a derivative action against Wells Fargo in the right and for the benefit of the Covered Trusts to redress losses suffered by the Covered Trusts as a direct result of Wells Fargo's breaches of the Governing Agreements and violations of the TIA. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

163.    Plaintiff will adequately and fairly represent the interests of the Covered Trusts in enforcing and prosecuting their rights. Plaintiff is the owner of RMBS in each of the Covered Trusts during a large portion of Wells Fargo's wrongful course of conduct alleged herein. Moreover, by operation of law, under New York General Obligations Law §13-107, RPI obtained all rights and causes of action of all prior holders of RPI's RMBS.

164.    Plaintiff did not make a pre-suit demand on Wells Fargo to pursue this action because such a demand would have been futile. The wrongful acts alleged herein were committed by Wells Fargo itself and Wells Fargo would not agree to sue itself, particularly since it faces claims for losses by the Covered Trusts in excess of $740 million. In addition, since Wells Fargo itself committed the wrongdoing complained of herein, and is accused of grossly negligent and willful misconduct, it therefore is not disinterested and lacks independence to exercise business judgment. Moreover, Wells

Fargo has benefitted from, and continues to benefit from, its wrongdoing as alleged herein (*i.e.*, failures to act), as Wells Fargo has maintained and preserved its business relationships with the Warrantors, Master Servicers and Servicers and has thereby continued to derive financial benefits from serving as Trustee to the Covered Trusts, and many other RMBS trusts, due to its continuing wrongdoing as alleged herein. Wells Fargo's wrongdoing has also resulted in protecting itself against liability from others that would have occurred from disclosures that it engaged in SEOTs and breached R&Ws.

165.    The Covered Trusts can only act through Wells Fargo since Wells Fargo is the Trustee of each Covered Trust. When Wells Fargo failed to act as required by the Governing Agreements and the TIA to protect the Covered Trusts and their assets –including the Mortgage Loans and the rights attendant to them – Wells Fargo caused the Covered Trusts to suffer massive losses. Wells Fargo deliberately failed to perform the following duties required of it under the Governing Agreements and the TIA, which injured the Covered Trusts: (1) enforce the Covered Trusts' rights to pursue and enforce breach of R&W claims against the Warrantors; (2) notify and require that the Master Servicers and Servicers cure their SEOTs, provide notice of defaults to plaintiff and the class, and take further actions, such as terminating or replacing the Master Servicers and Servicers; and (3) act as a prudent person during the defaults.

166.    Wells Fargo's failures to act amounted to gross negligence and willful misconduct on its part and caused the Covered Trusts to suffer losses in excess of $740 million. Plaintiff seeks to recover, for the benefit of the Covered Trusts: (i) the losses suffered by the Covered Trusts to date; (ii) all future losses caused by Wells Fargo's failures to act as required by the Governing Agreements and the TIA; and (iii) equitable relief enjoining Wells Fargo from continuing to breach the Governing Agreements and the TIA.

## COUNT I

**Violation of the Trust Indenture Act of 1939, 15 U.S.C. §77aaa, *et seq*.**

167.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

168.    Congress enacted the TIA, 15 U.S.C. §77aaa, *et seq*., to ensure, among other things, that investors in RMBS, bonds and similar instruments have adequate rights against, and receive adequate performance from, the responsible trustees.  15 U.S.C. §77bbb.  The Covered Trusts' Governing Agreements are "indentures" and Wells Fargo is an "indenture trustee" within the meaning of the TIA.  15 U.S.C. §77ccc(7), (10).  Moreover, the TIA applies to and is deemed to be incorporated into the Governing Agreements and the related RMBS.  15 U.S.C. §77ddd(a)(1).  Wells Fargo violated multiple provisions of the TIA.

169.    First, the TIA requires that, prior to default, the indenture trustee shall be liable for its failure to perform any duties specifically set out in the indenture.  15 U.S.C. §77ooo(a)(1).  As alleged above, Wells Fargo failed to perform the following duties specifically assigned to it by the Governing Agreements:

(a)    the duty to notify the Warrantors and other parties to the Governing Agreements of the Warrantors' R&W breaches and, if necessary, enforce the Warrantors' obligations to cure, substitute or repurchase Mortgage Loans, when Wells Fargo discovered breaches of the Warrantors' R&Ws concerning such Mortgage Loans;

(b)    the duty to notify the Master Servicers and Servicers of their SEOTs and require a cure; and

(c)    the duty to notify plaintiff and the class of the Warrantor's breaches of their R&Ws and the uncured SEOTs by the Master Servicers/Servicers; and

(d)      the duty to exercise the rights and powers conferred on it by the Governing Agreements to take further actions, including terminating or replacing a Master Servicer or Servicer that was engaging in an SEOT, or assuming its duties.

170.    Second, regardless of what the Governing Agreements provide, the TIA requires that Wells Fargo inform plaintiff and the class of all defaults under the Governing Agreements known to Wells Fargo within 90 days after their occurrence.   15 U.S.C. §77ooo(b) (citing 15 U.S.C. §77mmm(c)).  As alleged herein, there were numerous SEOTs by the Master Servicers and Servicers under the Governing Agreements of which Wells Fargo was aware.  In addition, as alleged herein, Wells Fargo had knowledge of massive breaches of the Warrantors' R&Ws, which were also defaults under the TIA.  Wells Fargo was required to provide notice of those defaults to plaintiff and the class within 90 days, yet Wells Fargo failed to provide such notice to plaintiff and the class, thereby violating the TIA, 15 U.S.C. §77ooo(b).

171.    Third, during a default, the TIA requires Wells Fargo to exercise all of its rights and powers under the Governing Agreements as a prudent person would in the conduct of his or her own affairs.  15 U.S.C. §77ooo(c).  Given the obvious negative impacts of the defaults alleged herein, any prudent person under those circumstances would have exercised all of his or her rights and powers to, among other things, promptly compel and enforce the cure, substitution or repurchase of defective Mortgage Loans that breached the Warrantors' R&Ws in a timely fashion, and take prompt actions to notify plaintiff and the class of the Master Servicers' and Servicers' SEOTs, and remedy such SEOTs. Indeed, with the huge numbers of breaching and defaulting Mortgage Loans in the Covered Trusts, and the pervasive SEOTs that were and are occurring, plaintiff, the class and the Covered Trusts could have been protected in large part from the damages they suffered only through Wells Fargo's

prompt and prudent exercise of those rights. By failing to prudently exercise its rights in those circumstances, Wells Fargo violated the TIA, 15 U.S.C. §77ooo(c).

172.    Wells Fargo is therefore liable to plaintiff, the class and the Covered Trusts for their actual losses and damages incurred as a result of Wells Fargo's violations of the TIA.

## COUNT II

## Breach of Contract

173.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

174.    As set forth above, the Governing Agreements are contracts setting forth the duties Wells Fargo owed to plaintiff, the class and the Covered Trusts with respect to their RMBS and the Mortgage Loans in the Covered Trusts. As a matter of law, the Governing Agreements incorporate the provisions of the TIA. Under the Governing Agreements and the TIA, Wells Fargo owed plaintiff, the class and the Covered Trusts duties to perform certain obligations, including, without limitation, the following:

(a)    the duty to promptly notify the Warrantors and other parties to the Governing Agreements of the Warrantors' R&W breaches and, if necessary, enforce the Warrantors' obligations to cure, substitute or repurchase any and all defective Mortgage Loans;

(b)    the duty to promptly notify the Master Servicers and Servicers of their SEOTs within the period prescribed in the Governing Agreements upon obtaining knowledge of such defaults and requiring the cure of said SEOTs;

(c)    the duty to notify plaintiff and the class of SEOTs and the Warrantors' breaches/defaults;

(d)     the duty to take additional actions during SEOTs, including taking actions to terminate or replace Master Servicers and Servicers that fail to cure their SEOTs, or assuming their responsibilities; and

(e)     the duty to exercise all of Wells Fargo's rights and powers under the Governing Agreements during SEOTs for the benefit of plaintiff and the class and as a reasonable and prudent person would in the conduct of his or her own affairs.

175.     As alleged herein, Wells Fargo failed to perform the above duties required of it by the Governing Agreements and therefore breached them.  Wells Fargo's breach of its duties set forth in the Governing Agreements deprived plaintiff, the class and the Covered Trusts of the benefit of their bargain, *i.e.*, they did not receive RMBS that were collateralized by Mortgage Loans that were warranted to be of a certain credit quality, and breaches of the R&Ws were not enforced as required by the Governing Agreements.  These breaches of the Governing Agreements by Wells Fargo caused plaintiff, the class and the Covered Trusts to suffer damages.

176.     In addition, plaintiff and the class did not receive the benefit of their bargain under the Governing Agreements when Wells Fargo failed to perform the obligations required of it by the Governing Agreements after Wells Fargo knew of uncured and ongoing SEOTs.  Wells Fargo's failure to act breached the Governing Agreements, preventing plaintiff and the class from obtaining notice of the SEOTs, which would allow them to mobilize and direct Wells Fargo on how to deal with the SEOTs, causing plaintiff, the class and the Covered Trusts to suffer damages.

177.     Furthermore, plaintiff, the class and the Covered Trusts did not receive the benefit of their bargain, to wit, that Wells Fargo would act as a prudent person and exercise all of its rights and powers under the Governing Agreements to protect plaintiff and the class as though it were seeking to

protect its own interests when Wells Fargo knew of SEOTs.  Wells Fargo's failure to so act breached the Governing Agreements and caused plaintiff, the class and the Covered Trusts to suffer damages.

178.    Wells Fargo and its responsible officers discovered and/or had actual knowledge of the Warrantors' breaches of their R&Ws and the Master Servicers' and Servicers' SEOTs, as they learned of them as alleged herein.

179.    As a result of Wells Fargo's multiple breaches of the Governing Agreements alleged herein, Wells Fargo is liable to plaintiff, the class and the Covered Trusts for the damages they suffered as a direct result of Wells Fargo's failure to perform its contractual obligations under the Governing Agreements.

180.    In addition, Wells Fargo has engaged in continuing breaches, as well as multiple new and additional breaches, of the Governing Agreements by failing to fulfill its duties to act as alleged herein and has caused plaintiff, the class and the Covered Trusts to suffer additional damages.

## COUNT III

### Breach of Trust

181.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

182.    Under common law, Wells Fargo had a duty to plaintiff and the class to affirmatively avoid conflicts of interest with them *at all times*.  Further, that duty also required Wells Fargo to refrain from advancing its own interests at the expense of plaintiff and the class, or benefitting therefrom *at all times*.

183.    Wells Fargo breached its duty of trust owed to plaintiff and the class by failing to avoid conflicts of interest and by advancing its own interests at the expense of plaintiff and the class, by failing to demand that the Warrantors cure, substitute, or repurchase Mortgage Loans that

breached their R&Ws, and by failing to act, and failing to act prudently, as was required when it became aware of uncured SEOTs by the Master Servicers and Servicers, as alleged herein.

184.    By doing so, Wells Fargo breached its common law duty of trust to plaintiff and the class.

185.    Wells Fargo has continued to breach its duty of trust and has also engaged in new and additional breaches of its duty of trust, and thus has continually failed to fulfill its duty of trust.

186.    As a result of Wells Fargo's breaches of its duty of trust, defective Mortgage Loans were not remedied and SEOTs were not corrected, and continued unabated, causing plaintiff and the class to suffer substantial damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure, and appointing the undersigned as class counsel;

B.    Alternatively, allowing this action to proceed as a derivative action in the right and for the benefit of the Covered Trusts;

C.    Awarding damages and/or equitable relief in favor of plaintiff, the class and/or the Covered Trusts against Wells Fargo for breaches of its statutory, contractual and common law duties, in an amount to be proven at trial, including interest thereon;

D.    Awarding plaintiff, the class and the Covered Trusts their reasonable costs and expenses incurred in this action, including counsel and expert fees; and

E.    Such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

DATED:  December 10, 2014   ROBBINS GELLER RUDMAN
                & DOWD LLP
                SAMUEL H. RUDMAN

                SAMUEL H. RUDMAN

                58 South Service Road, Suite 200
                Melville, NY  11747
                Telephone:  631/367-7100
                631/367-1173 (fax)

                ROBBINS GELLER RUDMAN
                & DOWD LLP
                ARTHUR C. LEAHY
                655 West Broadway, Suite 1900
                San Diego, CA  92101-8498
                Telephone:  619/231-1058
                619/231-7423 (fax)

                Attorneys for Plaintiff

## VERIFICATION

I, Guido De Clercq, hereby declare as follows:

I am Chairman of the Board of Directors of Royal Park Investments sa/nv ("RPI"), plaintiff in the within entitled action. RPI owns the RMBS in the Covered Trusts alleged herein and owned such RMBS at the time of most of the wrongdoing complained of herein. RPI further understands that it has acquired the rights and claims of the previous holders of the RMBS that held during the time of the wrongdoing complained of herein either contractually or by operation of New York General Obligations Law §13-107. RPI has continuously held such RMBS since acquiring them. RPI has retained competent counsel and is ready, willing and able to pursue this action vigorously on behalf of the Covered Trusts. I have read the Class Action Complaint and Alternative Verified Derivative Action for Breach of the Trust Indenture Act, Breach of Contract and Breach of Trust. Based upon discussion with, and reliance upon, my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signed and Accepted:

DATED: December 10, 2014

ROYAL PARK INVESTMENTS SA/NV

By: _____
    Guido De Clercq
    Chairman of the Board

# APPENDIX 1

## APPENDIX 1

- **May 2007**: *The New York Times* reported that <u>***Covered Trust Warrantor Ownit – Ownit was a Warrantor to the ABFC 2006-OPT1 Covered Trust*** *– admitted, through its CEO, that Ownit "loosen[ed] [its] lending standards . . . under pressure from [its] investors, particularly Merrill Lynch, which wanted more loans to package into lucrative [mortgage-backed] securities*</u>."

- **September 2007**: It was reported that <u>***SASC 2007-BC1 Covered Trust Warrantor Lehman and loan originator Lehman Bank*** *had purchased mortgage loans which breached their R&Ws from another lender and that such defective loans were included in RMBS trusts sponsored by Lehman*</u>.

- **October 26, 2007**: The *Boston Globe* reported that a mortgage broker with which <u>***Option One – a Warrantor and loan originator for both Covered Trusts***</u> – did business was shut down by the Massachusetts Division of Banks.  The news article reported that the mortgage broker was shut down by the Commonwealth because it inflated the incomes of borrowers.  The news article cited several examples of borrowers whose incomes had been falsely inflated, and in some cases, nearly tripled.

- **October 2007**: Alan Hummel, Chair of the Appraisal Institute, testified to a U.S. House Committee *that appraisers "experience[d] <u>systemic problems with coercion" and were "'ordered to doctor their reports' or else they would never 'see work . . . again' and/or would be placed on 'exclusionary appraiser lists*.'"</u>

- **December 30, 2007**: The *Kansas City Star* reported that Kurt Eggert, a law professor and member of the Federal Reserve's Consumer Advisory Panel, stated: "'***Originators were making loans based on quantity rather than quality . . . . They made loans even when they didn't make sense from an underwriting standpoint***.'"  The article also stated: "Mark Duda, a research affiliate at Harvard University's Joint Center for Housing Studies, said that because ***brokers were so intent to quickly sell off loans to investors, they had little incentive to make sure the loans were suitable for borrowers.  'They were setting people up to fail***,' Duda said."

- **January 2008**: It was reported that Cleveland, Ohio had sued 21 mortgage lenders and investment banking firms, alleging that ***they had caused "entire neighborhoods" in the city to become full of "abandoned and boarded up properties" because the lenders and investment bankers "routinely ma[de] loans to borrowers who had no ability to pay them back."***  <u>***The defendants included all of the Warrantors and loan originators for the Covered Trusts (or their related companies): Bank of America, Option One, Ownit (through its part owner Merrill Lynch), Lehman, and thus Lehman Bank and BNC (through Lehman)***</u>.

- **June 2008**: The Massachusetts Attorney General sued <u>***Option One – a Warrantor and loan originator for both of the Covered Trusts***</u>.  *The Massachusetts Attorney General alleged that, beginning in 2004, Option One "increasingly disregarded underwriting standards, created incentives for loan officers and brokers to disregard the interests of the borrowers*

*and steer them into high-cost loans, and originated thousands of loans that [Option One] knew or should have known the borrowers would be unable to pay, all in an effort to increase loan origination volume so as to profit from the practice of packaging and selling the vast majority of [Option One's] residential subprime loans to the secondary market*." Complaint, *Commonwealth of Massachusetts v. H&R Block, Inc., et al.*, No. SUCV2008-2474 (Mass. Super. Ct., Suffolk Cnty. June 3, 2008). The Massachusetts Attorney General *alleged that Option One's agents and brokers "frequently overstated an applicant's income and/or ability to pay, and inflated the appraised value of the applicant's home," and that Option One "avoided implementing reasonable measures that would have prevented or limited these fraudulent practices." Id. As a result, Option One's "origination policies . . . employed from 2004 through 2007 have resulted in an explosion of foreclosures*." *Id.*

- **August 14, 2008**:  The California Commissioner of Corporations ordered *Covered Trust Warrantor Option One, which was a Warrantor for both Covered Trusts, to cease mortgage lending activities in California because Option One was "conducting residential mortgage lending . . . in violation of Section 50205 of the [California] Financial Code and [was] conducting business in such an unsafe and injurious manner as to render further operations hazardous to the public or to customers*."

- **November 13, 2008**: The U.S. Government's OCC released a report entitled the "Worst Ten in the Worst Ten," identifying the ten metropolitan areas in the United States with the highest foreclosure rates in the first half of 2008, and the lenders that made the loans. The report studied loans originated from 2005 through 2007 – covering the time period the Mortgage Loans were originated, warranted and transferred to the Covered Trusts – and revealed that they had astoundingly high foreclosure rates: *from 13.9% to 22.9% of the loans were in foreclosure in the ten areas during the first half of 2008. These foreclosure rates were far higher than the historical average because "[p]rior to 2007, the foreclosure rate was historically less than 1%." FCIC Report at 402. The list of offending lenders identified in the OCC report included BNC, Option One and Ownit, each a Warrantor and/or loan originator to the Covered Trusts*.

- **November 2008**: A Massachusetts *court granted a preliminary injunction against Covered Trust Warrantor Option One and in favor of the Massachusetts Attorney General, finding that "certain mortgage loans [issued by Option One] were 'presumptively unfair,' because they posed an unreasonable risk of default and foreclosure*." *The preliminary injunction was subsequently affirmed on appeal*, and Option One's parent company eventually agreed to *pay $125 million to settle the suit*.

- **November 2008**: *BusinessWeek* published an exposé on the mortgage lending industry. The *Business Week* article identified *Covered Trust Warrantors and loan originators BNC, Merrill Lynch, which was part owner of Covered Trust Warrantor Ownit, and Lehman* and reported that their *"[loan] wholesalers . . . offered bribes to fellow employees [to approve unacceptable loan applications], fabricated documents, and coached brokers on how to break the rules. . . . [Loan] [b]rokers, who work directly with borrowers, altered and shredded documents. [In addition, loan] [u]nderwriters, the bank employees who actually approve mortgage loans, also skirted boundaries, demanding secret payments from*

*wholesalers to green-light loans they knew to be fraudulent."*  With respect to <u>Covered Trust loan originator BNC, which was owned by Warrantor Lehman</u>, *the article reported the following*:

> ### *DEMANDING "SPIFFS"*
>
> *       *       *
>
> Coleen Colombo joined the Concord (Calif.) branch of BNC in 2003.  The small office, next to a Mercedes-Benz dealership and a run-down Kmart (SHLD), was part of a regional group that funded some $1.2 billion of loans a month.  Colombo initially thrived in her job as a senior underwriter.  In a performance review, she received a top rating of "exceeds expectations," according to a wrongful termination and harassment suit filed in California Superior Court on behalf of Colombo and five other female employees.
>
> The environment turned hostile in 2005, the suit says.  One fellow employee, *a male wholesaler, began bringing Colombo questionable loans with incorrect salaries, occupations, and home values, she says.  In one instance, she claims in the suit, the wholesaler "tried to bribe [Colombo] to allow a loan with fraudulent information to go through*."
>
> *The bribes, known as spiffs, were common at the BNC branch, says Sylvia Vega-Sutfin, a former wholesaler who left the firm in 2005*.  The mother of four, who says she made $16,000 a month during the boom, says that some *underwriters demanded spiffs of $1,000 for the first 10 loans and $2,500 for the next 20 loans*, whether they approved the mortgages or not.  When she refused to pay them, Vega-Sutfin says, her loan files started to go missing and the size of her commission checks plummeted.  *Her bosses "said they would make an example of me to others: 'If you complain, this is what will happen,'" she says*.
>
> *Colombo says in the suit that she e-mailed the regional vice-president for operations to report the wholesaler who tried to bribe her.  She claims the vice-president brushed off her complaints in a meeting*.  Colombo "left the office in tears," the suit says.  *After she returned from a short leave of absence, the branch manager told her a co-worker "wanted her terminated for making the complaints," Colombo claims*.
>
> Meanwhile, the wholesaler who tried to bribe Colombo started sexually harassing her, according to the suit.  The male colleague made her feel "uncomfortable and fearful" by "intentionally rubbing his body against hers."  Columbo resigned from BNC in 2005.  "You would have thought he was the pimp and we were his prostitutes," says Linda Weekes, another underwriter who is part of the suit.  "*It felt like a dirty, sleazy place to work*."

# APPENDIX 2

**APPENDIX** 2

- **February 23, 2009**: Investors filed a complaint alleging that ***Covered Trust Warrantor Lehman***, its related companies and its officers and directors ***made false statements concerning Mortgage Loans within, inter alia, the SASC 2007-BC1 Covered Trust***. *See* Complaint, *In re Lehman Bros. Sec. and ERISA Litig.*, Nos. 09 MD 2017 (LAK) and 08-cv-6762 (S.D.N.Y. Feb. 23, 2009). ***The complaint alleged that Lehman had misrepresented that the Mortgage Loans within the SASC 2007-BC1 Covered Trust were originated in accordance with certain underwriting guidelines***.

- **April 22, 2009**: A *Mercury News* article headlined "Reckless mortgage lending in late '06 fueled California default wave" reported that an astounding ***64% of Covered Trust Warrantor Ownit's** loans originated from August to November 2006 had defaulted*. The article stated that ***Ownit and other lenders acted "recklessly," making loans "that had multiple risks" to "too many borrowers [who] could not afford their loans***."

- **September 2009**: National Public Radio interviewed former Morgan Stanley employee Mike Francis, who worked as an Executive Director on Morgan Stanley's residential mortgage trading desk. Francis revealed that there was industrywide misconduct occurring during the time period the Mortgage Loans were originated, warranted and transferred to the Covered Trusts. Francis stated: "***No income no asset loans, that's a liar's loan. We are telling you to lie to us, effectively. I mean, we're hoping you don't lie, but – tell us what you make. Tell us what you have in the bank. But we're not going to actually verify it? We're setting you up to lie. Something about that transaction feels very wrong. It felt wrong way back when. And I wish we had never done it. Unfortunately what happened, we did it because everybody else was doing it***."

- **January 22, 2010**: The *Dow Jones Newswire* reported on the story of Option One borrower Sarah Schrock, who "has a low credit score[,] . . . has had trouble holding on to jobs[, and] is deaf." In 2006, Schrock obtained a loan from ***Option One – a Warrantor to both of the Covered Trusts*** – through a mortgage broker named Soldi Financial LLC. The news article reported that Schrock claimed a "Soldi ***loan broker falsified her income to get her into a loan [from Option One] whose monthly payment exceeded her income***." The article further reported that one of Soldi's regional managers was sentenced to prison for mortgage fraud. These news reports further confirmed that Option One's loans did not comply with its R&Ws.

- **July 22, 2010**: The Comptroller of the State of New York sued ***Covered Trust Warrantor Ownit's*** partial owner Merrill Lynch alleging that ***Ownit increased its origination of loans to "borrowers with poor credit histories" at Merrill Lynch's insistence and "weaken[ed] its underwriting guidelines to originate more 'liar' loans" at Merrill Lynch's direction***. The lawsuit alleged that this forced Ownit into bankruptcy due in part to $93 million in R&W claims against Ownit by Merrill Lynch, which had purchased Ownit's defective loans. *See* Complaint, *DiNapoli v. Merrill Lynch & Co., et al.*, No. 10-cv-5562 (S.D.N.Y. July 22, 2010).

- **November 22, 2010**:  It was reported that Compass Point Research & Trading, a mortgage research firm, estimated that ***Covered Trust Warrantor Bank of America* faced up to $35 billion in R&W claims**, based in part on its subsidiary Merrill Lynch's breaches.  Merrill Lynch was a part owner of ***Covered Trust Warrantor Ownit***.

- **December 2010**: It was reported that JPMorgan analysts estimated "that 'put-back risk'" for loan warrantors, *i.e.*, loans subject to repurchase demands due to breaches of R&Ws, ranged ***from $60 to $110 billion for RMBS trusts like the Covered Trusts***.

- **March 21, 2011**: ***A United States District Court in Massachusetts certified a class of up to 130,000 African American borrowers suing <u>Covered Trust Warrantor Option One</u>.  The action alleged that Option One violated several federal statutes by engaging in discriminatory mortgage lending, a clear breach of Option One's R&Ws***.[1]

- **April 2011**:  RMBS insurer Assured Guaranty announced that ***<u>Covered Trust Warrantor Bank of America</u> was paying over $1 billion to settle R&W breach claims covering Bank of America's, and its subsidiary Countrywide's, RMBS securitizations***.

---

[1]     On April 24, 2012, the U.S. Securities and Exchange Commission filed a complaint against Option One alleging that ***Option One deceived RMBS investors by representing that it would repurchase any loans that breached its R&Ws, while simultaneously concealing that repurchase demands on Option One were so large that it could not meet its repurchase obligations***.  *See* Complaint, *SEC v. Option One Mortgage Corp., et al.*, No. SACV12-0633 (C.D. Cal. Apr. 24, 2012).  The same day, ***Option One agreed to pay $28.2 million to settle the charges***.

# APPENDIX 3

## APPENDIX 3

- **October 4, 2010**: California state assemblyman Ted Lieu, in discussing the rash of improper loan servicing and foreclosure issues, stated: "*[W]hat we have here is massive fraud being perpetrated on the courts. . . .  We're talking about hundreds of thousands of foreclosures that are now at risk because of what these robo-signers are doing. . . .  [Credit rating agency] Fitch . . . has come out and stated that they believe that this is an industry wide practice. . . .  [Y]ou just had [a] basic level failure to follow existing laws.  And you have people that are falsifying documents in front of judges. . . .  [Just] [y]ou imagine what is going on in [the] 27 other [non-judicial foreclosure] states where you don't have any judicial oversight*."

- **October 2010**:  The Ohio Attorney General began scrutinizing ***Covered Trust Servicer JPMorgan – a Servicer for the SASC 2007-BC1 Covered Trust*** – by sending a letter to JPMorgan seeking information about its robo-signing practices.  ***Defendant Wells Fargo also received such a letter***.

- **October 2010**: *The U.S. House Judiciary Committee sent similar letters to* most major loan servicers demanding the production of documents relating to their robo-signing and foreclosure practices.  *Master Servicers and Servicers to the Covered Trusts receiving letters from the House Judiciary Committee included Covered Trust Servicer JPMorgan and defendant Wells Fargo*.

- **October 2010**: The *Miami Daily Business Review* reported on a Florida attorney who had 150 deposition transcripts from people who robo-signed false foreclosure affidavits for loan servicers.  *The news article reported that the deposition transcripts included testimony from employees of Covered Trust Master Servicers/Servicers Aurora, JPMorgan and AHM Servicing, and defendant Wells Fargo*.  The attorney was quoted as saying that the 150 depositions "*prove flawed foreclosure documents are part of a fraudulent system*, not sloppy procedures" by loan servicers.  The attorney stated: "'*We are not talking about a mistake.  We are talking about perjury, crime . . . .This is system-wide* . . . .'"

- **October 2010**: It was reported that *U.S. regulators were "conducting an intensive probe of reportedly false foreclosure affidavits used by major U.S. financial institutions to evict thousands of American homeowners*."

- **October 2010**:  It was reported that *Covered Trust Servicer JPMorgan was freezing 56,000 foreclosures in 23 states because of forged documents, forged signatures and other loan servicing issues.  It was also reported that Wells Fargo was forced to submit revised documents in 55,000 of its foreclosures, obviously due to its robo-signing*.

- **October 2010**: Multiple news reports surfaced about many of the Master Servicers or Servicers to the Covered Trusts, reporting that they were widely and routinely engaged in robo-signing and other improper loan servicing practices.  For example, *it was reported that Covered Trust Servicer AHM Servicing was using false, robo-signed foreclosure documents*.  *It was also reported that defendant Wells Fargo admitted that its employees signed hundreds of foreclosure documents daily without reading them*.

- **October 2010**:  The *Mortgage Daily* reported that Bank of America, **had released statistics indicating that "80 percent of its borrowers who faced foreclosure had not even made a payment in more than a year, while the average foreclosed loan was 560 days past due**," or over 18 months past due, graphically illustrating the long delays caused by loan servicers' misconduct.   Similarly, **Wells Fargo reported that its average foreclosed loan as of September 2010 was 16 months past due, obviously due to servicing misconduct which caused long delays**.[1]

- **October 28, 2010**:  **Bloomberg reported that <u>AHM Servicing, a Servicer to both Covered Trusts</u>, was facing a barrage of lawsuits, including lawsuits by the States of Texas and Ohio, at least one class action, and numerous individual suits, alleging that it was engaged in widespread loan servicing misconduct that amounted to SEOTs**.

- **Late October 2010**: It was reported that **the Attorneys General of all 50 states were investigating "whether mortgage lenders falsified affidavits attesting to their review and verification of foreclosure documents, as well as whether they failed to sign the affidavits in the presence of a notary public**."  Illinois Attorney General Lisa Madigan stated:  "**The same mortgage giants and big banks that fraudulently put people into unfair loans are now fraudulently throwing people out of their homes.  They should not be above the law.  Illinois homeowners are legally entitled to a foreclosure process that is transparent, accurate and fair**."

- **October 31, 2010**:  The *Houston Chronicle* reported that the SEC sent letters to loan servicers "**urg[ing] [them] to disclose their expected losses from flawed foreclosure documents**."  It was further reported that <u>**Covered Trust Servicer JPMorgan and defendant Wells Fargo had set aside billions to cover buybacks of loans they had improperly serviced**</u>.

---

[1]    Subsequently, a report by Amherst Securities Group LP ("Amherst") in February 2012 noted that the average delinquency time for liquidated loans grew from 21 months in September 2010 to 26 months by February 2012, an increase in delays of nearly 25%.  In addition, Amherst reported that the average delinquency time for non-performing (*i.e.*, non-liquidated) loans increased from 19 months in September 2010 to 24 months by February 2012, an increase in delays of over 26%.  Amherst reported that these statistics **demonstrated "the delay created by the [loan servicers'] robo-signing actions**."  The report further stated that "**we believe the remaining loans will stay in the [delinquency] pipeline for another 12-15 months**," further demonstrating the compounding effect of the delays caused by the Master Servicers'/Servicers' ongoing robo-signing.

# APPENDIX 4

APPENDIX 4

- **November 2010**: *U.S. Treasury Department Assistant Secretary Michael Barr* provided an update on the investigation of loan servicers by U.S. banking regulators. Barr announced that they were uncovering "*widespread" and "inexcusable" breakdowns in loan servicing practices*. Barr stated: "*These problems must be fixed*."

- **November 4, 2010**: *Legal Services of New Jersey provided a report to the New Jersey Supreme Court* detailing numerous instances of robo-signing and false affidavits in connection with foreclosure proceedings in New Jersey and throughout the nation. The report, which was supported by evidentiary exhibits, such as deposition transcripts of robo-signers indicating that they lied in court documents and falsified and back-dated documents, and other evidence of fraud, *concluded that "[a] great volume of national information . . . suggests a pervasive, industry-wide pattern of false statements and certifications at various stages of foreclosure proceedings*." *The report specifically implicated many of the Covered Trust Master Servicers and Servicers in the misconduct, including Option One, JPMorgan and AHM Servicing, and even noted that Wells Fargo was involved in a number of fraudulent foreclosures*.[1]

- **December 20, 2010**: New Jersey Administrative Director of the Courts, Judge Grant, issued an administrative order requiring 24 loan servicers and RMBS trustees to file certifications demonstrating that there were no irregularities in the handling of their foreclosure proceedings. *The order was directed at, among others, Aurora and Nationstar, Master Servicers and/or Servicers to the SASC 2007-BC1 Covered Trust. Judge Grant's order cited specific instances of improper foreclosures by Covered Trust Servicer JPMorgan, and also cited cases in which Wells Fargo itself was involved with improper foreclosures. Judge Grant's order identified Covered Trust Master Servicers and Servicers who collectively serviced Mortgage Loans in each of the two Covered Trusts*.

- **December 20, 2010**: Judge Jacobson of the Superior Court of New Jersey in Mercer County *issued an order to show cause directed at, inter alia, Covered Trust Servicer JPMorgan, and defendant Wells Fargo*! *The order to show cause held that JPMorgan and Wells Fargo were selected for scrutiny because of their "public record of questionable practices," "deposition testimony provided by [their] employees" that "raised serious questions about the accuracy and reliability of documents submitted to courts," and "the execution of affidavits, certifications, assignments, and other documents in numerous residential mortgage foreclosure actions in New Jersey and elsewhere [that] may not have*

---

[1] The report noted that the "*[c]ommon practices and characteristics*" that Legal Services of New Jersey found in its nationwide investigation included: (a) affiants claiming personal knowledge of facts that the affiant had no personal knowledge of; (b) failure to review documents and evidence on which certifications were based; (c) false statements about when and how a loan was transferred; (d) false identification of signatories (*e.g.*, an employee of a servicer will be identified as a vice president, or similar title, of the foreclosing mortgagee); (e) forged signatures; and (f) improperly and illegally notarized documents.

- 1 -

*been based on personal knowledge in violation of the Rules of Court and may thus be unreliable*."

- **December 2010**:  In testimony before the U.S. House Judiciary Committee, Thomas Cox, an attorney for the Maine Attorneys Saving Homes Project, presented compelling evidence against ***Covered Trust Servicer JPMorgan*** and loan servicers GMAC and Bank of America, revealing that they were engaged in systemic foreclosure fraud.  Cox also testified to the prevalence of foreclosure fraud by the loan servicing industry in general: "***I know from my personal experience over the past two and one half years that this kind of servicer fraud-on-the-court activity is not isolated to GMAC Mortgage.  It has been the norm across the entire foreclosure industry, including the other servicers represented here today, [including Covered Trust Servicer] JPMorgan Chase***."  Cox's testimony expressly stated that fraudulent foreclosure practices amounting to SEOTs were occurring "***across the entire foreclosure industry***" and were thus not isolated or infrequent.  Indeed, over two years later, after the massive scope of this misconduct finally became known to those outside of the loan servicing and RMBS trustee industries, Yale Law School Professor Raymond Brescia stated: "'***I think it's difficult to find a fraud of this size on the U.S. court system in U.S. history. . . .  I can't think of one where you have literally tens of thousands of fraudulent documents filed in tens of thousands of cases***.'"

- **December 2010**: An article published in the *Yale Journal on Regulation* and written by law professor Adam Levitin and attorney Tara Twomey concluded:

  > *[T]he residential mortgage servicing business . . . suffers from an endemic principal-agent conflict between investors and servicers.  Securitization separates the ownership interest in a mortgage loan and the management of the loan.  <u>Securitization structures incentivize servicers to act in ways that do not track investors' interests,</u> and these structures limit investors' ability to monitor servicer behavior*.

  > \*          \*          \*

  > *As a result, <u>servicers are frequently incentivized to foreclose on defaulted loans rather than restructure the loan, even when the restructuring would be in the investors' interest</u>*.

- **December 2010**: In a U.S. Senate Banking, Housing and Urban Affairs Committee hearing, law professor Kurt Eggert testified that ***loan servicers were incentivized to initiate foreclosures and then extend them for long periods of time since it allowed the servicers time to add improper and excessive "junk fees" to the amounts owed by borrowers***.  Then, when the mortgages were finally foreclosed and the properties sold, the loan servicers' improper "junk fees" would be paid first, before the remaining amounts, if any, were remitted to the RMBS trusts, thus generating substantial (but bogus) fees for the servicers while improperly diverting money away from RMBS investors like plaintiff and the class.

- **December 2010**: Professor Eggert also testified that ***loan servicers were often also the originators and warrantors of the mortgage loans in the trusts, and therefore would have***

- 2 -

*firsthand knowledge of any breaches of their R&Ws (similarly, at least one of the Warrantors to the Covered Trusts was also the Master Servicer or Servicer of the very same Mortgage Loans it warranted).* Under RMBS trust agreements, master servicers and servicers were required to notify the trustee whenever they discovered breaches of their own (or their related companies') R&Ws. *See, e.g.*, ABFC 2006-OPT1 PSA §2.03(d). Eggert testified that *master servicers and servicers of RMBS did not notify anyone of their own breaches, because they would basically be turning themselves in and, therefore, would have to pay for their breaches* by curing, substituting or repurchasing defective loans. <u>**Both Covered Trusts had at least one Warrantor that was also a Master Servicer or Servicer to the Covered Trust at the same time**</u>.

- **December 2010**: Professor Eggert further testified that loan servicers owned large numbers of second lien loans while the RMBS trusts owned the majority of first lien loans. *This incentivized loan servicers to refuse to modify first lien loans in ways that would benefit RMBS investors because it would harm the servicers' interests in their second lien loans*, which second liens were typically extinguished in a modification of a first lien loan, causing losses to the loan servicers. Thus, *loan servicers would encourage borrowers of second lien loans owned by the servicers to make payments due on such second lien loans instead of the RMBS trusts' first lien loans*. These perverse incentives, which caused loan servicers to service the mortgage loans in ways that hurt RMBS investors, instead of benefitting them as required by the Governing Agreements, were yet additional SEOTs under the Governing Agreements.

- **January 26, 2011**: *The U.S. Inspector General released a report* in which the following observations were made about the loan servicing industry:

  > *Anecdotal evidence of [loan servicers'] failures [have] been well chronicled. From the repeated loss of borrower paperwork, to blatant failure to follow program standards, to unnecessary delays that severely harm borrowers while benefiting servicers themselves, stories of servicer negligence and misconduct are legion, and . . . they too often have financial interests that don't align with those of either borrowers or investors.*

- **January 27, 2011**: *The FCIC Report further confirmed the existence of loan servicers' conflicts of interests with RMBS investors which led to SEOTs by the Covered Trusts' Master Servicers/Servicers*. The FCIC reported that loan servicers were improperly denying borrowers' loan modifications under the U.S. Government's "HAMP" program, which was created to assist borrowers with obtaining mortgage loan modifications to avoid foreclosures. FCIC Report at 405. Most of the Master Servicers and Servicers had joined the HAMP program and had agreed to modify qualifying loans and borrowers in exchange for monetary incentives from the government. The FCIC Report noted that Diane Thompson of the National Consumer Law Center had testified before the U.S. Senate's Banking, Housing, and Urban Affairs Committee, stating that "'[o]nly a very few of the potentially eligible borrowers have been able to obtain permanent modifications. *Advocates continue to report that borrowers are denied improperly for HAMP . . . and that some servicers persistently disregard HAMP applications*.'" *Id.* The FCIC Report also noted that a Moody's Investors

Service managing director "*learned that a survey of servicers indicated that very few troubled mortgages were being modified*." *Id.* at 223.

- **January 27, 2011**: *The FCIC Report confirmed that loan servicers had incentives to push loans into foreclosure rather than to modify them in a manner that would benefit RMBS investors because the servicers collected large fees from foreclosures*. Loan modifications in many cases were beneficial to RMBS investors because a borrower that continued to make loan payments – even reduced modified payments – could be much more profitable to RMBS investors over time than a borrower who had ceased making payments and who was foreclosed on in a depressed real estate market with excessive loan servicing fees being deducted from the proceeds going to the RMBS trusts.

- **January 27, 2011**: *The FCIC Report further re-confirmed the robo-signing scandal*, noting testimony given by New York State Supreme Court Justice F. Dana Winslow to the U.S. House Judiciary Committee. Justice Winslow testified that the loan servicing issues had become so prevalent in New York that an RMBS trustee's standing to foreclose had "'become . . . a pervasive issue.'"   FCIC Report at 407.   The FCIC Report further documented numerous other improper loan servicing practices that Justice Winslow had observed in foreclosure cases, such as:

  > *[T]he failure to produce the correct promissory notes in court during foreclosure proceedings; gaps in the chain of title, including printouts of the title that have differed substantially from information provided previously; retroactive assignments of notes and mortgages in an effort to clean up the paperwork problems from earlier years; questionable signatures on assignments and affidavits attesting to the ownership of the note and mortgage; and questionable notary stamps on assignments*.

  *Id.* at 407-08.

- **February 2011**: <u>*Covered Trust Master Servicer/Servicer Nationstar was sued in a class action for thousands of violations of West Virginia law in connection with its servicing of loans within that State*</u>. *See* Complaint, *Triplett v. Nationstar Mortgage, LLC*, No. 3:11-cv-238 (S.D. W. Va. Feb. 15, 2011).  Nationstar subsequently settled the class action.

# APPENDIX 5

# APPENDIX 5

- **July 2011**: The *Associated Press*, in an exclusive reported titled "Mortgage 'robo-signing' goes on," revealed that **"[m]ortgage industry employees are still signing documents they haven't read and using fake signatures more than eight months after big banks and mortgage companies promised to stop the illegal practices that led to a nationwide halt of home foreclosures**." The *Associated Press* article further reported:

    > **County officials in at least three states say they have received thousands of mortgage documents with questionable signatures since last fall, suggesting that the practices, known collectively as "robo-signing," remain widespread in the industry.**
    >
    > *         *         *
    >
    > **Lenders say they are working with regulators to fix the problem but cannot explain why it has persisted**.
    >
    > **Last fall, the nation's largest banks and mortgage lenders, including <u>[Covered Trust Servicer] JPMorgan Chase [and defendant] Wells Fargo</u> . . . suspended foreclosures as they investigated how corners were cut to keep pace with the crush of foreclosure paperwork**.
    >
    > **Critics say the new findings point to a systemic problem with the paperwork involved in home mortgages and titles.  And they say it shows that banks and mortgage processors haven't acted aggressively enough to put an end to widespread document fraud in the mortgage industry**.
    >
    > "**<u>Robo-signing is not even close to over</u>," says Curtis Hertel, the recorder of deeds in Ingham County, Mich., which includes Lansing.  "<u>It's still an epidemic</u>**."

- **July 2011**: Michael Calhoun, President of the Center for Responsible Lending, told the U.S. Senate Banking, Housing and Urban Affairs Committee that "**<u>[a]busive [loan servicing] practices have become so ingrained in the servicing culture that they are now endemic to the industry</u>**."  He then testified concerning multiple ongoing servicing abuses he had observed, such as:

    - "dual track[ing]," an improper servicing practice where the borrower is foreclosed on in the middle of ongoing loan modification negotiations or after a trial modification was agreed to and being performed by the borrower;

    - "[f]oreclosing even when [RMBS] investors would receive more from a sustainable modification";

    - "[i]mproper denial and delay of loan modification requests . . . because fees, which eventually flow directly to servicers . . . continue to accrue";

- 1 -

- "[f]orcing homeowners into multiple temporary modifications [which is] a best-of-both-worlds situation for servicers, who continue to charge fees";

- "[f]orce-placed insurance [which is] very expensive . . . often driving an otherwise current borrower into delinquency and even foreclosure";

- "[i]mproper fees";

- "[m]isapplication of borrower payments";

- "[m]ismanaged escrow accounts";

- "[f]ailing or refusing to provide payoff quotations to borrowers";

- "[a]buses in the default and delinquency process"; and

- "*fail[ure] to adhere to loss mitigation requirements of [RMBS] investors," i.e., failure to abide by the Governing Agreements*.

- **July 18, 2011**: *In a special investigative report titled "Banks continue robo-signing," Reuters reported that several of the Master Servicers and Servicers to the Covered Trusts were continuing to engage in SEOTs on a grand scale. Reuters' investigation found that loan servicers "continue[d] to file questionable foreclosure documents with courts and county clerks," and that "servicers have filed thousands of documents that appear to have been fabricated or improperly altered, or have sworn to false facts." Reuters also reported that "[o]ne of the industry's top representatives admits that the federal settlements [in April 2011] haven't put a stop to questionable practices," and that "many [servicers] are still taking the same shortcuts they promised to shun, from sketchy paperwork to the use of 'robo-signers.'" <u>The Reuters investigative report cited multiple examples of continuing improper loan servicing involving several of the Servicers to the Covered Trusts, including Ocwen and Option One</u>*. The *Reuters* article confirmed ongoing, rampant SEOTs:

  Reuters reviewed records of individual county clerk offices in five states – Florida, Massachusetts, New York, and South Carolina – with searchable online databases. Reuters also examined hundreds of documents from court case files, some obtained online and others provided by attorneys.

  *The searches found more than 1,000 mortgage assignments that for multiple reasons* appear *questionable: promissory notes missing required endorsements or bearing faulty ones; and "complaints" (the legal documents that launch foreclosure suits) that appear to contain multiple incorrect facts*.

  <u>*The Reuters article also reported that even defendant Wells Fargo was still involved in robo-signing*</u>.

- 2 -

- **August 2011**: *American Banker* reported that "***the largest mortgage servicers," including <u>defendant Wells Fargo</u>, "are still fabricating documents***" filed in foreclosure proceedings. The article reported the following:

  > *Several dozen documents reviewed by American Banker show that as recently as August some of the largest U.S. banks . . . were essentially backdating paperwork necessary to support their right to foreclose.*

  > *Some of the documents reviewed by American Banker included signatures by current bank employees claiming to represent lenders that no longer exist.*

  > \*          \*          \*

  > "*It's one thing to not have the documents you're supposed to have even though you told investors and the SEC you had them," says Lynn E. Szymoniak, a plaintiff's lawyer in West Palm Beach, Fla. "But they're making up new documents.*"

  > \*          \*          \*

  > *North Carolina consumer bankruptcy lawyer O. Max Gardner III says servicers and trustees often submit promissory notes in court without proper endorsements, which show the chain of title from one lender to another. Then, after the fact, there will be "a magically appearing note with a stamped endorsement," Gardner said.*

  > *When plaintiff's lawyers then try to depose the person whose name is stamped on the endorsement, "we're being told the person is no longer employed by the servicer or by the party for whom they signed," Gardner says.*

  > *Linda Tirelli, a New York bankruptcy lawyer, calls such mortgage documents "Ta-Da!" assignments because they seem to appear out of nowhere.*

  > "*Why are they creating their own assignments to begin with?" asks Tirelli, who represents borrowers. "Why is this even an issue?*"

- **September 1, 2011**:  The New York Department of Financial Services ("NYFS") announced that it had entered into an agreement with ***<u>Covered Trust Servicer Ocwen</u>*** to have Ocwen refrain from committing numerous types of loan servicing misconduct amounting to SEOTs. The agreement was required by the New York regulator as a pre-condition to Ocwen's acquisition of another loan servicer.  The New York regulator's news release indicated that the agreement was intended to put an end to Litton's misconduct amounting to SEOTs:

  > *The new Agreement on Mortgage Servicing Practices that . . . Ocwen . . . ha[s] signed makes important changes in the mortgage servicing*

*industry which, as a whole, has been plagued by troublesome and unlawful practices. Those practices include: "Robo-signing," referring to affidavits in foreclosure proceedings that were falsely executed by servicer staff without personal review of the borrower's loan documents and were not notarized in accordance with state law; weak internal controls and oversight that compromised the accuracy of foreclosure documents; unfair and improper practices in connection with eligible borrowers' attempts to obtain modifications of their mortgages or other loss mitigation, including improper denials of loan modifications, and imposition of improper fees by servicers.*

- **October 6, 2011**: Neil Barofsky, former Special Inspector General for the Troubled Asset Relief Program, or TARP, testified before a U.S. House Financial Services Subcommittee and stated that the Government Accountability Office ("GAO") "***confirmed . . . widespread anecdotal evidence of [loan] servicers' failures***" to properly service mortgage loans. Barofsky also confirmed that "***the widespread abuse suffered . . . at the hands of the mortgage servicers . . . has gone largely unaddressed . . . even though [the Government] has been aware of servicer misconduct since 2009***," and further confirmed that "***rampant mortgage servicer abuse that has so strongly characterized the [financial] crisis . . . continues to go unpunished***." ***Barofsky identified <u>Covered Trust Servicer JPMorgan and defendant Wells Fargo</u> as two of the offending servicers.***

- **November 10, 2011**: The NYFS announced it had entered into an agreement with ***<u>AHM Servicing, a Servicer for both Covered Trusts</u>***, and several other loan servicers, to reform their loan servicing practices. Benjamin Lawsky, Superintendent of the NYFS, stated: "'***Today's agreements are an important step forward in cleaning up some of the mortgage industry's most troubling practices***.'" According to the NYFS's press release, the agreements were made to address the following misconduct by AHM Servicing and the other loan servicers:

  - "robo-signing," where servicer staff signed affidavits stating they reviewed loan documents when they had not actually done so;

  - weak internal controls and oversight that compromise the accuracy of foreclosure documents;

  - referring borrowers to foreclosure at the same time as those borrowers are attempting to obtain modifications of their mortgages or other loss mitigation;

  - improper denials of loan modifications;

  - failing to provide borrowers with access to a single customer service representative, resulting in delays or failure of the loss mitigation process; and

  - imposition of improper fees by servicers.

The press release further outlined the servicers' agreements to reform their practices as follows:

1.  End Robo-signing and impose staffing and training requirements that will prevent Robo-signing.

2.  Require servicers to withdraw any pending foreclosure actions in which filed affidavits were Robo-signed or otherwise not accurate.

3.  End "dual tracking," *i.e.*, referring a borrower to foreclosure while the borrower is pursuing loan modification or loss mitigation, and prohibit foreclosures from advancing while denial of a borrower's loan modification is under an independent review, which is also required by the agreements.

4.  Provide a dedicated single point of contact representative for all borrowers seeking loan mitigation or in foreclosure so borrowers are able to speak to the same person who knows their file every time they call.

5.  Require servicers to ensure that any force-placed insurance be reasonably priced in relation to claims incurred, and prohibit force-placing insurance within an affiliated insurer.

6.  Impose more rigorous pleading requirements in foreclosure actions to ensure that only parties and entities possessing the legal right to foreclose can sue borrower.

7.  For borrowers found to have been wrongfully foreclosed, require servicers to ensure that their equity in the property is returned, or, if the property was sold, compensate the borrower.

8.  Impose new standards on servicers for application of borrowers' mortgage payments to prevent layering of late fees and other servicer fees and use of suspense accounts in ways that compounded borrower delinquencies and defaults.

9.  Require servicers to strengthen oversight of foreclosure counsel and other third party vendors, and impose new obligations on servicers to conduct regular reviews of foreclosure documents prepared by counsel and to terminate foreclosure attorneys whose document practices are problematic or who are sanctioned by a court.

- **December 15, 2011**: It was reported that ***Covered Trust Servicer JPMorgan was found by the Veterans Affairs Committee to be illegally foreclosing on U.S. military families in violation of the Servicemember Civil Relief Act***.

- **December 2011**: It was reported that an ***Alabama bankruptcy court judge ruled that defendant Wells Fargo had filed at least 630 sworn foreclosure affidavits containing false facts***, including claims that borrowers were in arrears for amounts not actually due. Judge

Margaret A. Mahoney had declared that "Wells Fargo 'took the law into its own hands'" and disregarded perjury laws.

- **December 28, 2011**: *A United States Bankruptcy Court issued an order sanctioning <u>Covered Trust Servicer AHM Servicing</u>* based on numerous instances of loan servicing misconduct that were SEOTs. *The court held that AHM Servicing's "conduct [was] willful" in violating the court's Chapter 13 reorganization plan repeated times, and "that AHM[] [Servicing's] attitude and conduct in this matter is indefensible." <u>The court awarded the borrowers $10,000 in damages and $40,000 in punitive damages, payable by AHM Servicing.</u> The court further awarded the borrowers their attorneys' fees and prohibited AHM Servicing from raising the borrowers' payments without court approval*. Order at 7, *In re Wright*, No. 08-02079 (Bankr. N.D. Iowa Dec. 28, 2011).

- **January 2012**: The *Chicago Tribune* reported:

  > *Foreclosure-related case files in just one New York federal bankruptcy court, for example, hold at least a dozen mortgage documents known as promissory notes bearing evidence of recently forged signatures and illegal alterations, according to a judge's rulings and records reviewed by Reuters.  Similarly altered notes have appeared in courts around the country*.

  > *Banks in the past two years have foreclosed on the houses of thousands of active-duty U.S. soldiers who are legally eligible to have foreclosures halted.  Refusing to grant foreclosure stays is a misdemeanor under federal law*.

  > *The U.S. Treasury confirmed in November that it is conducting a civil investigation of 4,500 such foreclosures.  Attorneys representing service members estimate banks have foreclosed on up to 30,000 military personnel in potential violation of the law*.

  > \*      \*      \*

  > *And in thousands of cases, documents required to transfer ownership of mortgages have been falsified.  Lacking originals needed to foreclose, mortgage servicers drew up new ones, falsely signed by their own staff as employees of the original lenders – many of which no longer exist*.

- **February 3, 2012**: *The Ohio Court of Appeals reversed a summary judgment in favor of <u>Covered Trust Master Servicer/Servicer Aurora</u>*, holding that Aurora provided no evidence that it was assigned the note or mortgage at issue, or that it was the holder.  The court noted that Aurora's affidavits submitted in support of its summary judgment were devoid of evidence proving its allegations, while other evidence contradicted Aurora's allegations. *See Aurora Loan Serv., LLC v. Lewis*, No. L-10-1289 (Ohio Ct. App. Feb. 3, 2012).

- **February 9, 2012**: The U.S. Department of Justice ("DOJ") and 49 states obtained "***a landmark $25 billion settlement," "the largest federal-state civil settlement ever obtained***," against the nation's five largest loan servicers for continuing "***mortgage loan servicing and foreclosure abuses***" (hereafter the "National Mortgage Settlement"). U.S. Attorney General Eric Holder called the servicers' misconduct "***reckless and abusive mortgage practices***." ***The five loan servicers charged by the DOJ and 49 states were repeat offenders – they had previously entered into the April 13, 2011 consent orders. One of the five serial offenders was Covered Trust Servicer JPMorgan and another repeat offender was defendant Wells Fargo***.  These repeat offenders were charged with

  > *violations of state and federal law[;] . . . [the] use of "robo-signed" affidavits in foreclosure proceedings; deceptive practices in the offering of loan modifications; failures to offer non-foreclosure alternatives before foreclosing on borrowers with federally insured mortgages; and filing improper documentation in federal bankruptcy court*.

- **February 2012**: ***The New York Attorney General sued Covered Trust Servicer JPMorgan and defendant Wells Fargo*** among others.  The New York Attorney General also sued MERSCORP Inc. and its subsidiary Mortgage Electronic Registration Systems, Inc. (collectively, "MERS").  The lawsuit alleged that ***Covered Trust Servicer JPMorgan, Wells Fargo and MERS repeatedly submitted documents to courts in foreclosure proceedings that contained misleading and false information***.  The New York Attorney General stated: "'***Once the mortgages went sour, these same banks brought foreclosure proceedings en masse based on deceptive and fraudulent court submissions, seeking to take homes away from people with little regard for basic legal requirements or the rule of law***.'"

- **March 5, 2012**: U.S. Secretary of Housing and Urban Development, Shaun Donovan, stated in televised comments that "***as high as 60 percent of foreclosures were [still] being done wrong***."

- **March 30, 2012**:  Jamie Dimon, CEO of JPMorgan Chase & Co., which owned and controlled ***Covered Trust Servicer JPMorgan***, sent a letter to JPMorgan Chase & Co's shareholders admitting that JPMorgan engaged in robo-signing.  Dimon wrote:

  > *Our servicing operations left a lot to be desired:  There were too many paperwork errors, including affidavits that were improperly signed because the signers did not have personal knowledge about what was in the affidavits but, instead, relied on the company's processes.*

- **April 9, 2012**:  Borrowers filed a first amended class action complaint against ***Covered Trust Master Servicer/Servicer Aurora*** alleging that Aurora and other defendants engaged in "systemic violations of California Notary laws" through the "widespread dissemination of improperly acknowledged foreclosure documents."  The complaint also alleged that ***Aurora "implemented a business practice that relie[d] upon the systematic violation of notary laws and standards," and that "'Robo-signing' [was] central to an institutional business practice . . . of improper notarial acts, known by [Aurora] to be wrongful, deceptive and***

*improper*."  First Amended Complaint, *Jahromi, et al. v. Aurora Loan Services, LLC, et al.*, No. CV11-10721 CJC(RNBx) (C.D. Cal. Apr. 9, 2012).

- **June 7, 2012**: Law professor Adam Levitin testified before a U.S. House Subcommittee, stating that the ***National Mortgage Settlement would "not deter future consumer fraud by too-big-to-fail" master servicers/servicers***, calling their conduct "__*one of the most pervasive violations of procedural rights in history*__*," supported by "evidence of widespread fraud [that] was too great to ignore*."  Regarding the National Mortgage Settlement, Professor Levitin stated: "Critically for the purposes of this hearing, ***the settlement permits the banks to receive credit under the settlement by reducing principal or refinancing on mortgages that they service, but*** __*do not own*__*," and therefore "servicers have strong incentives not to engage in principal write-downs on loans they own"; instead, "it appears likely that most of the principal reductions will come from* __*investor-owned mortgages*__*," i.e., Mortgage Loans like those in the Covered Trusts*.  Professor Levitin concluded: "__*I would expect servicers to perform some [principal reductions] that violate PSAs in order to get . . . settlement credit*__."

- **November 8, 2012**:  ***The U.S. Court of Appeals for the  Eighth Circuit reversed the dismissal of borrowers' claims that*** __*Covered Trust Master Servicer/Servicer Aurora*__ ***had no right to foreclose because of unrecorded mortgages or mortgages that were executed by individuals "lacking the legal authority to do so*."  *Murphy v. Aurora Loan Servs. LLC*, 699 F.3d 1027, 1033 (8th Cir. 2012).

- **December 2012**: An Ohio appeals court rendered a decision against ***Covered Trust Master Servicer/Servicer Nationstar*** that revealed that Nationstar was engaging in the same SEOTs as the Covered Trusts' other Master Servicers and Servicers.  In *Nationstar Mortg., LLC v. Van Cott*, No. L-12-1002, 2012 Ohio App. LEXIS 4999, at *1 (App. Ct. Ohio Dec. 7, 2012), ***the appeals court reversed a summary judgment of foreclosure in favor of Nationstar***, holding that while Nationstar alleged in its complaint that it was "'entitled to enforce the Note pursuant to Section 1303.31 of the Ohio Revised Code, and the Mortgage was given to secure the Note' . . . Nationstar did not attach a copy of either the note or mortgage to its complaint and alleged that the note had been misplaced and could not be located."  But, miraculously, a note and mortgage magically appeared at the time Nationstar filed its summary judgment motion.  However, the appeals court noted that the note "***show[ed] no evidence of an assignment to Nationstar" and in fact "do[es] not show an assignment of . . . the note to anyone," contrary to Nationstar's allegations and affidavits. Id. at *15, *18.  The court also noted that "an assignment of the mortgage . . . to Nationstar . . . was executed on September 3, 2010," but that "[t]he complaint was filed on August 23, 2010." Id. at *18.  This clearly indicated that Nationstar had misrepresented the fact that it owned the note and mortgage at the time it filed suit, as required by Ohio law***.

- **March 4, 2013**: A class of nationwide borrowers sued ***Covered Trust Master Servicer/Servicer Nationstar*** for improper loan servicing practices, alleging that Nationstar violated state and federal laws by making "***repeated misrepresentations***" and ***engaging in "deceptive***" business practices in connection with improperly denying loan modifications required by it under the HAMP program.  ***The borrowers alleged that Nationstar operated***

> *"a system designed to wrongfully"* **deny borrowers loan modifications**. *See* Complaint, *Burton v. Nationstar Mortg. LLC*, No. 1:13-cv-00307 (E.D. Cal. Mar. 4, 2013).

- **March 7, 2013**: ***Covered Trust Master Servicer/Servicer Nationstar*** was sued again, this time by an RMBS investor. The ***RMBS investor alleged that Nationstar was "not fulfill[ing] its duties as Master Servicer, but rather ha[d] engaged in practices to enrich itself at the expense of the . . . certificate holders." The investor alleged that Nationstar was breaching its master servicing agreement with the RMBS trust and engaging in a "blatant abdication of its servicing duties under the governing contracts" by "auctioning off the trusts' mortgage loans in bulk . . . for amounts that are a fraction of the loans' unpaid balances or the value of the properties securing the loans*** ." The investor alleged these actions profited Nationstar, which recouped the fees it advanced, but injured investors. *See* Complaint, *KIRP, LLC v. Nationstar Mortg. LLC*, No. 650794/2013 (N.Y. Sup. Ct., N.Y. Cnty. Mar. 7, 2013). ***The court immediately issued a temporary restraining order against Nationstar and ordered it to stop selling the loans***. Nationstar thereafter quickly settled the case.

- **June 2013**: The Charlotte Observer reported that the monitor overseeing the administration of the National Mortgage Settlement found that ***Covered Trust Servicer/Servicer JPMorgan and defendant Wells Fargo were not complying with the settlement.*** *The New York Times* further reported that the servicers had received "***almost 60,000 complaints***" from borrowers about their servicing misconduct, while

> *state officials have expressed deep disappointment with the banks' performance in other areas. Last month, lawyers in the office of Martha Coakley, the attorney general of Massachusetts, detailed what they said were hundreds of violations of the settlement, including a failure to adhere to the required timetable or provide reasons for the denial of an application.*
>
> *They also pointed to cases where they said banks had improperly inflated the value of a loan before writing it down so as to claim a greater amount of relief, or where they had reverted to a higher interest rate while delaying, for months, the decision to make a trial loan modification permanent.*
>
> *Soon after, Eric T. Schneiderman, the attorney general of New York, announced plans to sue . . . Wells Fargo, saying [it was] repeatedly violating the terms of the settlement.*
>
> *Lisa Madigan, the attorney general of Illinois, said there was an "alarming pattern" of violations of the servicing standards. In a review of servicer handling of loan modification requests in Illinois, she found that in 60 percent, servicers failed to comply with the time frame for notifying borrowers of missing documents and in 45 percent they made multiple requests for the same documents.*

> ***Pam Bondi, the attorney general of Florida, has written letters to Bank of America and Wells Fargo detailing similar complaints that are resolved only by the intervention of her office***.

- **September 2013**: *Salon.com* reported that **Covered Trust Master Servicer/Servicer Nationstar** was engaging in an "***appalling new way to cheat homeowners***."  The article stated:

> ***A few months ago, Ceith and Louise Sinclair of Altadena, California, were told that their home had been sold.  It was the first time they'd heard that it was for sale.***
>
> ***Their mortgage servicer, Nationstar, foreclosed on them without their knowledge, and sold the house to an investment company.  If it wasn't for the Sinclairs going to a local ABC affiliate and describing their horror story, they would have been thrown out on the street, despite never missing a mortgage payment.  It's impossible to know how many homeowners who didn't get the media to pick up their tale have dealt with a similar catastrophe, and eventually lost their home.***
>
> *     *     *
>
> ***Nationstar has racked up an impressively horrible customer service record in its short life, failing to honor prior agreements with borrowers and pursuing illegal foreclosures.  The fact that Nationstar and other corrupt companies like it are beginning to corner the market for mortgage servicing should trouble not only homeowners, but the regulators tasked with looking out for them.  It didn't seem possible that a broken mortgage servicing industry could get worse, but it has.***
>
> *     *     *
>
> ***[But] Nationstar is no different. . . .  While the company promised California that it would adhere to all settlement obligations on the servicing rights it purchases, the Sinclairs were subjected to familiar abuse.  The family paid their mortgage on time since purchasing their home in 2003.  Last year, they received a loan modification.  But their servicer sold the rights to Nationstar, and Nationstar didn't honor the modification.  In June, the Sinclairs sent in their mortgage payment, and Nationstar sent it back in full.  Then it sold the home.  When questioned, Nationstar claimed the Sinclairs didn't notarize one page of their modification, which turned out to be untrue.***
>
> ***It was a clear attempt to find an excuse to deny the modification and push the Sinclairs into foreclosure.  Mortgage servicers actually make more money with foreclosures than with loan modifications, because of how their compensation structure works.  Servicers load up various***

- 10 -

> *foreclosure fees on homeowners that they get to keep, and they get paid off first in a foreclosure sale. A loan modification simply cuts their percentage balance on the loan.*

- **October 2013**: A lawsuit was filed by a borrower whose loan was serviced by ***Covered Trust Master Servicer/Servicer Nationstar***. ***The complaint alleged that Nationstar engaged in "home mortgage servicing abuse" and "exploit[ation] [of] an unsophisticated consumer" through a series of misrepresentations and deceit.*** *See* Complaint at 1, *Hatfield v. Nationstar Mortg., LLC*, No. 13-C-829-B (W.Va. Cir. Ct., Raleigh Cnty. Oct. 11, 2013).

- **November 2013**: ***Covered Trust Servicer JPMorgan*** *announced it was willing to pay $4.5 billion to settle, inter alia, claims that* ***loans were improperly serviced in 330 RMBS trusts***. In addition, Standard & Poor's estimated that the largest loan servicers' exposure for improper loan servicing conduct was ***an astounding $30 billion***.

- **December 2013**: The monitor for the National Mortgage Settlement reported that ***Covered Trust Servicer JPMorgan*** *was still failing to comply with the servicing standards required by the settlement, nearly two years after it agreed to do so*.

- **December 2, 2013**: ***Covered Trust Master Servicer/Servicer Nationstar*** had its foreclosure action dismissed because it engaged in numerous instances of misconduct amounting to SEOTs, as the court held:

  > *[Nationstar] counsel conceded that there was no properly filed verified amended complaint and that they had been proceeding for more than a year as if there was. It was further conceded that [the borrower's] counsel had inexplicably been left off the service list and did not receive notice of prior hearings and filings. . . . Instead, many of the pleadings were directed to the client and [borrower], Jennie Cassady without notice to her attorney. No plausible explanation was provided*.

  > . . . [Nationstar] now seeks once again for permission to properly file an Amended Verified Complaint, almost two years from the date leave to amend was initially granted. Further, [Nationstar] was on notice since December of 2010 that it was delinquent in posting a non-resident cost bond in accordance with § 57.011, Fla. Stat. No bond has yet to be filed and the 20 day grace period under the statute has long since expired. . . . *[Nationstar] [has engaged in] years of delay and willful and deliberate inaction and inattention to court orders, as well as the questionable behavior of counsel in failing to ensure timely service of notices and pleadings to [the borrower's] attorney and not the client. [Nationstar's] repeated failure to file the cost bond even when put on notice to do so nearly three years ago in and of itself is a sufficient basis for dismissal of this action.[fn]*

  > \*       \*       \*

- 11 -

> *[fn] [Nationstar] was not just "tardy" but deliberately obstinate and recalcitrant in ignoring the "safe harbor" warning given in 2010 and other later notices by the [borrower].*

*Nationstar Mortg. LLC v. Cassady*, No. 502010CA28180AXXXXMB, slip op. at 2-3 & n.2 (Fla. Cir. Ct., Palm Beach Cnty. Dec. 2, 2013).

- **January 2014**: A class action was filed against ***Covered Trust Master Servicer/Servicer Nationstar*** in Nevada alleging that Nationstar improperly refused to honor loan modification agreements, as well as "***assessed unwarranted penalties and costs***."

- **January 30, 2014**: *The CFPB issued a report highlighting "unfair and deceptive" loan servicing practices it had found during 2013. CFPB Director Richard Cordray stated: "'*Problems in mortgage servicing have plagued consumers for years* . . . .'" The CFPB report pointed out several instances where loan servicers violated federal laws by refusing to honor loan modification agreements, requiring borrowers to waive their rights against the servicers in order to obtain a modification, lied to borrowers, and provided false information to consumer reporting agencies*.

- **February 2014**: Steven Antonakes, Deputy Director of the CFPB, confirmed that the loan servicing industry as a whole was continuing its servicing abuses and SEOTs. At the Mortgage Bankers Association's National Mortgage Servicing Conference in February 2014, Antonakes gave a speech which took the industry to task, stating: "***Nearly eight years have passed and I remain deeply disappointed by the lack of progress the mortgage servicing industry has made***." Antonakes stated that ***the CFPB was still receiving "around 4,900 complaints per month***" concerning mortgage servicing, and ***"too many [borrowers] continue to receive erratic and unacceptable treatment. . . . This kind of continued sloppiness is difficult to comprehend and not acceptable. It is time for the paper chase to end. . . . It has felt like 'Groundhog Day' with mortgage servicing for far too long***." Antonakes also said the pervasive practice of successor servicers failing to honor loan modification agreements with prior servicers "would not be tolerated," and that the servicing industry's continuing deceptive practices would not be allowed: "***There will be no more shell games where the first servicer says the transfer ended all of its responsibility . . . and the second servicer***" claims ignorance about the modification*. Antonakes summed up his speech as follows, which clearly indicated that the industry still had not stopped committing SEOTs:

> *My message to you today is a tough one. I don't expect a standing ovation when I leave. But I do want you to understand our perspective. I would be remiss if I did not share it with you.*
>
> *In our view, the intense human suffering inflicted on American consumers by an all-too-frequently indifferent mortgage servicing system has required us to change the paradigm in mortgage servicing forever. Frankly, the notion that government intervention has been required to get the mortgage industry to perform basic functions correctly – like customer service and record keeping – is bizarre to me but, regrettably, necessary. . . .*

- 12 -

> *But please understand: if you choose to operate in this space, the fundamental rules have changed forever.  It's not just about collecting payments.  It's about recognizing that you must treat Americans who are struggling to pay their mortgages fairly before exercising your right to foreclose.  We have raised the bar in favor of American consumers and we are ready, willing and able to vigorously enforce that bar.*
>
> *Ultimately, these profound changes will be good for all Americans, including industry. But please understand, business as usual has ended in mortgage servicing. Groundhog Day is over.  Thank you.*

- **March 5, 2014**: NYFS Superintendent Benjamin Lawsky sent a letter to ***Covered Trust Master Servicer/Servicer Nationstar*** stating: ***"We have received hundreds of complaints from New York consumers about your company's mortgage modifications, including problems related to mortgage modifications, improper fees, lost paperwork, and numerous other issues***."

- **March 2014**: *The Washington Post reported on a foreclosure lawsuit filed in federal court in New York in which <u>an internal "foreclosure manual" of defendant Wells Fargo was obtained and filed</u>.  The borrower's attorney asserted that the internal manual instructed attorneys working for Wells Fargo on <u>how to essentially perform robo-signing and create false foreclosure documents</u>.  The borrower's attorney was reported to have stated: "'<u>This is a blueprint for fraud. . . . The idea that this bank is instructing people how to produce these documents is appalling.</u>'" The Washington Post further reported that the borrower's attorney "has long suspected Wells Fargo of manufacturing documents.  A number of her past cases involving the bank featured mortgage notes that were not endorsed by anyone, but when she brought it to Wells Fargo's attention the bank would 'magically' produce[] the document."  It happened so frequently to this attorney and her colleagues "that they started to call paperwork 'ta-da' documents."  <u>This revealed unequivocal evidence that Wells Fargo had an established, uniform and written practice manual that directed the manufacture of falsified, robo-signed documents, a clear SEOT</u>.*

- **May 23, 2014**: ***<u>Wells Fargo</u>*** *settled a derivative action by its shareholders against Wells Fargo executives alleging they allowed foreclosure abuses to occur, including improper robo-signing and the filing of false affidavits not based on personal knowledge.  Wells Fargo paid $67 million to settle the case*.

- **May 2014**:  The California Reinvestment Coalition issued a report titled "Chasm Between Words and Deeds" in which it revealed that loan servicers were continuing to engage in loan servicing practices that were SEOTs.  ***<u>The report identified violations of state and federal law, settlement agreements and the like, by the loan servicing industry.  The report specifically pointed to continuing servicing abuses by Covered Trust Master Servicers/Servicers Nationstar, Ocwen and JPMorgan, the Covered Trusts Master Servicers/Servicers for both of the Covered Trusts at that time</u>***.

- **June 25, 2014**: It was reported by the *Courthouse News Service* that, according to a recently unsealed lawsuit, ***<u>Covered Trust Servicer JPMorgan was violating the National Mortgage</u>***

- 13 -

*Settlement by granting loan forgivenesses on loans it had sold to other parties and was improperly taking credit for such forgivenesses in violation of the settlement and state and federal laws prohibiting "false and misleading statements" to the Government*.  Such dishonest conduct revealed that JPMorgan had routine business practices that resulted in SEOTs.

- **September 10, 2014**:  A *Bloomberg* article discussed the recent financial crisis and made the following observations about loan servicers' ongoing misconduct:

    *[T]he banks took many short cuts and did so on purpose and with the goal of improperly expediting the process.  They failed to review the documents of the mortgages they were foreclosing on, then told the courts they had.  They didn't verify information, but claimed to have done so in sworn affidavits.  They hired $8 an hour burger-flippers to "robosign" these documents, pretending the underlying legal work had been done.  They knowingly used falsified records, some of which they bought en masse.  They were aided by a company called DocX, which had a price list of fabricated documents for use in court.  (DocX, by the way was eventually indicted on charges of mortgage fraud)*.

    *After creating phony dossiers on borrowers, the banks signed and notarized affidavits stating they had taken all of the legal steps.  In many cases, even the notarizations were fakes.  Submitting a falsified notarized affidavit to a court is perjury and fraud*.

- **October 1, 2014**:  *Thomson Reuters* reported that a federal judge had decided that ***<u>defendant Wells Fargo</u>*** would have to face a class action ***lawsuit accusing it of providing false and inaccurate information to credit reporting agencies concerning borrowers, which harmed the borrowers'*** credit and ability to obtain new loans.

- **October 1, 2014**:  *Interest.com* reported that numerous loan servicers were still engaged in fraudulent or illegal conduct.  The article quoted Lisa Sitkin, the managing attorney for Housing and Economic Rights Advocates:  "'***I have to say there is no shortage of problems and errors and possible violations [by loan servicers] that we see pretty constantly***.'"

- **October 20, 2014**:  ***HousingWire reported that "as many as 490,000 homeowners could be affected by faulty [loan] servicer database records"*** that ***"had significant discrepancies***."

# APPENDIX 6

# APPENDIX 6

- **April 2004**: The OTS instituted an enforcement action against Ocwen Federal Bank.  The OTS found that Ocwen had *engaged in illegal, unsafe and unsound loan collection practices*.  As a result, Ocwen entered into a written "supervisory agreement" with the OTS, in which it agreed to improve its compliance with numerous federal laws, including the Real Estate Settlement Procedures Act, the Fair Debt Collection Practices Act and the Fair Credit Reporting Act.  The *Palm Beach Post* reported that Ocwen entered into the agreement with the OTS after being *"[f]looded" with "hundreds" of complaints by borrowers, consumer advocates and class-action attorneys, and "several proposed class-action suits against Ocwen*."[1]

- **November 29, 2005**: In a lawsuit in which an RMBS trustee, Ocwen and others were co-defendants, a jury rendered *an $11.5 million verdict in favor of a borrower and against Ocwen arising out of Ocwen's mis-servicing of the loan*.  *See Davis v. Ocwen Loan Servicing LLC, et al.*, No. 2004 CV 1469 (Tex. Dist. Ct., Galveston Cnty. Nov. 29, 2005) (Criss, J.).  *The jury award included $10 million in punitive damages against Ocwen* because of the egregious misconduct it engaged in (the jury award was later reduced to $1.8 million by agreement of the parties).  According to borrower Davis's attorney, in February 2002, Davis, 64, took out a $31,000 home equity loan on the Texas City residence where she had lived since 1942.  In 2003, Davis became ill and spent four days in the hospital, which forced her to miss one loan payment.  Ocwen told her it would put her on a payment plan, but never did.  Ocwen also failed to credit Davis for the money she paid and began to foreclose on her house while continuing to falsely assure her she was on a payment plan.  Ocwen eventually foreclosed on Davis's home, and she filed for bankruptcy in the hopes of ending Ocwen's harassment.  During the bankruptcy, however, Ocwen requested an additional $390 to cover its costs and fees related to a default she had already cured.  *At trial, a former Ocwen employee provided uncontradicted testimony concerning Ocwen's unfair business practices, which included paying incentives to its loan collectors for improperly moving loans on properties with equity into foreclosure.  The former employee testified that Ocwen employees would review their records to identify loans in which the borrowers had equity, and then prey on the borrowers by improperly manufacturing ways to falsely foreclose on them*.  The former employee testified that they selected loans with equity because it ensured that there was money to pay the Ocwen employees their incentive payments once they wrongfully foreclosed.  The evidence also showed that *Ocwen engaged in predatory servicing by not informing borrowers of how to make their loans current, and failing to give credit for payments when they were made, in order to artificially manufacture foreclosures.  The jury found that Ocwen made fraudulent, deceptive and misleading representations to Davis when she missed her loan payment while hospitalized in 2003*.  Davis's attorney, Robert Hilliard of Corpus Christi, said: "*The jury believed that

---

[1]     In order to escape further scrutiny from the OTS, and to avoid being held accountable under the supervisory agreement, Ocwen then quickly dissolved Ocwen Federal Bank and created non-bank loan servicer Ocwen Loan Servicing LLC, taking itself outside of the OTS's jurisdiction.  In this way, Ocwen could continue to operate its fraudulent business model without OTS interference.

*Ocwen has a scheme of stealing homes" by classifying timely payments as late and then beginning foreclosure proceedings*.

- **January 23, 2006**: The *South Florida Business Journal* reported:

   *The Business Journal's review of court filings shows Ocwen and affiliates are defendants in more than 500 civil suits filed in federal courts since 2002.  Many of the cases have more than one customer among plaintiffs. About 100 of the cases are still pending*.

   \*        \*        \*

   *Plaintiff lawyers are currently seeking class action status for 57 federal cases being consolidated in Chicago and the West Palm Beach company says it is facing 331 lawsuits altogether. . . .*

   *The allegations are sometimes harsh - one plaintiff describes the company's actions as "naked fraud*" . . . .

   \*        \*        \*

   *Ocwen probably isn't done with [Attorney] Hilliard.  The attorney said he is preparing to file about 100 suits for Texas residents who claim Ocwen falsified mortgage payments and began foreclosure proceedings*.

- **March 2009**: *ProPublica* published an article examining Ocwen, which stated:

   *[Ocwen's] business practices have also drawn a wide array of criticism from customers, consumer advocates and the federal government itself*.

   \*        \*        \*

   Ocwen got a lucrative contract in 2003 to manage and sell thousands of foreclosed properties owned by the Department of Veterans Affairs, but a report from the Government Accountability Office in 2007 panned Ocwen's performance and said the "***VA also has not been satisfied with Ocwen's performance***":  Ocwen racked up $1.3 million in penalties from the VA in the last three quarters of 2005 (at the height of the housing boom) for failing to meet sales targets.

   There were other problems too: ***Ocwen charged the VA for home-upkeep repairs that were never made, the GAO reported. Houses fell into disrepair and were covered in "trash and debris," which the GAO suspects might have lowered property values***.

   \*        \*        \*

   But that wasn't Ocwen's only run-in with the federal government.

- 2 -

*In 2000, Ocwen Federal Bank, a now-defunct subsidiary, paid $50,000 to settle . . . charges from HUD concerning various rule violations on its loan servicing. Four years later, the Office of Thrift Supervision forced Ocwen Federal Bank to sign an agreement . . . promising to improve its compliance with fair-lending laws.*

*John Taylor, president of the National Community Reinvestment Coalition, cited those regulatory actions when criticizing the VA's choice of Ocwen in 2003. "Why would you want, when you have a repeated history of problems, to expose VA housing to a potential predator?" he asked in* American Banker.

\*　　　\*　　　\*

*Ocwen has ranked last in J.D. Power and Associates' survey of customer service at mortgage servicers for the last three years in a row. Frustrated customers point specifically to its tortuous and unhelpful phone services.*

\*　　　\*　　　\*

*Ocwen didn't fare much better with the Better Business Bureau of Central Florida, which has received 520 complaints about Ocwen in the last 36 months and slapped it with an F, its lowest rating.*

\*　　　\*　　　\*

*Ocwen has in fact been accused of predatory practices in a slew of lawsuits in the last few years. Frequent allegations include that Ocwen falsely classifies timely payments as late, charges unwarranted fees and improperly starts foreclosure proceedings.*

- **May 2009**: A Louisiana bankruptcy court judge blasted Ocwen after being subjected to its repeated violations of the bankruptcy code for which the court had repeatedly sanctioned it. *See In re McKain*, No. 08-10411, 2009 Bankr. LEXIS 2519, at \*5-\*8, \*10-\*11 (Bankr. E.D. La. May 1, 2009), *rev'd on other grounds*, *Ocwen Loan Servicing, LLC v. McKain*, No. 09-3662, slip op. (E.D. La. Aug. 15, 2011). The court held:

  <u>*Ocwen's History*</u>

  *This is not the first time Ocwen has appeared before the Court for improperly administering a loan or attempting to collect fees and costs to which it was not entitled. The Court has been involved with six other cases [fn] in the last four years where Ocwen either included improper fees in its claim; attempted to collect, post-discharge, fees and costs that were undisclosed but assessed during a bankruptcy; or attempted to foreclose on disallowed or discharged debt.*

\*　　　\*　　　\*

>*Ocwen has consistently shown an inability or refusal to comply with the[] basic statutory tenets [of the bankruptcy code].   As a result, discharged debtors have continued to incur the threat of foreclosure and collection of debts that have been discharged or disallowed.  Ocwen has failed to disclose the assessment of postpetition charges to others, misleading them into a false sense that a fresh start was theirs to enjoy*.

> \*       \*       \*

>*Ocwen has repeatedly abused the claims process and failed to honor the discharge injunction by attempting to collect from debtors and their bankruptcy estate disallowed or undisclosed debts.  The Court finds that this practice is in bad faith. . . .  The record reflects that this is an ongoing pattern . . . .  The Court has repeatedly struck improper charges and has issued monetary sanctions against Ocwen.  Ocwen's continuing disregard for bankruptcy law and procedure is a clear indication that monetary sanctions are simply ineffective*.

> \*       \*       \*

>*[fn]It is likely that there are many additional cases where this activity has occurred, but not all debtors' counsel carefully monitor creditors' proof of claims*.

- **August 2009**: The *Southeast Texas Record* reported on a lawsuit filed against Ocwen for *wrongfully foreclosing on a borrower even though she was current on her mortgage loan payments*.  The complaint alleged that Ocwen did not properly apply loan payments that were made in order to improperly manufacture a foreclosure, fraudulently assessed improper fees, costs, interest and charges, and violated state laws.

- **December 2010**: The Florida Attorney General's office compiled a presentation titled "Unfair, Deceptive and Unconscionable Acts in Foreclosure Cases." The Attorney General's presentation contained "copies of allegedly forged signatures, false notarizations, bogus witnesses and improper mortgage assignments," including *documents signed by Ocwen employee "Scott Anderson."  Anderson's signature had been signed by at least four different persons, an obvious act of robo-signing*.

- **January 2011**: The United States District Court for the Eastern District of North Carolina entered an order affirming a bankruptcy court order *holding Ocwen in contempt of court for violating a discharge injunction and a bankruptcy court order*.  *See In re Adams*, No. 5:10-CV-340-BR, 2011 U.S. Dist. LEXIS 158090, at *13 (E.D.N.C. Jan. 24, 2011).  The District Court held that "*Ocwen's conduct was . . . reprehensible*" and that Ocwen "transmitted an inaccurate payoff quote and loan history; . . . assessed discharged principal, fees, and costs; reported inaccurate information to credit reporting agencies; *and, most importantly, after the inaccurate information had been brought to its attention a number of times, failed to correct the information."  The District Court found that the foregoing misconduct by Ocwen was "willful and intentional," id. at *21, and thus merited punitive damages*.

- 4 -

- **March 2011**: The Federal Trade Commission began investigating Ocwen's foreclosure practices and demanded the production of documents relating to Ocwen's loan servicing activities.

- **June 2011**: The U.S. Treasury Department found that Ocwen's loan servicing practices were in need of "substantial improvement."

- **July 2011**: A foreclosure action by an RMBS trustee was dismissed with prejudice by a New York State court judge in large part because three Ocwen employees had improperly "robo-signed" foreclosure documents in the case. *See HSBC Bank USA, N.A. v. Taher*, 932 N.Y.S.2d 760, 2011 N.Y. Misc. LEXIS 3171 (Sup. Ct. July 1, 2011), *rev'd*, 104 A.D.3d 815, 962 N.Y.S.2d 301 (2d Dep't 2013) (reversed on the law, not the facts). The court specifically singled out the aforementioned Ocwen robo-signer, Scott Anderson, and noted that it too had observed that there were at least four different variations of his signature in the cases before the court.

- **July 2011**: *Reuters* reported that Ocwen was still engaging in widespread robo-signing:

  > *Reuters . . . identified at least six "robo-signers," individuals who in recent months have each signed thousands of mortgage assignments – legal documents which pinpoint ownership of a property. These same individuals have been identified – in depositions, court testimony or court rulings – as previously having signed vast numbers of foreclosure documents that they never read or checked*.

  > *Among them: Christina Carter, an employee of Ocwen. . . . Her signature – just two "C"s – has appeared on thousands of mortgage assignments and other documents this year*.

  > *In a case involving a foreclosure, a New York state court judge called Carter a "known robo-signer" and said he'd found multiple variations of her two-letter signature on documents, raising questions about whether others were using her name*.

  *Reuters* also reported that it had found that "in recent months," **Ocwen "filed foreclosure documents of questionable validity**."

- September 1, 2011: In connection with Ocwen's acquisition of loan servicer Litton, the **NYFS required Ocwen to enter into an agreement to reform its robo-signing practices** by, among other things, ensuring that foreclosure affidavits were true, accurate and correct, were based on personal knowledge and were properly notarized, and by withdrawing any of its pending foreclosure proceedings that used false affidavits, as well as agreeing to a host of other reforms designed to stop its improper loan servicing activities.

- **September 2011**: *Ocwen was held in contempt by the court in In re Phillips, No. 02-66299, 2011 Bankr. LEXIS 3780 (Bankr. N.D. Ohio Sept. 29, 2011)* (Ocwen and an RMBS trustee both held in contempt for Ocwen's violations of bankruptcy discharge injunction). *See also*

*In re Englert*, 495 B.R. 266, 269 (Bankr. W.D. Pa. 2013) ("***[T]he Court . . . found Ocwen in further contempt for which further sanctions would be addressed at the Rule to Show Cause hearing***.").

# APPENDIX 7

**APPENDIX 7**

- **April 30, 2012**: The Sixth Circuit Court of  Appeals reversed an order dismissing a borrower's complaint alleging that an RMBS trustee and Ocwen were violating the Fair Debt Collection Practices Act.  *See Bridge v. Ocwen Fed. Bank, FSB*, 681 F.3d 355, 356-57 (6th Cir. 2012).  The Court of Appeals held:

    > *The Fair Debt Collection Practices Act was passed to protect consumers against both abusive and mistaken collection activity.  This case reveals why.  It began with seemingly innocuous accounting errors on the part of a bank that were corrected.   Despite repeated proof of that correction, unremitting collection activity was undertaken, foreclosure proceedings were instituted, and the credit of two consumers was seriously impaired*.

    > \*          \*          \*

    > *Ocwen . . . began dunning Bridge and her husband, who is not a co-borrower on the mortgage loan, for the May payment claimed to be overdue, despite proof [that is was not overdue because] of the double payment submitted by Bridge to Ocwen and Aames.  Since then Ocwen has: made endless collection calls by phone to Mr. and Mrs. Bridge, despite cease and desist requests and registry on the federal "Do Not Call" directory; threatened foreclosure; assessed monthly late fees; and reported derogatory information to the credit reporting agencies. Additionally, the law firm . . . allegedly retained by Ocwen, sent a collection letter to Bridge threatening foreclosure*.

- **July 19, 2012**: A bankruptcy court in Kentucky issued its decision, findings of fact and conclusions of law after a trial in an adversary proceeding involving Ocwen and a borrower. *See In re Tolliver*, No. 09-21742, 2012 Bankr. LEXIS 3333, at \*3, \*6-\*7 (Bankr. E.D. Ky. July 19, 2012).  **The court blasted Ocwen for its misconduct**:

    > *Defendants [Ocwen and the co-defendant RMBS trustee] breached the terms of the Note and Mortgage by applying unauthorized late charges, costs and fees to [the borrower's] account and breached an implied contractual duty of good faith and fair dealing. . . .  Ocwen misrepresented the status of the Plaintiff's Loan to fraudulently induce her to enter into [improper forbearance] agreements when, but for Ocwen's unauthorized acts, the Plaintiff had paid her Loan in full.  The Plaintiff, having overpaid her Loan, is entitled to compensatory and punitive damages for the Defendants' breach of contract and implied covenant of good faith and fair dealing, fraud, and conversion*.

    > \*          \*          \*

- 1 -

*Ocwen proceeded to mishandle the servicing of the Plaintiff's Loan by misapplying her payments contrary to the terms of the Note and Mortgage and assessing unauthorized fees and charges. This forced the Plaintiff into a constant state of default, allowing Ocwen to profit by continuing to assess more fees and charges based on her default status. Ocwen knew or should have known that it could not charge these fees and charges, yet Ocwen misrepresented to the Plaintiff that her Loan was in default thereby forcing the Plaintiff to enter into a series of meaningless oral and written forbearance agreements, none of which allowed her to cure her alleged default and two of which contained provisions that Ocwen ultimately argues excuses its misbehavior. These provisions, found in the 2004 and 2005 written forbearance agreements, allowed Ocwen to charge these unauthorized fees to the Plaintiff's account and required the Plaintiff to waive any claims it had against Ocwen. But for Ocwen's misapplication of her payments, and contrary to Ocwen's representations, the Plaintiff had actually paid her Loan in full by October 2004. As a result of Ocwen's actions, the Plaintiff has overpaid her Loan by thousands of dollars*.

- **December 5, 2012**: *The NYFS announced that Ocwen was violating its prior agreement to refrain from engaging in loan servicing misconduct*.  The NYFS's press release stated:

    "*[W]e conducted a targeted exam of Ocwen's performance and discovered gaps in the company's compliance.  <u>The Department is requiring the company to hire a monitor</u> so that we can be sure that the reforms are implemented and homeowners have a real chance to avoid foreclosure*."

    \*        \*        \*

    *The Department's examination of Ocwen's mortgage servicing practices found that, in some instances, the company failed to demonstrate that it had sent out required 90-day notices before commending foreclosure proceedings or even that it had standing to bring the foreclosure actions.  The exam also revealed gaps in Ocwen's Servicing Practices, including indications that in some instances it failed to provide the single point of contact for borrowers; pursued foreclosure against borrowers seeking a loan modification; failed to conduct an independent review of denials of loan modifications; and failed to ensure that borrower and loan information was accurate and up-to-date.*

- **February 2014**: Large institutional investors Pimco and BlackRock were reported to be considering legal action against Ocwen concerning its misconduct relating to loan modifications.

- **February 12, 2014**: *National Mortgage News* reported that New York banking Superintendent Benjamin Lawsky "unleashed a verbal assault on nonbank servicer Ocwen" in a speech to the New York Bankers Association.  The article reported:

*Lawsky said Ocwen's public documents make "for startling reading." He sees "corners being cut," by nonbank servicers that have touted their ability to help distressed borrowers.*

*"We have serious concerns that some of these nonbank mortgage servicers are getting too big, too fast," Lawsky told New York bankers. . . . "We see far too many struggling homeowners getting caught in a vortex of lost paperwork, unexplained fees and avoidable foreclosures."*

*                    \*        \*        \**

*But he took particular umbrage by Ocwen's assertions that it can service delinquent loans at a cost that is 70% lower than the rest of the industry, calling into question its entire servicing model.*

*"Those kinds of cost-saving claims bear special scrutiny," Lawsky said.   "Regulators have to ask whether the purported efficiencies at nonbank mortgage servicers are too good to be true."*

*                    \*        \*        \**

Lawsky made specific references to servicers' difficulty in handling the transfer of documents and dealing with distressed borrowers.

*"We see electronic loan files strewn around the globe with no one who knows how to pull them together," Lawsky said.   "We see a virtual potpourri of computer systems containing critical borrower information, but no one who knows how to extract that information at the right time and for the right purpose*."

- **February 26, 2014**: Lawsky's office sent a letter to Ocwen.  As reported by *HousingWire*, Lawsky was very concerned about a

  *"number of potential conflicts of interest" [Ocwen had] with other public companies it's dealing with, and he wants his questions answered*.

  *                    \*        \*        \**

  Lawsky's letter demands that Ocwen more specifically detail the relationship and financial connection between the companies' executives and employees, and for information regarding any other agreements between Ocwen and other companies.

  *"Presently, Ocwen's management owns stock or stock options in the affiliated companies.  This raises the possibility that management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of affiliated companies, resulting in*

- 3 -

*harm to borrowers, mortgage investors, or Ocwen shareholders as a result*."

In addition to information on Ocwen's officers, directors and employees, Lawsky's office wants all documents sufficient to show the nature and extent of services provided to Ocwen by each of the affiliated companies, including all agreements for such services, and copies of all agreements between Ocwen and the affiliated companies concerning procurement of third party services.  Ocwen is also being probed about its agreements concerning the outsourcing of information management to the affiliated companies.

- **February 27, 2014**: *Bloomberg BusinessWeek* reported:

     *As of mid-February, American homeowners had filed more than 9,000 mortgage-related complaints against Ocwen – the highest number of any non-bank servicer, according to data from the Consumer Financial Protection Bureau in Washington*.

     \*     \*     \*

     "<u>*Ocwen is one of the most complained about servicers*</u> *when we ask housing counselors and lawyers what they are seeing,*" *said Kevin Stein, associate director of the California Reinvestment Coalition, a San Francisco-based consumer advocacy group.  "We're hearing a lot about foreclosing because of bad servicing practices*."

- **March 2014**: A New York federal court denied Ocwen's motion to dismiss and allowed a class action to proceed against it and others alleging that *Ocwen misled borrowers about loan modifications*.  *See Dumont v. Litton Loan Servicing, LP*, No. 12-cv-2677-ER-LMS, 2014 U.S. Dist. LEXIS 26880 (S.D.N.Y. Mar. 3, 2014).

- **April 2014**: *Reuters* reported that New York Banking Superintendent Lawsky was going after Ocwen again and demanding information.  The *Reuters* article stated:

     *New York's banking regulator is probing Ocwen Financial Corp, which collects mortgage payments, for potentially over charging borrowers and investors to auction off foreclosed properties it services*.

     Benjamin Lawsky, superintendent of New York's Department of Financial Services, sent a letter to Ocwen saying *he was concerned the company and an affiliate, Altisource Portfolio Solutions SA, were engaged in so-called self-dealing through an online auction site called Hubzu*.

     Self-dealing is when a company represents its own interests in a transaction, rather than those of a client.

Ocwen uses Hubzu, an Altisource Portfolio subsidiary, to auction off borrower homes facing foreclosure and foreclosed investor-owned properties. When Ocwen selects Hubzu to host foreclosure or short sale auctions, the letter said, the Hubzu auction fee is 4.5 percent; when Hubzu is competing for business on the open market, its fee is as low as 1.5 percent.

*"The relationship between Ocwen, Altisource Portfolio and Hubzu raises significant concerns regarding self-dealing," the letter said, adding that it raises questions about whether the companies are charging inflated fees through conflicted business relationships that may hurt homeowners and investors*.

- **May 20, 2014**: Superintendent Lawsky spoke at the Mortgage Bankers Association Secondary Market Conference. *HousingWire* reported the following:

    *Lawsky says that part of the DFS's focus on Ocwen is because his office's review of nonbank servicers has also turned up another enormous profit center associated with these MSRs that could put homeowners and mortgage investors at risk: the provision of what they call ancillary services.*

    *"Now, in most circumstances, there's nothing inherently wrong with companies and their affiliates providing a range of ancillary services," Lawsky said.  "This is the extraordinary circumstance where there effectively is no customer to select its vendor for ancillary services. Nonbank servicers have a captive and often confused consumer in the homeowner*.

    *"So who makes the decision about where to procure these ancillary services, and how much of the investor's or the borrower's money to pay for them?  It's usually the servicer, seemingly with no oversight whatsoever.  The very same servicer that benefits – either directly or indirectly – from the profitability of the affiliated companies that provide these services," Lawsky said*.

    *Specifically, Lawsky is referring to the latest move DFS made against Ocwen, when it sent a letter to Ocwen's general counsel demanding answers to questions about Ocwen and how it operates in relation to its subsidiaries, Hubzu and Altisource*.

    *"The potential for conflicts of interest and self-dealing here are perfectly clear.  Servicers have every incentive to use these affiliated companies exclusively for their ancillary services, and they often do. The affiliated companies have every incentive to provide low-quality services for high fees, and they appear in some cases to be doing so," Lawsky said.  "In the context of the nonbank mortgage servicing market, homeowners and investors are at risk of becoming fee factories*."

- 5 -

- **May 2014**: Ocwen was sued again by another class of borrowers alleging *Ocwen failed to timely file notices of satisfaction of loans the borrowers had paid off in violation of federal and state laws*.  *See* Complaint, *Dempsey v. Ocwen Loan Servicing LLC*, No. 14-CV-2824 (E.D. Pa. May 15, 2014).

- **August 4, 2014**:  *Bloomberg* reported that New York banking Superintendent Lawsky asked Ocwen "about an insurance agreement" between Ocwen and one of its affiliates.  ***The report stated that Lawsky "says [the agreement is] designed to funnel [inflated] fees to [the] affiliate for minimal work*.**"  The report also indicated that Ocwen's chairman, William Erbey, owns 27% of the affiliate and that *Lawsky had "'serious concerns about the apparently conflicted role' played by Erbey and potentially other officers and directors [of Ocwen] in directing profits to" the affiliate.  The news report also indicated that such conduct violated state laws.  These conflicts of interest and inflated fees indicated yet another situation where Servicers such as Ocwen were improperly and illegally profiting at the expense of plaintiff and the class*.

- **October 21, 2014**:  *Lawsky sent a letter to Ocwen in which he reported that his Department had uncovered "serious issues" with Ocwen's loan servicing, "including Ocwen's backdating of potentially hundreds of thousands of letters to borrowers*."  These letters consisted of letters sent to borrowers that were *backdated more than 30 days from the time they were actually sent* informing them that they had 30 days to appeal their loan modification denials, *preventing the borrowers from timely appealing*.  The letters also included letters sent to borrowers with a date by which to cure their loan defaults and avoid foreclosures, *but the cure dates in the letters were "months prior to receipt of the letter[s]," thus preventing the borrowers from timely bringing their loans current and avoiding foreclosure*.  Lawsky's letter also revealed that his Department also discovered that even though these problems were brought to the attention of Ocwen's management, Ocwen ignored the problem and initially lied to Lawsky's Department.  *These actions by Ocwen violated the law and the settlement agreement between Ocwen and the CFPB, and were clear SEOTs*.

- **October 23, 2014**:  *Bloomberg News* reported that the *Attorneys General from Illinois, Florida and Iowa were investigating Ocwen for backdated letters*.

- **October 30, 2014**: Various news outlets reported that *Ocwen took a massive $100 million reserve for a potential settlement with Lawsky's Department over Ocwen's backdating of letters to borrowers*, although such settlement could ultimately cost more according to Ocwen's Executive Chairman, William Erbey.  *USA Today* also reported that Ocwen had *13,520 complaints filed against it with the CFPB by borrowers complaining of loan servicing and foreclosure misconduct*.

I:\RPI Wells Fargo Trustee\Pleadings\CPT Wells Fargo Trustee RPI.docx