**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X

ROYAL PARK INVESTMENTS SA/NV,

                                            Plaintiff,

                    -against-

WELLS FARGO BANK, N.A.,

                                            Defendant.

------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__ 1/10/2018

**14-CV-09764 (KPF)(SN)**

**OPINION & ORDER and**
**REPORT &**
**RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

Plaintiff Royal Park Investments SA/NV ("Royal Park") brings this putative class action against Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), asserting claims for breach of contract and breach of trust in connection with Wells Fargo's duties as trustee of two residential mortgage-backed securities ("RMBS") trusts of which Royal Park and the putative class members are or were beneficiaries (the "Trusts").[1] Royal Park moves to certify this matter as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), appoint Royal Park as class representative, and appoint Royal Park's counsel, Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), as class counsel. See ECF No. 339. Wells Fargo opposes class certification and moves to exclude the opinions of Royal Park's damages expert, W. Scott Dalrymple. See ECF No. 384.

---

[1] Royal Park originally asserted claims under the Trust Indenture Act of 1939 (the "TIA") and derivative claims on behalf of the Trusts at issue. Royal Park subsequently abandoned its derivative claims during the pendency of the motion to dismiss. See Pl.'s Opp. at 33 n.34 ("Royal Park's action was brought as a class action, or in the alternative, derivatively in the right and for the benefit of the Covered Trusts against Wells Fargo. In light of recent authority . . . Royal Park is electing to proceed only on a class basis."). The District Court dismissed the TIA claim in an Opinion and Order dated March 30, 2017.

For the reasons that follow, Wells Fargo's motion to exclude Royal Park's expert testimony is DENIED. I further recommend that the Court deny Royal Park's motion for class certification.[2]

## BACKGROUND

The factual and procedural background of this case is summarized briefly below but familiarity with the Court's prior decisions is presumed.

Royal Park is a Belgian limited liability company formed as a special purpose vehicle during the 2008 financial crisis to acquire certain distressed assets formerly held by Fortis Bank SA/NV and its affiliates. The collapse of the U.S. housing market caused significant losses to Fortis Bank, leading Royal Park to acquire interests in a portion of its structured credit portfolio as part of a larger bailout package. Among the assets that Royal Park acquired in May 2009 were Cayman collateralized debt obligations ("CDOs"), which included the two Trusts at issue in this action (ABFC 2006-OPT1 and SASC 2007-BC1). See Am. Compl. ¶ 32 (ECF No. 24). Royal Park was assigned "all right, title and interest" in the CDOs. Id. The CDOs were subsequently liquidated on February 12, 2010. Royal Park believes that it obtained all litigation rights and claims that the CDOs' initial purchasers had in the RMBS, including claims against Wells Fargo. See id.

The two Trusts issued bond-like instruments called RMBS Certificates (the "Certificates"), in which Royal Park and other investors acquired beneficial interests. The Certificates are collateralized by thousands of mortgage loans held in the Trusts, with the Certificate-holders entitled to the cash flows generated by those loans. The loans were transferred to the Trusts by institutional entities known as "Depositors." The Depositors

---

[2] 28 U.S.C. § 636(b)(1)(A), (B).

previously acquired the loans from "Sponsors" or "Sellers," which either purchased them directly or indirectly from originating lenders and aggregated them or originated the loans themselves.

The Trusts are governed by Pooling and Servicing Agreements (the "PSAs"), between the Trustee, relevant Depositors, Sponsors and/or Sellers, and other interested parties, as well as by other governing agreements. See, e.g., ABFC 2006-OPT1 Pooling and Servicing Agreement Exemplar, Ex. 11 to the Declaration of Christopher M. Wood ("Wood Dec.") (ECF No. 360-11). The relevant Sponsors/Sellers (or other loan-originating or transferring entities) warrant the credit quality and characteristics of the loans held by the Trusts, such as the borrower's employment status and the property's appraisal value. (These are referred to as the "Representations and Warranties," or "R&Ws.") In addition, the PSAs require the warranting entities to cure, substitute and/or repurchase any loans that fail to conform to the R&Ws. Most pertinent to this case, the PSAs require the Trustee, Wells Fargo, to discharge certain duties for the benefit of the Certificate-holders. Wells Fargo's responsibilities include:

(i) The duty to, "[u]pon discovery or receipt of written notice of any materially defective document in, or that a document is missing from, a Mortgage File or of the breach by the Originators or the Seller of any representation or warranty . . . in respect of any Mortgage Loan which materially adversely affects the value of such Mortgage Loan," "promptly notify the applicable Originator or the Seller" and request that the breach be cured (ABFC 2006-OPT1 PSA § 2.03(a) (ECF No. 206-8);

(ii) The duty to, in the event of a "Servicer Event of Termination . . . of which a Responsible Officer has actual knowledge," "exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs." ABFC 2006-OPT1 PSA § 8.01 (ECF No. 206-11).

Following the Court's March 30, 2017 decision of Wells Fargo's motion to dismiss, Royal Park is left with two operative causes of action related to these agreements. The first

asserts that Wells Fargo discovered pervasive R&W breaches and servicer violations in the two at-issue Trusts but disregarded its contractual duties to protect the interests of the Certificate-holders. The second avers that Wells Fargo breached its common law duty of trust to avoid conflicts of interest with the Trust beneficiaries by, among other things, putting its own interests ahead of the beneficiaries and failing to take necessary action despite knowing about Servicer Events of Termination and R&W breaches.

Royal Park now moves to certify the following class to further prosecute these claims:

> All persons and entities who held Certificates in the Covered Trusts at any time between the date of issuance to no later than 60 days after notice of class certification and opportunity to opt out is issued and were damaged as a result of Wells Fargo Bank, N.A.'s conduct alleged in the Complaint. Excluded from the Class are defendant, the loan originators, the Warrantors, the Master Servicers and the Servicers to the Covered Trusts, and their officers and directors, their legal representatives, successors or assigns, and any entity in which they have or had a controlling interest.

See Pl.'s Mem. of Law at 1 (ECF No. 359).

In conjunction with its brief in opposition to Royal Park's class certification motion, Wells Fargo moved to exclude the testimony and opinions proffered by Royal Park's damages expert, W. Scott Dalrymple ("Dalrymple"). See June 23, 2017 Order (ECF No. 356) (authorizing Wells Fargo's Daubert motion). The Court denied Royal Park leave to move against Wells Fargo's experts on timeliness grounds. See July 24, 2017 Order (ECF No. 388).

## DISCUSSION

### I.    Wells Fargo's Motion to Exclude

#### A.  Rule 702 Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It provides that an expert who is "qualified . . . by knowledge, skill, experience, training, or education" may testify if the testimony would be helpful to the trier of fact, is "based on sufficient facts or data,"

is "the product of reliable principles and methods," and the expert has reliably applied the facts

of the case. Fed. R. Evid. 702. "[T]he proponent of expert testimony has the burden of

establishing by a preponderance of the evidence that the admissibility requirements of Rule 702

are satisfied." United States v. Williams, 506 F.3d 151. 160 (2d Cir. 2007).

Rule 702 imposes "a special obligation upon a trial judge to 'ensure that any and all

scientific testimony . . . is not only relevant, but reliable.'" Kumho Tire Co. v. Carmichael, 526

U.S. 137, 147 (1999) (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589

(1993)); see also Davis v. Carroll, 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013) (the court serves an

initial gatekeeping function of weeding out "junk science"). The court must determine whether

the expert "employs in the courtroom the same level of intellectual rigor that characterizes the

practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152.

The first step in evaluating a motion to exclude is determining "whether the expert has

sufficient qualifications to testify." Davis, 937 F. Supp. 2d at 412 (internal quotation marks

omitted). If so, the second "question is 'whether the proffered testimony has a sufficiently reliable

foundation.'" Id. (quoting Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir.

2002) (internal quotation marks omitted)). It is "critical that an expert's analysis be reliable at

every step," for "*any* step that renders the analysis unreliable under the *Daubert factors renders

the expert's testimony inadmissible*." Amorgianos, 303 F.3d at 267 (internal quotation omitted)

(emphasis in original). To determine the reliability of the testimony, the Court may consider factors

including:

> (1) whether a theory or technique can be (and has been) tested, (2) whether the
> theory or technique has been subjected to peer review and publication, (3) a
> technique's known or potential rate of error, and the existence and maintenance of
> standards controlling the technique's operation, and (4) whether a particular
> technique or theory has gained general acceptance in the relevant scientific
> community.

Amorgianos, 303 F.3d at 266 (quoting Daubert, 509 U.S. at 593–94 (internal citations and quotation marks omitted)).

Notably, any contentions that the expert's "assumptions are unfounded go to the weight, not the admissibility, of the testimony." Id. (internal citation omitted). The Court need not exclude testimony because of a "minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method." Amorgianos, 303 F.3d at 267 (internal citation omitted). But "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

Because "the gatekeeping inquiry must be tied to the facts of a particular case," Kumho Tire, 526 U.S. at 150 (internal quotation marks omitted), the "Daubert inquiry is fluid and will necessarily vary from case to case." Amorgianos, 303 F.3d at 266. The "formality of a separate hearing" is not always required for a district court to "effectively fulfill[] its gatekeeping function under Daubert." Williams, 506 F.3d at 161.

### B.  **Daubert** at Class Certification

As a preliminary matter, Wells Fargo may raise Daubert objections to the admissibility of expert testimony for purposes of class certification. "Neither the Supreme Court nor the Second Circuit has definitively decided whether the Daubert standard governs the admissibility of expert evidence submitted at the class certification stage." Chen–Oster v. Goldman Sachs & Co., 114 F. Supp. 3d 110, 114 (S.D.N.Y. 2015). The Supreme Court, however, has strongly implied that Daubert *does* apply to expert testimony offered at the class certification stage. See Wal–Mart Stores, Inc. v. Dukes, 564 U.S. 338, 354 (2011) ("The District Court concluded that Daubert did

not apply to expert testimony at the certification stage of class-action proceedings. We doubt that is so." (internal citation omitted)); see also Floyd v. City of New York, 283 F.R.D. 153, 166-67 (S.D.N.Y. 2012) (applying Daubert at the certification stage).

Despite the lack of a clear legal standard on this issue, trial courts in this Circuit often "subject expert testimony to Daubert's rigorous standards insofar as that testimony is relevant to the Rule 23 class certification analysis." Scott v. Chipotle Mexican Grill, Inc., 315 F.R.D. 33, 55 (S.D.N.Y. 2016). The "scope of the Daubert analysis is cabined by its purposes at this stage: the inquiry is limited to whether or not the expert reports are admissible to establish the requirements of Rule 23." Chen–Oster, 114 F. Supp. 3d at 115 (internal citation and quotation marks omitted).

### C. Application to Dalrymple

Dalrymple submitted a report accompanying Royal Park's motion to certify the class, as well as a rebuttal report responding to the reports of Wells Fargo's experts. Dalrymple's principal report contains the following four opinions: (1) the class of those who invested in the Certificates contains at least 185 unique members; (2) the Certificates at issue were "interrelated" because the cash flows were derived from common underlying mortgages, and because losses suffered in the more subordinated securities would also cause the more senior securities to lose value; (3) Wells Fargo's alleged failure to fulfill its duties "affected the securities in the Covered Trusts similarly"; and (4) damages for all class members are "calculable on a class-wide process" based on the following methods—modeling collateral cash flows using a Covered Trust's waterfall structure, performing a discounted cash flow analysis, analyzing market and transaction prices, and using third-party pricing. Expert Report of W. Scott Dalrymple ("Dalrymple Report") ¶¶ 4, 51–58, Ex. 6 to the Wood Dec. (ECF No. 360-6).

Wells Fargo seeks to exclude all four opinions on the basis of Dalrymple's failure to (i) exclude for ownership, actual damage, and assignment of litigation claims in determining numerosity (Opinion 1); (ii) provide a quantitative analysis of the Covered Trusts' payment provisions and distribution structure in order to determine commonality (Opinions 2 and 3); and (iii) specify a damages methodology or construct a damages model (Opinion 4).

### 1. Dalrymple's Qualifications

The first step of the Daubert analysis is whether Dalrymple has "sufficient qualifications to testify." Davis, 937 F. Supp. 2d at 412 (quotation omitted). Dalrymple holds a Master of Science in Economics from the London School of Economics. See Dalrymple Report ¶ 8. He has presented to the American Bar Association, the Licensing Executives Society, and other organizations on economic and financial topics. Id. In addition, Dalrymple has presented expert opinion in other lawsuits involving RMBS offerings and other structured financial products. Id. ¶ 7. Although Wells Fargo asserts in a footnote that "it is not apparent" Dalrymple "has experience constructing 'but-for' damages or other econometric models in this context," Def.'s Daubert Br. at 8 n.3 (ECF No. 385), Wells Fargo does not elaborate as to how Dalrymple is ill-prepared to render expert testimony.

"Courts within the Second Circuit have liberally construed expert qualification requirements when determining if a witness can be considered an expert." SEC v. Revelation Capital Mgmt., Ltd., 215 F. Supp. 3d 267, 273 (S.D.N.Y. 2016) (internal citations omitted); see also In re Zyprexa Prods. Liab. Litig., 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) ("If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent.").

The Court finds Dalrymple's academic and professional qualifications more than sufficient to render his expert opinions potentially useful to the trier of fact.

### 2. Dalrymple's Methodology

At the second step, the Court must consider whether Dalrymple's methods are sufficiently reliable to be admissible under Rule 702.

### a. Numerosity Opinion

Wells Fargo challenges Dalrymple's methodology used to conclude that the putative class is numerous, including that he did not exclude class members who were not damaged by Wells Fargo's alleged conduct.

In opining that the class consists of at least 185 unique members, Dalrymple first explained that there is "no single, comprehensive list setting forth the identities of all investors who had a beneficial ownership interest in the securities at any given point in time." Dalrymple Report ¶ 41. To approximate the number of beneficial interest holders, Dalrymple reviewed account information provided by the Depository Trust Company ("DTC") (a banking organization and clearing agency based in the United States) and 20 entities that hold and trade in the Certificates of the Covered Trusts. See Dalrymple Report ¶ 45. In addition, Dalrymple analyzed "client counters" provided by the Bank of New York Mellon ("BONY"), and compared the BONY and non-BONY data. Although he noted that there were likely some investors in the BONY dataset who were not in the non-BONY dataset, he conservatively assumed complete overlap between the two datasets based on the available information. See id. ¶ 46. He then took the higher of the non-BONY and BONY figures—185 potential class members— reasoning that this number would only increase if more data from additional providers or account information was provided. See id. ¶ 47.

Wells Fargo contends that Dalrymple's methodology overstates the number of proposed class members by failing to exclude certain categories of investors who were not damaged by Wells Fargo's alleged breaches. But this puts the cart before the horse. It is unreasonable to require Dalrymple to identify which class members may be eliminated due to certain defenses at this stage. This is especially true when those defenses remain a matter of dispute (and are yet to be briefed). See In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig., 241 F.R.D. 435, 444 (S.D.N.Y. 2007) (citing Fed. R. Civ. P. 23(a)(1)) ("[T]he sole question with regard to numerosity is whether the class of people who may bring claims against the Companies is 'so numerous that joinder of all members is impracticable,' not whether that class of people will ultimately prevail in those claims."). To the extent that Wells Fargo contends that individualized defenses make a class action an inappropriate vehicle to adjudicate these claims, that argument is better directed to the predominance portion of the Rule 23 analysis.

The Court finds the facts relied upon by Dalrymple and the methodology he used to render his opinion with regards to numerosity to be sufficiently reliable and not subject to exclusion.

### b. Commonality Opinion

Dalrymple concludes that Wells Fargo's alleged failure to cure the breaches and servicer defaults affected class members in ways common to the class. In reaching these conclusions, Dalrymple did not recreate the waterfall structures created by the governing agreements or quantify the exact loss amounts caused by Wells Fargo's alleged conduct. Instead, Dalrymple's

opinions are based on his expertise in economics and understanding of how waterfall payments typically operate.

Wells Fargo asserts that Dalrymple "performed no analysis of whether any loss of subordination had any impact" on the Certificates at issue. Df.'s <u>Daubert</u> Mem. of Law, at 21. Wells Fargo further cites various sections of Dalrymple's report and deposition testimony which they claim demonstrate only a generalized understanding of waterfall structures. Wells Fargo argues that Dalrymple has not yet determined whether losses associated with Wells Fargo's alleged misconduct, if any, can be extrapolated to the Trusts in some kind of universal fashion. Dalrymple himself concedes that the exact amounts of the negative impact would vary for the different Certificates and depend on each security's position in the waterfall structure. <u>See</u> Dalrymple Report ¶ 38.

The Court rejects Wells Fargo's challenge to the admissibility of Dalrymple's opinion regarding commonality. Where a proposed expert witness bases his testimony on practical experience rather than scientific analysis, courts recognize that "[e]xperts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from . . . specialized experience.'" <u>Kumho Tire</u>, 526 U.S. at 149–50. While courts should exclude expert testimony that is speculative or conjectural, or "based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison," arguments that the assumptions are unfounded "go to the weight, not the admissibility, of the testimony." <u>Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC</u>, 571 F.3d 206, 214 (2d Cir. 2009) (internal quotation marks omitted). The Court has discretion "to determine whether the expert acted reasonably in making assumptions of fact upon which he

would base his testimony." <u>Boucher v. U.S. Suzuki Motor Corp.</u>, 73 F.3d 18, 21 (2d Cir. 1996) (per curiam) (internal quotation marks omitted).

For the present analysis, Dalrymple need show only that Wells Fargo's alleged misconduct would have affected the value of the Certificates in a common manner. Dalrymple's conclusions are based on his general knowledge of mortgage cash flows and losses and the typical waterfall structure, and application of that understanding to the specific facts of this case. He explains that Wells Fargo's alleged failure to meet its contractual obligations caused universal reductions in the collateral value of each Covered Trust and how such reductions were allocated through a typical waterfall structure.

Accordingly, Wells Fargo may challenge the weight that should be afforded to Dalrymple's testimony or otherwise attempt to contradict it but Dalrymple's opinions in this area are admissible under Rule 702.

### c.  Damages Opinion

Dalrymple asserts that damages can be calculated by subtracting a Certificate's actual value from its "but-for" value (that is, the value it would have had if Wells Fargo had fulfilled its obligations). Dalrymple Report ¶ 56. This valuation analysis would rely on one or a combination of the following "widely-used" techniques—discounted cash flow analysis, analysis of market and transaction prices, and third-party pricing services—and then "applied to the proposed class in a formulaic manner." <u>Id.</u> ¶ 57–58. Wells Fargo asserts that it cannot ascertain which particular valuation method Dalrymple would ultimately use to measure the damages to each of the class members because he has failed to set forth a "single classwide damages methodology." Def.'s <u>Daubert</u> Br. at 6. Wells Fargo also maintains that Dalrymple's damages proposals do not actually

measure damages flowing from the class's asserted theory of liability and are untethered from the facts of the case.

But Wells Fargo is not contending that Dalrymple is using junk science or that his methodology is invalid. Whether Dalrymple has failed to commit to one particular damages methodology and construct a model sufficiently tied to Wells Fargo's alleged misconduct is separate from the question of whether Dalrymple's analytical methodology is sound. At the class certification stage, the Dalrymple need not create a fully implemented damages methodology, but rather must show that the methods he plans to use are applicable to a class.

In short, Dalrymple's opinions regarding the common effects on the Certificates' value of the failure to cure or seek repurchase of breaching loans and servicer defaults and the methods he used to calculate the number of class members and damages can be reliably applied to the evidence in this case. Accordingly, they are admissible for purposes of determining whether the Rule 23 requirements have been met.

Wells Fargo's Rule 702 motion is therefore DENIED.

## II.     Royal Park's Motion for Class Certification

### A.  Ascertainability Requirement

Independent of the express requirements for class certification set forth in Federal Rule of Civil Procedure 23, there is "'an implied requirement of ascertainability.'" Brecher v. Republic of Argentina, 806 F.3d 22, 24 (2d Cir. 2015) (quoting In re Initial Pub. Offering Sec. Litig., 471 F.3d 24, 30 (2d Cir. 2006)). Before the Court can determine whether Royal Park has carried its burden with respect to Rule 23's express requirements, it must first address Wells Fargo's contention that the membership of the putative class is not ascertainable. See, e.g., In re Fosamax Prods. Liab. Litig., 248 F.R.D. 389, 397 (S.D.N.Y. 2008) ("until a class of persons alleged to be

entitled to relief is defined, the Court cannot conduct the numerosity, commonality, typicality and adequacy analyses that must precede certification").

In this Circuit, the standard for ascertainability is whether a class is defined "using objective criteria that establish a membership with definite boundaries." In re Petrobras Secs., 862 F.3d 250, 264 (2d Cir. 2017) ("Petrobras"). "This modest threshold requirement will only preclude certification if a proposed class definition is indeterminate in some fundamental way." Id. at 269. In Petrobras, the Court of Appeals explained that "the ascertainability analysis is limited to [the] narrower question" of whether class membership is "objectively *possible*," not whether it is practical or administratively feasible. Id. at 270 (emphasis in original).

Indeed, the Court of Appeals specifically rejected an administrative feasibility requirement, concluding that such a requirement would risk encroaching on the manageability component of the superiority analysis or the preponderance requirement. Whereas "ascertainability is an absolute standard" (that is, can membership be established within definite boundaries or not?), superiority and preponderance are comparative in nature (that is, is the class action vehicle superior to other methods for adjudicating a controversy? And do common questions predominate over individual ones?). Id. at 268.

The Court accordingly restricts its analysis on whether Royal Park's proposed class definition contains objective criteria. To be a member of the class, an investor must have "held Certificates in the Covered Trusts at any time between the date of issuance to no later than 60 days after the notice of class certification and opportunity to opt out is issued." This definition incorporates a temporal limitation, avoiding the Deutsche Bank court's concern that a class that failed to bookend the class period with explicit start and end dates would be unascertainable because its membership would constantly shift. Royal Park Investments SA/NV v. Deutsche

Bank Nat'l Tr. Co., No. 14-CV-4394 (AJN), 2017 WL 1331288, at *5 (S.D.N.Y. Apr. 4, 2017)

("Deutsche Bank"). See also Royal Park Investments SA/NV v. Bank of New York Mellon, No.

1:14-CV-6502-GHW, 2017 WL 3835339, at *5 (S.D.N.Y. Aug. 30, 2017) (same concern).

     In its opposition, Wells Fargo recites a litany of issues in identifying both former and

current Certificate-holders. But these obstacles are reserved for the predominance and superiority

analysis. Though it may be difficult, the Court is satisfied that it is possible to ascertain the class

based on Royal Park's class definition.

     Finally, Wells Fargo raises passing concern that Royal Park's class definition would

constitute an impermissible "fail-safe class" because it would include only those members who

"were damaged as a result of" Wells Fargo's alleged conduct. See Def.'s Mem. of Law at 13. A

fail-safe class is one whose definition "shields the putative class members from receiving an

adverse judgment. . . ." Randleman v. Fidelity Nat'l Title Ins. Co., 646 F.3d 347, 352 (6th Cir.

2011); see also Kamar v. Radio Shack Corp., 375 F. App'x. 734, 736 (9th Cir. 2010) ("The fail-

safe appellation is simply a way of labeling the obvious problems that exist when the class itself

is defined in a way that precludes membership unless the liability of the defendant is

established."). "In a fail-safe class, either the class members win or, by virtue of losing, they are

not in the class, and therefore not bound by the judgment." See Mazzei v. Money Store, 288

F.R.D. 45, 55 (S.D.N.Y. 2012).

     Wells Fargo argues that a class comprised of members who were legally injured by Wells

Fargo's conduct highlights the individualized inquiries that are required if the class were

certified. These concerns are valid, and are addressed below. For present purposes, however, the

Court does not find that a class of members who "were damaged as a result of" Wells Fargo's

alleged conduct is an impermissible fail-safe class. See also In re Initial Pub. Offering Sec. Litig.,

671 F. Supp. 2d 467, 491-93 and notes 190, 191 (S.D.N.Y. 2009) (rejecting challenge to class definition of investors "who were damaged"; finding that the term is essentially a standing requirement; and identifying decisions from the Fifth Circuit Court of Appeals and the Southern District of New York that reached the same conclusion). See also Deutsche Bank, 2017 WL 1331288, at *11 (rejecting standing challenge to Royal Park's proposed class of persons and entities who held Certificates in the Trusts and "were damaged thereby"). Royal Park's class definition simply ensures that its class only contains those who have standing to sue—such class members would be bound by a final judgment here.

## B.  Rule 23(a)

To certify a class, a plaintiff must first demonstrate that the proposed class satisfies the four prerequisites of Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. These requirements of "numerosity, commonality, typicality, and adequate representation . . . limit the class claims to those fairly encompassed by the named plaintiff's claims." Dukes, 564 U.S. at 349 (internal quotation marks omitted). A class may be certified only if the court is satisfied that the putative class meets the prerequisites of Rule 23(a). See Roach v. T.L. Cannon Corp., 778 F.3d 401, 405 (2d Cir. 2015) (internal citation and quotation marks omitted).

### 1.  Numerosity

To meet the requirements of Rule 23(a)(1), the class must be "so numerous that joinder of all members would be impracticable." Fed. R. Civ. P. 23(a); see also Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, LLC, 504 F.3d 229, 244-45 (2d

Cir. 2007) (construing "impracticable" to require not impossibility but instead "that the difficulty

or inconvenience of joining all members of the class make use of the class action appropriate").

"Precise qualification of the class members is not necessary because a court may make common

sense assumptions regarding numerosity." In re Vivendi Universal, S.A., 242 F.R.D. 76, 83

(S.D.N.Y. 2007), aff'd sub nom. In re Vivendi, S.A. Sec. Litig., 838 F.3d 223 (2d Cir. 2016)

(citations omitted); see also Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993) ("evidence of

exact class size or identity of class members" is not required to satisfy numerosity); In re Blech

Sec. Litig., 187 F.R.D. 97, 103 (S.D.N.Y. 1999) (plaintiffs may "rely on reasonable inferences

drawn from the available facts in order to estimate the size of the class"). The numerosity

requirement is met if a putative class has 40 or more members. See Shahriar v. Smith &

Wollensky Rest. Grp., Inc., 659 F.3d 234, 252 (2d Cir. 2011) (citing Consolidated Rail Corp. v.

Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995)).

According to Dalrymple, Royal Park's proposed class contains at least 185 unique

members, exceeding the presumptive level of 40. See Dalrymple Report ¶ 4. Wells Fargo argues

that Dalrymple's count was not strictly limited to those investors damaged as a result of Wells

Fargo's alleged breaches of its duties as trustee—for example, Dalrymple did not exclude those

investors whose tranches were paid off in full before the alleged breaches. See Dalrymple Dep.

Tr. at 27:2-29:20, 39:3-6; see also Rebuttal Report of W. Scott Dalrymple ("Dalrymple Rebuttal

Report") ¶ 105, Ex. 17 to the Wood Dec. (ECF No. 360-17) (testifying that the question of

"which investors were damaged" could be answered only "after the damages stage"). Dalrymple

also did not exclude those investors whose holdings profited during a damages period and who

purchased Certificates in the Covered Trusts after this litigation was filed. See Dalrymple

Rebuttal Report ¶¶ 101–03. In short, Wells Fargo argues that Dalrymple included Certificate-holders who may not have ultimately been harmed.

But "[s]tanding and numerosity are two separate unrelated inquiries." Babcock v. Computer Assoc. Internat'l, Inc., 212 F.R.D. 126, 130 (E.D.N.Y. 2003). The relevant question is whether Royal Park's proposed class is "so numerous that joinder of all members is impracticable," not "whether that class will ultimately prevail in those claims." In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 241 F.R.D. 435, 444 (S.D.N.Y. 2007). While Dalrymple's figures are somewhat indefinite, they are sufficiently conservative to leave the Court confident that the class will exceed 40 members, even with fluctuation in the final headcount.

Accordingly, Royal Park has established a presumption that joinder of class members is impracticable, and the Court recommends a finding that the numerosity requirement is satisfied.

### 2. Commonality

The commonality requirement requires a plaintiff to show "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2); see also Marisol A. by Forbes v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997). A plaintiff must articulate a common issue that drives the resolution of the litigation, such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Sykes v. Mel S. Harris and Associates LLC, 780 F.3d 70, 84 (2d Cir. 2015) (citing Dukes, 564 U.S. at 350). The commonality requirement poses a "low hurdle." Dodona I, LLC v. Goldman, Sachs & Co., 296 F.R.D. 261, 267 (S.D.N.Y. 2014); see also Adkins v. Morgan Stanley, 307 F.R.D. 119, 137 (S.D.N.Y. 2015) (courts have generally given the commonality requirement a "permissive application" (internal citation and quotation marks omitted)).

Royal Park alleges that Wells Fargo breached identical or substantially identical contractual terms and engaged in a common course of behavior, based on common policies and procedures. Royal Park contends that each class member would have to answer the following common questions in order to prove the class member's individual claims: (1) Did Wells Fargo discover loans in breach of R&Ws? (2) Did Wells Fargo know of Events of Default? (3) Did Wells Fargo violate its contractual duties by failing to enforce R&W breaches or declare Events of Default? (4) Were class members damaged as a result of Wells Fargo's conduct? See Pl.'s Mem. of Law at 8. According to Royal Park, such common questions will generate common answers based on Wells Fargo's course of conduct and policies and procedures. Dukes, 564 U.S. at 350.

Wells Fargo does not address the issue of commonality head-on but urges instead that individual questions predominate over common ones. The Court agrees with Royal Park that questions of whether Wells Fargo breached certain provisions of the underlying agreements are common ones material to the resolution of this litigation. Accordingly, the Court recommends a finding that Royal Park has satisfied commonality's "low hurdle."

### 3. Typicality

Typicality requires that the claims or defenses of the class representatives be typical of the claims or defenses of the class members. See Brown v. Kelly, 609 F.3d 467, 475 (2d Cir. 2010) (citing Fed. R. Civ. P. 23(a)(3)). Rule 23(a)(3) is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Vincent v. Money Store, 304 F.R.D. 446, 455 (S.D.N.Y. 2015) (quoting Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997)). "The central feature for typicality is that plaintiffs assert 'that defendants committed the same wrongful acts in

the same manner, against all members of the class,' and the court looks 'not at the plaintiffs' behavior, but rather at the defendant's actions.'" Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co., 301 F.R.D. 116, 132 (S.D.N.Y. 2014) (quoting Tsereteli v. Residential Asset Securitization Trust 2006–A8, 283 F.R.D. 199, 208 (S.D.N.Y. 2012)).

That said, "[w]hile it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 59 (2d Cir. 2000) (quoting Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990)). The unique defense rule, however, "is intended to protect [the] plaintiff class—not to shield defendants from a potentially meritorious suit." Newman v. RCN Telecom Servs., Inc., 238 F.R.D. 57, 77 (S.D.N.Y. 2006) (quoting Trief v. Dun & Bradstreet Corp., 144 F.R.D. 193, 200–01 (S.D.N.Y. 1992)).

Wells Fargo's principal argument that Royal Park is atypical rests on the assertion that Royal Park is subject to unique legal defenses not shared by other class members, including standing, alleged lack of ownership of the Certificates, and failure to mitigate. Wells Fargo maintains that Royal Park has failed to demonstrate both a chain of ownership and an explicit transfer of litigation rights. In addition, according to Wells Fargo, Royal Park adopted counter-selling and counter-hedging internal policies and therefore failed to mitigate damages.

But Wells Fargo has not demonstrated that Royal Park is subject to "unique" defenses that will "become the focus of the litigation." Any standing and ownership defenses asserted by Wells Fargo are hardly unique to Royal Park. As the Court discusses later, because of the nature of the RMBS at issue and the problem of assigned claims, many of the putative class members

20

will need to prove standing and ownership. The same is true for mitigation-related defenses. It is true that many of these defenses are specific to each individual plaintiff. But "the disputed issues of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." Dodona I, LLC v. Goldman, Sachs & Co., 296 F.R.D. 261, 267 (S.D.N.Y. 2014) (quotations and citations omitted). In other words, Royal Park faces unique defenses to the same degree as all other plaintiffs. This is certainly problematic, but is an issue better addressed under a predominance analysis. Accordingly, the Court recommends finding that the typicality requirement is met.

### 4. Adequacy of Representation

In conducting the adequacy analysis, the Court must consider whether "1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 35 (2d Cir. 2009) (internal quotation marks omitted). The adequacy requirement is not demanding.

The Court is satisfied that Robbins Geller could fairly and adequately represent the class's interests. To date, Robbins Geller has managed several trust-related complex litigations adeptly and has demonstrated a thorough understanding of the litigation process and substantive subject matter. Other courts have agreed in similar securities litigations. See Billhofer v. Flamel Techs., S.A., 281 F.R.D. 150, 157 (S.D.N.Y. 2012) ("[C]ourts within this Circuit have repeatedly found Robbins Geller to be adequate and well-qualified for the purposes of litigating class action lawsuits."); Sgalambo v. McKenzie, 268 F.R.D. 170, 174 (S.D.N.Y. 2010) (characterizing Robbins Geller as a "highly competent plaintiffs' firm[] with substantial securities class action experience"). Wells Fargo does not dispute Robbins Geller's adequacy as lead counsel.

The Court is similarly satisfied that Royal Park could fairly and adequately protect the interests of other class members. Royal Park, in some respects, is a vehicle for litigation: the Court is confident that it would zealously pursue the class's claims. It has demonstrated an adequate understanding of the underlying claims at issue. Wells Fargo points out that the harm may vary by seniority of tranche, such that Royal Park may be pursuing claims that more senior Certificate-holders would not. But this remains a disputed topic, and to the extent it is relevant, it is better reserved for the predominance inquiry. Though courts have found fault with Royal Park during the discovery process, see, e.g., Royal Park v. Deutsche Bank, 2016 WL 4613390, at *8, these issues are not sufficiently problematic to disqualify Royal Park as an adequate representative. Compare Steinberg v. Nationwide Mut. Ins. Co., 224 F.R.D. 67, 75 (E.D.N.Y. 2004) (class representative adequate despite earlier failure to follow rules of civil procedure and comply with discovery requests); with McDaniel v. Cnty. of Schenectady, No. 04 Civ. 757 (GLS)(RFT), 2005 WL 1745566, at *3 (N.D.N.Y. July 21, 2005) (class representative inadequate due to her failure to appear at her deposition three times under court order). The Court recommends a finding that both the plaintiff and its counsel are adequate representatives.

### C.  Rule 23(b)(3)

In addition to the four Rule 23(a) requirements, a plaintiff must establish that certification is appropriate for one of the three reasons set forth in Rule 23(b). Royal Park seeks certification pursuant to Rule 23(b)(3), under which a court must "find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and effectively adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of

separate actions; (B) the extent and nature of any litigation concerning the controversy already

begun by or against class members; (C) the desirability or undesirability of concentrating the

litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class

action." Id.

### 1. Predominance

Rule 23(b)(3) requires that "questions of law or fact common to class members

predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

This predominance requirement is satisfied if (1) resolution of any material "legal or factual

questions . . . can be achieved through generalized proof," and (2) "these [common] issues are

more substantial than the issues subject only to individualized proof." Mazzei v. The Money

Store, 829 F.3d 260, 272 (2d Cir. 2016) (quoting Myers, 624 F. 3d at 547). "An individual

question is one where 'members of a proposed class will need to present evidence that varies

from member to member,' while a common question is one where 'the same evidence will

suffice for each member to make a prima facie showing or the issue is susceptible to generalized

class-wide proof.'" Tyson Foods, Inc. v. Bouaphakeo, __ U.S. __, 136 S. Ct. 1036, 1045 (2016)

(alternations omitted) (quoting 2 William B. Rubenstein, Newberg on Class Actions § 4:59, at

196-97 (5th ed. 2012)).

The predominance inquiry is a "core feature" of the Rule 23(b)(3) analysis. Petrobras,

862 F.3d at 270. "[W]hen individual rather than common issues predominate, the economy and

efficiency of class-action treatment are lost and . . . the risk of confusion is magnified." 7AA

Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1778, at 1441 (3d ed.

2005) (footnote omitted). For this reason, district courts must "take a 'close look' at whether

common questions predominate over individual ones." Comcast Corp. v. Behrend, 133 S. Ct.

1426, 1432 (2013) (quoting <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 615 (1997)). <u>See also</u> <u>Amchem</u>, 521 U.S. at 623–24 (Rule 23(b)(3)'s predominance requirement is "far more demanding" than Rule 23(a)(2)'s commonality requirement). Courts must ask "whether the common, aggregation-enabling issues in the case are more prevalent or important that the non-common, aggregation-defeating, individual issues." <u>Tyson Foods</u>, 136 S. Ct. at 1045.

Under Royal Park's proposed class definition, the individual inquiries predominate over issues common to the class. Class members' claims differ by jurisdiction, time period, ownership and assignment histories, affirmative defenses, and damages. For the reasons stated below, I recommend a finding that Royal Park's proposed class does not satisfy the Rule 23(b)(3) predominance standard.

### a)  Article III Standing

A "class must . . . be defined in such a way that anyone within it would have standing." <u>Denney v. Deutsche Bank AG</u>, 443 F.3d 253, 264 (2d Cir. 2006). While the Court need not determine whether each putative class member has standing at the certification stage, it will have to do so before the end of this litigation. Newberg on Class Actions § 2:3 (collecting cases). The individualized inquiries required to ensure that all class members have Article III standing overwhelm any questions common to the proposed class.

As a preliminary matter, the Court must trace who held the beneficial interest in the Certificates. <u>See</u> <u>Brecher</u>, 806 F.3d at 22–26. This is a difficult proposition. The trading history of these Certificates is opaque: the Certificates do not have unique identifiers, they are actively traded on the secondary market without a central clearinghouse to record trades, and many Certificate holders are not the actual beneficiaries. Each of these features makes it difficult, if not

impossible, for the Court to determine on a class-wide basis who has standing to sue for any alleged breaches.

But that is only the first step. Even if the plaintiffs are able to trace the ownership of each Certificate back to the original sale, it must then engage in fact-intensive, individualized inquiries to determine which potential class member retained litigation rights and which statute of limitations applies to each potential class member's claim.

### 1)  The Trading History of the Certificates

First, the Certificates are difficult to trace without obtaining a record of each sale. Although each RMBS tranche can be divided into multiple holdings, the Certificates are identifiable only by a CUSIP number that applies universally to all interests in a given RMBS tranche. See Expert Report of John H. Dolan ("Dolan Report") ¶ 27, Ex. 4 to the Kcehowski Dec. (ECF No. 383-4). As such, "one cannot distinguish the holdings of two or more holders within the same tranche or CUSIP. That is, certificates are fungible within tranches." Id. ¶¶ 27, 30 (comparing the CUSIP of a Certificate to a zip code for a house instead of a unique address).

Second, private-label RMBS like the Certificates at issue are typically traded via over-the-counter negotiations between various dealers, rather than on an exchange. See id. ¶ 28. In conducting a transaction with a party, a dealer is free to omit information regarding the counterparty. "As such, if Party A sells to Party B, who sells to Party C (and so on to Parties D through M), then no Party is likely to know the identity of all other parties in the chain of ownership." Id. In addition, there is "no central repository of trade history to allow one to follow changes in ownership over time from issuance or even 2009, 2010, or 2011 to the present," which will require investor-specific questions as to how far back the chain of ownership leads. Id. ¶ 29; see also Brecher, 806 F.3d at 26 ("Further, all bonds from the same series have the same

trading number identifier (called a CUSIP/ISIN), making it practically impossible to trace purchases and sales of a particular beneficial interest.").

Third, even if the Court is able to learn all the past owners of a Certificate, the Court would still need to determine who held the beneficial interest—another individualized analysis. Royal Park contends that it subpoenaed the DTC and 26 participants for documents identifying all owners and holders of beneficial interest in the Certificates. Pl.'s Mem. of Law at 22–23. Based on this review, Royal Park argues that the "DTC only ever made payments to approximately 42 separate Participant IDs" and of those 42 Participants, "just eight separate institutions received over 95% of all payments from DTC with respect to the Certificates." Pl.'s Mem. of Law at 22. But "ownership records of the DTC only list participant institutions," not the actual beneficial owner. Id. ¶ 44; see also Dolan Report ¶ 32. In other words, most of the securities registered in the names of the DTC participants are actually "registered on behalf of other persons or entities who are the actual beneficial owners of the securities." Dalrymple Report ¶ 44. For example, the DTC's data shows the "owners" as "BNYMEL/TST" (Bank of New York Mellon) or "SSB&T CO" (State Street Bank & Trust) but does not show the actual beneficial owners of the notes. Dolan Report ¶ 35.

Therefore, while the DTC knows which Participants are listed on its books, only the Participants know the identities of the actual beneficial owners. See ¶ 34 ("[A]n investor's beneficial ownership is not evidenced by a physical certificate, nor is it assigned an identification number. Rather, it is just recorded as block dollar amounts on the records of DTC Participants."). Indeed, the DTC asserted in its response to the subpoena that it could not identify all "the beneficial owners of the subject securities" because, as noted above, its "record of ownership stops at its own Participants." Aug. 10, 2015 DTC Letter, Ex. 13 to the Kcehowski Decl. (ECF

No. 383-13). Dalrymple also concedes that, given the current state of document production, "it may not be possible to identify a complete chain of ownership or list of beneficial holders." Dalrymple Rebuttal Report ¶ 54. This "layered" or indirect form of recording ownership "presents hurdles even to identifying *current* Certificate holders, and thus compounds the challenge of identifying, in an administratively feasible manner, all those who have ever 'held' Certificates at any time since their issuance, without resort to individualized inquiries." Deutsche Bank, 2017 WL 1331288, at *6 (emphasis in original).

Taken together, these three issues mean that it is very difficult to know who owned a Certificate and when. Tracing transactions in securities that are not traded on an exchange and are recorded as indirect electronic entries in a depository would require "evidence that varies from member to member" and is "not obviously susceptible to [] class-wide proof." Petrobras, 862 F.3d at 272 (internal quotations omitted).

Royal Park also proposes an extensive claims process for ascertaining putative class members. See Pl.'s Mem. of Law at 23–25. But Plaintiff's expert has not elaborated how a complete set of records would be compiled or how much time the process would require. See Deutsche Bank, 2017 WL 1331288, at *8 ("vague references to additional datasets from unidentified sources and 'possible' further analyses" are not enough to "carry Royal Park across the figurative 50-yard line"). And even if "the pertinent locational details for each transaction are likely to be found in the records routine[ly] produced by the modern financial system," the "plaintiff-specific" nature of this issue would weigh against a finding of predominance. Petrobras, 862 F.3d at 272 (internal quotations omitted). And as explained below, beyond merely identifying previous Certificate-holders, a claims process also requires producing records that allow for systematic determination of ownership periods, assignments, and choice of law.

### 2)  Assignment of Litigation Rights

In order to pursue a claim under common law breach of contract or breach of trust claims, a class member must have the right to sue, or the litigation rights. If a current or former holder of a Certificate does not possess such rights, it does not have Article III standing because it has no claim upon which it can recover. To be a member of the putative class, therefore, a current or former holder of a Certificate must show that it has retained the litigation rights associated with that Certificate. And without class-wide proof of litigation rights, "the fact-finder would have to look at every class member's [transaction] documents to determine who did and who did not have a valid claim," thereby defeating predominance. Petrobras, 862 F.3d at 274 (quoting Mazzei, 829 F.3d at 272).

Determining whether a potential class member holds the litigation rights requires two individualized inquiries. The first inquiry applies New York's fact-intensive "center of gravity" test to determine which jurisdiction's law controls. The Court then applies the law of the governing jurisdiction to determine who holds the litigation rights. Under New York law, litigation rights transfer automatically with the sale of a Certificate; under most other states' laws, however, assignors must manifest an intent to transfer litigation rights. Racepoint Partners, LLC v. JP Morgan Chase Bank, 2006 WL 3044416, at *4 (S.D.N.Y. Oct. 26, 2006) ("New York is the only state to have enacted such a provision for the automatic assignment of bondholders' claims."); see also Deutsche Bank, 2017 WL 1331288, at *7. In these foreign jurisdictions, if the Court determined that the seller did not pass on the rights, the Court would have to trace the chain of assignment until it unearthed the party that did retain the rights.

It is apparently common to divorce the litigation rights from the underlying securities. Indeed, "Royal Park itself presents an example of the need for precisely this sort of

individualized inquiry." <u>Deutsche Bank</u>, 2017 WL 1331288, at *7. Royal Park acquired its Certificates on the secondary market, allegedly pursuant to transactions in which it obtained all of the previous holders' litigation rights. Later, it sold its holdings under a contract by which it explicitly retained those litigation rights. The same is true in the related <u>Commerzbank</u> action, in which an investor claims to have acquired litigation rights when it purchased certain securities, but retained the litigation rights when it sold other, different securities. Compl., <u>Commerzbank, AG v. Wells Fargo Bank, N.A.</u>, 15-civ-10033 (KPF)(SN), ¶¶ 17-20. This transaction-level variation among investors—"who sold them the relevant securities, how those transactions were effectuated, and what forms of documentation might be offered in support"—militates against a finding of predominance with regards to issues of who actually has a claim. <u>Id.</u> at *15–16 (predominance not satisfied where "the fact-finder would have to look at every class member's documents to determine who did and who did not have a valid claim" (internal citation and quotation marks omitted)).

### b) Statute of Limitations Defenses

The defendant's affirmative statute of limitations defense will vary from class member to class member, requiring the Court to make individualized determinations. To ascertain which jurisdictions' statute of limitations applies, the Court must make extensive, individualized, fact-based inquiries. "Although the existence of a meritorious defense does not necessarily defeat certification, affirmative defenses may be considered as a factor in the class certification calculus." <u>Weiss v. La Suisse, Societe D'Assurances Sur La Vie</u>, 226 F.R.D. 446, 454 (S.D.N.Y. 2005).

Under New York's borrowing statute, N.Y. CPLR 202, a court must apply "the Statute of Limitations of a foreign jurisdiction where a nonresident's cause of action accrued, if that

limitations period is shorter than New York's." Glob. Fin. Corp. v. Triarc Corp., 93 N.Y.2d 525, 526 (N.Y. 1999). Similar to ascertaining who holds the litigation rights, a court must, in accordance with CPLR 202, determine an investor's residency, the limitations period of that jurisdiction, and whether the investor's claim is time-barred. According to plaintiff's own expert, the "investors in the Covered Trusts are from all over the country, including California, Colorado, New Jersey, New York, Pennsylvania, Texas, and Florida as well as from outside the United States, including Europe and Asia." Dalrymple Report ¶ 48. In short, in order to consider a statute of limitations defense, the Court will have to consider the timing of each investor's transactions.

Further complicating matters is determining whether *assigned* claims are time-barred, which requires looking to "the statute of limitations of the jurisdiction in which the claim accrued to the assignor." IKB Internat'l S.A. v. Bank of Am., No. 12 Civ. 4036 (LAK), 2014 WL 1377801, at *6 (S.D.N.Y. Mar. 31, 2014). This would involve piecing together multiple sales and periods of ownership for just one investor, a daunting task given the lack of unique identifiers and the piecemeal trading and selling of the RMBS at issue.

Therefore, there will be individualized questions concerning the statute of limitations, and those will require the transactions of each putative class member to be reviewed individually. While taken alone, these affirmative defenses would be insufficient to counsel against certifying a class, they require the Court to engage in further individualized inquiries. These individual issues will also predominate over any common issues shared by the class.

### c) Damages

Investors bought and sold different tranches of the Certificates at different times. These varied circumstances make class-wide proof of damages difficult. For example, investors in a

Certificate's senior tranches may have benefitted from Wells Fargo's inaction because they were paid in full. While Royal Park may maintain that these investors were also harmed, determining by how much, and why, will again engender an individualized inquiry. Even if these investors are ultimately determine to fall outside of the class for lack of injury, that determination itself is highly individualized.

The testimony of Dalrymple, plaintiff's expert, does little to resolve this conundrum. While he need not develop a comprehensive model at the class certification stage, he has not shown that any single model could account for these concerns. Dalrymple points to several methods of calculating damages, which this Court found sufficiently reliable under FRE 702. But as described above, the "inputs" needed for his damages methodology require individualized determinations.

### 2.  Superiority

The second part of the Rule 23(b)(3) analysis asks whether "the class action device [is] superior to other methods available for a fair and efficient adjudication of the controversy." Green v. Wolf Corp., 406 F.2d 291, 301 (2d Cir. 1968). To determine whether class treatment is the superior form of adjudication, a court may consider (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation already commenced by or against class members; (3) the desirability of concentrating the litigation in a particular forum; and (4) difficulties likely to be encountered in the management of a class action. See Fed. R. Civ. P. 23(b)(3). Class treatment is particularly appropriate where it allows large groups of claimants to bundle common claims that are too small to pursue individually into a single action. See Amchem, 521 U.S. at 617; Noble v. 93 Univ. Place Corp., 224 F.R.D. 330, 346 (S.D.N.Y. 2004) (class treatment is appropriate in

"negative value cases," where the individual interest of each class member in the litigation is less than the cost to maintain an individual action).

Wells Fargo contends that a settlement entered in the Lehman Brothers' bankruptcy proceeding (the "Lehman settlement") will resolve the same R&W claims for loans in the SASC 2007-BC1 trust as Royal Park has asserted against Wells Fargo thereby defeating superiority. That is because Royal Park's breach claims purportedly stem from the same underlying R&W claims asserted by various RMBS trustees against Lehman in its capacity as warrantor of approximately 90% of the loans in the SASC 2007-BC1 trust. See Def.'s Surreply Mem. of Law at 8–9; James Report ¶ 86.

Earlier this year, a group of RMBS trustees settled with Lehman Brothers-affiliated warrantors and debtors to resolve certain R&W claims. The settlement was approved on July 6, 2017. See Order Approving RMBS Settlement Agreement, In re Lehman Bros. Holdings Inc., et al., Debtors, No. 08-13555 (SCC), 2017 WL 2889658, at *3 (Bankr. S.D.N.Y. July 6, 2017) ("Approval Order"). The Approval Order contained explicit language preserving the claims and defenses at issue in this action:

> This Order is not intended to, and does not release, enjoin, or preclude any claim or cause of action that any investor in any of the Accepting Trusts (including any former investors that have retained their claims) has against any Accepting Trustee[3] or any other person or entity, other than (i) claims against the Accepting Trustees arising out of the Accepting Trustees' evaluation and acceptance of the RMBS Settlement Agreement and implementation of the Settlement Agreement in accordance with its terms, and (ii) claims against the Released Parties[4] to the extent released under the RMBS Settlement Agreement. Moreover, for the avoidance of any doubt, *the entry of this Order does not and is not intended to extinguish or prevent the prosecution of the claims and causes of action, or the assertion of defenses, that have been asserted in* the cases styled as Royal Park Investments SA/NV v. U.S. Bank National Association, as Trustee, No. 14-cv-02590-VM (S.D.N.Y.) and Royal Park Investments SA/NV v. Wells Fargo Bank, N.A., as Trustee, No. 14-cv-09764-KPF-SN (S.D.N.Y.), and the parties to those cases

---

[3] Wells Fargo is not one of the Accepting Trustees. See Pl.'s Reply Mem. of Law at 22.

[4] Wells Fargo is also not a "Released Party" under the Lehman settlement. See id.

> *reserve all rights to present arguments and evidence in those cases as to any impact that the RMBS Settlement Agreement and the facts underlying the RMBS Settlement Agreement may have on those cases to the extent not inconsistent with the balance of this paragraph.*

Approval Order, 2017 WL 2889658, at *6 (emphasis and footnotes added)).

Although it involves a common warrantor and a common trust, the <u>Lehman</u> settlement, with certain RMBS trustees (a group that does not include Wells Fargo) asserting claims against Lehman debtors, is distinct from this putative class action. Wells Fargo does not fully explain how Royal Park's breach of contract and breach of trust claims dovetail with the trustees' R&W breach claims against Lehman as warrantor. Consequently, it is unclear how the <u>Lehman</u> settlement could function as an "other available method" to this action. And the Approval Order makes clear that Royal Park's "claims and causes of action," as well as Wells Fargo's "assertion of defenses," in this action have not been extinguished. Approval Order, 2017 WL 2889658, at *6. Furthermore, although recovery for class members who invested in the SASC 2007-BC1 trust is a possibility, Royal Park represents that, under the terms of the confirmed liquidation plan, the <u>Lehman</u> settlement will not be paid in full and will not provide any trust with a *complete* recovery. Therefore, the fact of the <u>Lehman</u> settlement alone does not demonstrate that the proposed class action is inferior.

But, although there is undeniable efficiency that stems from consolidating and concentrating the litigation of similar claims, the individualized nature of claims in this case indicates that management of the litigation would be difficult, if not near impossible, and separate actions may be more appropriate. <u>See</u> <u>Bd. of Trs. of S. Cal. IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon Corp.</u>, 287 F.R.D. 216, 230 (S.D.N.Y. 2012) ("<u>IBEW</u>") (class treatment was not superior where "a class action could become unmanageable because of the . . . need for mini-trials to resolve individual issues" (internal quotation marks

omitted)). As discussed above, the nature of the Certificates and the fact that they have been

transferred via multiple assignments (involving different jurisdictions with different laws

governing assignment of claims) will necessitate individualized hearings on the merits of each

class member's claim, overwhelming any issues common to the class. The necessity of hearing

all this individualized evidence defeats a finding of superiority of class treatment. See Fed. R.

Civ. P. 23(b)(3)(D).

Furthermore, class certification has been denied where "the proposed class members

would have a strong interest in individually controlling the prosecution of their own actions

because they are sophisticated institutional investors with large claims in the millions of dollars,"

and "several [plaintiffs] have already commenced their own lawsuits against Defendants."

IBEW, 287 F.R.D. at 229–30. Generally, purchasers of the RMBS at issue were highly

sophisticated, knowledgeable financial institutions or wealthy private investors. See In re

Countrywide Fin. Corp. Mortg.-Backed Secs. Litig., 2014 WL 3529677, at *3 (C.D. Cal. July 14,

2014) (parties to RMBS litigation, including Royal Park, were "sophisticated investors who

routinely engage in complex financial transactions").

If such investors believed they had claims against Wells Fargo with respect to the two

Covered Trusts, it is likely they would have elected to pursue litigation already. Indeed, two

other groups of plaintiffs in the consolidated RMBS trustee litigation against Wells Fargo in this

Court are actively pursuing claims with respect to the ABFC 2006-OPT1 Trust. See Ex. 1

attached to Compl. at 2, BlackRock Allocation Target Shares: Series S Portfolio, et al. v. Wells

Fargo Bank, N.A., No. 14 Civ. 9371 (KBF)(SN) (ECF No 1-1); Ex. A attached to Compl.,

Commerzbank AG v. Wells Fargo Bank, N.A., No. 15 Civ. 10033 (KBF)(SN) (ECF No. 1-1).

And BlackRock is also seeking to certify a class based on investments in the ABFC 2006-OPT1 Trust.

There is no indication that the sophisticated investors of the RMBS at issue need Royal Park to defend their interests. And although some "made purchases of as little as $10,000," see Pl.'s Reply Mem. of Law at 19, Royal Park has produced no evidence to suggest that such investors represent a majority of the proposed 185-member class.

Accordingly, I suggest a finding that a class action is not a superior method of adjudication in this case.

Because individual issues would predominate over common ones, and because the class action would be an inferior vehicle in which to adjudicate these claims, I recommend that the Court conclude that Royal Park has not satisfied the predominance requirement as required by Rule 23(b)(3).

### D.      Rule 23(c)(4) Class Certification

Royal Park proposes, in the alternative, that the class should be certified for liability purposes pursuant to Rule 23(c)(4), which provides that a class action may be "maintained . . . with respect to particular issues." Fed. R. Civ. P. 23(c)(4); see also In re Nassau Cnty. Strip Search Cases, 461 F.3d 219, 225 (2d Cir. 2006) ("a court may employ Rule 23(c)(4)[] to certify a class on a particular issue even if the action as a whole does not satisfy Rule 23(b)(3)'s predominance requirement"); Petrobras, 862 F.3d at 274 ("district courts are authorized to implement management strategies tailored to the particularities of each case"). Thus, in its discretion, the Court could certify a liability class solely on the question of whether Wells Fargo breached its duties. To the extent any efficiencies could be gained by such certification (beyond any preclusion arguments), the Court would still be left with many of the same problems

addressed above to determine who could benefit from such a finding. And, as discussed above, there are genuine questions as to whether the class action device is superior in this case.

Thus, I do not recommend that the Court exercise its discretion to certify a liability-only class under Rule 23(c)(4).

## III.   Motion to File Under Seal

The parties jointly moved to file certain exhibits under seal and related portions of their briefs under seal. The Court provisionally granted these requests. See ECF Nos. 351, 379. The basis for filing these documents under seal is to protect the competitively sensitive business information contained within them from public disclosure.

There is a presumption of public access to judicial documents under the balancing test established in Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119 (2d Cir. 2006). First, the Court must determine whether the documents are judicial documents. A judicial document is a document "relevant to the performance of the judicial function and useful in the judicial process." Id. at 115. This includes documents submitted in support of a class certification motion. Deutsche Bank, 2017 WL 1331288, at *11.

Second, the Court must determine the weight of the common law presumption of access to the judicial documents. Lugosch, 435 F.3d at 119. Judicial documents lie along "a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance." Lugosch, 435 F.3d at 119 (quoting United States v. Amodeo, 71 F.3d 1044, 1051 (2d Cir. 1995) (Amodeo II). Motions for class certifications, like motions for summary judgment, are part of the Court's core adjudicative function to which a strong presumption of access attaches. Deutsche Bank, 2017 WL 1331288, at *11; see also Lugosch, 435 F.3d at 121.

Third, the Court assess whether there are any countervailing concerns that would weigh against full public access to the documents. Lugosch, 435 F.3d at at 120. The privacy interest of a nonparty is a "venerable common law exception to presumption of access." Amodeo II, 71 F.3d at 1051. Courts, in more limited circumstances, have held that the privacy interest of a party can also constitute an exception to the presumption. See Standard Inv. Chartered, Inc. v. Fin. Indus. Regulatory Auth., Ind., 347 F. App'x 615, 617 (2d Cir. 2009) (upholding a decision that held that the party's "interest in protecting confidential business information outweighs the qualified First Amendment presumption of public access.").

The public also has a qualified First Amendment right to access certain judicial documents. Lugosch, 435 F.3d at 120. Determination of the existence of a First Amendment right to access the documents largely maps onto the common law approach, though it is "'more stringent' and 'sealing of the documents may be justified only with specific, on-the-record findings that sealing is necessary to preserve the higher values and only if the sealing is narrowly tailored to achieve that aim.'" Tropical Sails Corp. v. Yext, Inc., No. 14 CIV. 7582 (JFK), 2016 WL 1451548, at *2 (S.D.N.Y. Apr. 12, 2016) (quoting Lugosch, 435 F.3d at 124).

The documents of concern here are unquestionably judicial documents. They were submitted in conjunction with a motion for class certification, which is a core adjudicative process. Having reviewed the documents in consideration for this Report and Recommendation, the Court finds that a strong presumption of access attaches.

The documents the parties request to remain under seal fall into two categories. First are documents (and portions of the briefs) containing sensitive business information from the parties. Second are documents (and portions of the briefs) containing sensitive business information from nonparties, obtained often via subpoena. The parties made efforts to tailor their redactions

narrowly to only contain reference to these documents. The Court finds that the redaction of

third-party information contained in plaintiff's brief on page 22, and in the expert reports,

deposition transcripts and RFAs, is appropriate (Exhibits 4, 5, 6, 8, 28, 36 to the Kcehowski

Declaration, Exhibits 1, 2, 3, 4, 5, 6 to the Schaffer Declaration, and Exhibits 14, 15, 16 to the

Wood Declaration). The Court notes one exception: in this Report & Recommendation, the

Court specifically cites paragraphs 34 and 35 of Dolan expert report, which contain third-party

information. These two paragraphs should be unredacted and filed on the public docket.

      The parties contend that their own redacted documents contain proprietary,

competitively sensitive business information or are related to internal procedures, the disclosure

of which would put it at a competitive disadvantage. This type of harm is "comparable to other

harms that courts have recognized as potentially sufficient to defeat the presumption in favor of

disclosure." Standard Inv. Chartered, 2008 WL 199537, at *8 (holding that competitive harm

could overcome the presumption of access). The documents placed under seal by the parties are

often strategic in nature, and reflect sensitive business information that the parties could

reasonably wish to remain confidential (Exhibits 25, 29, 31, 32, 35 to the Kcehowski Declaration

and Exhibits 5, 7, 10, 20, 21, 25, 27, 28, 36 to the Wood Declaration). Exhibit 27 to the

Kcehowski Declaration, however, is a factual declaration from the former CEO of Royal Park.

This testimony does not contain sensitive business information, but is rather a document created

for the purposes of this litigation. Wells Fargo should file this document in full on the public

docket. Similarly, Exhibit 37 is an exchange about scheduling a deposition, and is the type of

document routinely attached to discovery motions in this Court. Any privacy concerns related to

Exhibit 37 do not overcome the strong presumption of access here.

While the Court agrees with the majority of the parties' proposed redactions, the redacted portions of the briefs are not sufficiently "narrowly tailored." Lugosch, 435 F.3d at 126. Specifically, the plaintiff's memorandum of law in favor of class certification contains certain redacted passages that are not directly derived from business-sensitive documents, meaning the presumption of access is not rebutted. Royal Park is ORDERED to unredact the following portions of its opening brief and refile it on ECF: all redacted passages on pages 1-2; all redacted passages on page 9; from "Wells Fargo's" to "regarding" on page 14; and from "which was" to "procedures" on page 15.

### CONCLUSION

Wells Fargo's motion to exclude the expert report and opinions of W. Scott Dalrymple is DENIED. The Court recommends that Royal Park's motion to certify this matter as a class action, to appoint Royal Park as class representative, and to appoint Robbins Geller as class counsel be DENIED.

Because it arguably contains reference to information that Royal Park or Wells Fargo has requested to be maintained under seal, this Opinion & Order and Report & Recommendation shall be filed under TEMPORARY SEAL. The parties are directed to meet and confer and to advise the Court within two business days of this Order whether they believe that any portion should be redacted before its public docketing. The time to file any objections to the Court's Report and Recommendation shall accrue from today. Fed. R. Civ. P. 72(b)(2).

This Order resolves the pending motions at ECF No. 384.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:        January 10, 2018
               New York, New York

\*   \*   \*

### NOTICE OF PROCEDURE FOR FILING OBJECTIONS
### TO THIS REPORT AND RECOMMENDATION

  The parties shall have fourteen days from today, January 10, 2018, the publication date of this sealed Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Katherine Polk Failla at the United States Courthouse, 40 Foley Square, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Failla. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).