UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

ROYAL PARK INVESTMENTS SA/NV,     :

                 Plaintiff,     :

                               :

          v.                        :

WELLS FARGO BANK, N.A.,         :

               Defendant.     :

------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: <u>April 17, 2018</u>

14 Civ. 9764 (KPF) (SN)

<u>OPINION AND ORDER
ADOPTING REPORT AND
RECOMMENDATION</u>

KATHERINE POLK FAILLA, District Judge:

Pending before the Court is the January 10, 2018 Report and

Recommendation issued by Magistrate Judge Sarah Netburn (the "R&R")

recommending the denial of the motion for class certification brought by

Plaintiff Royal Park Investments SA/NV ("Royal Park") in this action against

Defendant Wells Fargo Bank, N.A. ("Wells Fargo"). At the outset, the Court

observes that class certification in cases of this type, alleging breaches by the

trustee of a residential mortgage-backed security ("RMBS") trust, is not an

issue of first impression in the Southern District of New York. Several other

courts in the District have addressed the issue, and though their reasoning has

evolved along with more recent Second Circuit decisions, none has found that a

class action would be an appropriate vehicle for prosecuting such a case. *See*

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14 Civ. 4394 (AJN),

2018 WL 1750595 (S.D.N.Y. Apr. 11, 2018); *Royal Park Invs. SA/NV v. HSBC*

*Bank USA, N.A.* ("*HSBC*"), No. 14 Civ. 8175 (LGS), 2018 WL 679495 (S.D.N.Y.

Feb. 1, 2018); *Royal Park Invs. SA/NV* v. *Bank of N.Y. Mellon*, No. 14 Civ. 6502

(GHW), 2017 WL 3835339 (S.D.N.Y. Aug. 30, 2017); *Royal Park Invs. SA/NV* v.

*Deutsche Bank Nat'l Tr. Co.* ("*Deutsche Bank*"), No. 14 Civ. 4394 (AJN), 2017

WL 1331288 (S.D.N.Y. Apr. 4, 2017). For the reasons that follow, the Court

finds no reason to chart a new course here, and it therefore adopts the R&R in

its entirety.

**BACKGROUND**[1]

**A.    Factual Background**

Both this Court and Judge Netburn have previously offered lengthy

recitations of the facts underlying this action and several related actions. *See*

*BlackRock Allocation Target Shares: Series S. Portfolio* v. *Wells Fargo Bank, Nat'l*

*Ass'n*, 247 F. Supp. 3d 377, 383-88 (S.D.N.Y. 2017) ("*BlackRock Series S*"),

*objections overruled sub nom. BlackRock Allocation Target Shares: Series S*

*Portfolio* v. *Wells Fargo Bank, Nat'l Ass'n*, No. 14 Civ. 10067 (KPF) (SN), 2017

WL 3610511 (S.D.N.Y. Aug. 21, 2017); *BlackRock Allocation Target Shares* v.

*Wells Fargo Bank, Nat'l Ass'n*, No. 14 Civ. 9371 (KPF) (SN), 2017 WL 953550, at

*2-3 (S.D.N.Y. Mar. 10, 2017), *order clarified sub nom. BlackRock Allocation*

*Target Shares: Series S Portfolio* v. *Wells Fargo Bank, Nat'l Ass'n*, No. 14 Civ.

---

[1]     The facts discussed in this Opinion are drawn from the R&R (Dkt. #442), and from
Royal Park's Amended Complaint ("Am. Compl." (Dkt. #24)) and the exhibits attached
thereto. In addition, the Court refers to the parties' briefing on Royal Park's objections
to the R&R as follows:  Royal Park's Memorandum of Law in Support of Its Rule 72
Objections and Motion to Vacate the Magistrate Judge's Opinion and Order and Report
and Recommendation as "Pl. Obj." (Dkt. #455); Wells Fargo's Opposition to the
Objections as "Def. Opp." (Dkt. #458); and Royal Park's Reply to Wells Fargo's
Opposition as "Pl. Reply" (Dkt. #466).

10067 (KPF) (SN), 2017 WL 3610511 (S.D.N.Y. Aug. 21, 2017). This Opinion therefore focuses on the facts necessary to resolve the instant objections to the R&R.

### 1. The RMBS Trusts

This case involves two RMBS trusts for which Wells Fargo serves as trustee. (*See* Am. Compl. ¶ 1).[2] In May 2009, Royal Park acquired collateralized debt obligations ("CDOs") that included those two trusts, which acquisition entitled Royal Park to beneficial interests in RMBS certificates ("Certificates"). (R&R 2). Thousands of mortgage loans contained in the trusts operate as collateral for the Certificates, and certificateholders like Royal Park are entitled to the cash flow from the loans. (*Id.*). Institutional entities known as "Depositors" transferred the loans to the trusts after acquiring the loans from "Sponsors" or "Sellers," which, as their names suggest, either originated the loans or acquired the loans from originating lenders. (*Id.* at 2-3). Although the CDOs were liquidated in February 2010, Royal Park asserts that it retains

_____

[2]     The RMBS trusts at issue are titled "ABFC 2006-OPT1" and "SASC 2007-BC1." (Am. Compl. ¶ 2). An RMBS trust operates as follows:

> To raise funds for new mortgages, a mortgage lender sells pools of mortgages into trusts created to receive the stream of interest and principal payments from the mortgage borrowers. The right to receive trust income is parceled into certificates and sold to investors, called certificateholders. The trustee hires a mortgage servicer to administer the mortgages by enforcing the mortgage terms and administering the payments. The terms of the securitization trusts as well as the rights, duties, and obligations of the trustee, seller, and servicer are set forth in a Pooling and Servicing Agreement[.]

*BlackRock Fin. Mgmt. Inc.* v. *Segregated Account of Ambac Assur. Corp.*, 673 F.3d 169, 173 (2d Cir. 2012).

the litigation rights that the initial purchasers of the CDOs had against Wells Fargo. (*Id.* at 2).

## 2. The Trustee's Obligations

Royal Park grounds its claims in the agreements that govern the responsibilities between and among Wells Fargo as trustee; the Depositors, Sponsors, and Sellers; and other interested parties. In particular, Pooling and Servicing Agreements ("PSAs") contained Representations and Warranties ("R&Ws") requiring the Sponsor, Seller, or other entity that originated or transferred one of the underlying loans to the trusts to "warrant the credit quality and characteristics" of those loans — including, for example, "the borrower's employment status and the property's appraisal value." (R&R 3). The PSAs required the warranting party "to cure, substitute[,] and/or repurchase any loans that fail[ed] to conform to the R&Ws." (*Id.*).

Pursuant to the PSAs, Wells Fargo was responsible for assuring compliance with the R&Ws. Specifically, and as relevant to Royal Park's claims, Wells Fargo had the duties (i) to "promptly notify the applicable Originator or the Seller" upon discovering "any materially defective document in, or that a document is missing from, a Mortgage File or of the breach by the Originators or the Seller of any representation or warranty" that is applicable to any "Mortgage Loan which materially adversely affects the value of such Mortgage Loan"; and (ii) if "a Responsible Officer ha[d] actual knowledge" of a

"Servicer Event of Termination,"[3] Wells Fargo was to "exercise such of the rights and powers vested in it by [the PSA]" with "the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs."  (R&R 3).

## B.    Procedural Background

### 1.    Royal Park's Claims Against Wells Fargo

Royal Park alleges that Wells Fargo failed to satisfy the PSAs' requirements — thereby breaching both the PSAs and Wells Fargo's common-law duty of trust to avoid conflicts of interest with trust beneficiaries — because it discovered R&W breaches and Servicer Events of Termination in the underlying trusts but "took 'virtually no action to enforce Seller obligations to repurchase defective loans and Servicer obligations to cure defaults and reimburse the Trusts for damages.'"  *BlackRock Series S*, 247 F. Supp. 3d at 387 (citation omitted).  At present, only Royal Park's breach of contract and breach of trust claims remain, the Court having previously dismissed claims under the Trust Indenture Act and the Streit Act.  *See id.* at 393-401.  (*See also* Am. Compl. ¶¶ 173-200).  In pursuit of these remaining claims, Royal Park seeks to certify the following class:

> All persons and entities who held Certificates in the Covered Trusts at any time between the date of issuance

---

[3]    A "Servicer Event of Termination" included failures on the part of the loan servicer, such as a "failure by the Servicer to deposit in the Collection Account or remit to the Trustee for deposit in the Distribution Account any payment required to be made under the terms of" PSA.  (Am. Compl., Ex. A (§ 7.01(a)(i)(A) of the PSA for the ABFC 2006-OPT1 Trust)).

to no later than 60 days after notice of class certification and opportunity to opt out is issued and were damaged as a result of Wells Fargo Bank, N.A.'s conduct alleged in the Complaint. Excluded from the Class are defendant, the loan originators, the Warrantors, the Master Servicers and the Servicers to the Covered Trusts, and their officers and directors, their legal representatives, successors or assigns, and any entity in which they have or had a controlling interest.

(Pl. Obj. 3).

## 2. The R&R

On January 10, 2018, Magistrate Judge Netburn issued the R&R on Royal Park's class certification motion, recommending that the Court deny certification. (Dkt. #442). Judge Netburn found that Royal Park had established that membership in the putative class was ascertainable and that the class satisfied Federal Rule of Civil Procedure 23(a)'s requirements of numerosity, commonality, typicality, and adequate representation. (R&R 13-22). The certification motion failed, in Judge Netburn's view, because Royal Park did not satisfy Rule 23(b)(3)'s requirements that common questions predominate over individual issues and that a class action be superior to other methods of adjudication. (*Id.* at 22-35). Judge Netburn also declined to recommend certifying a class under Rule 23(c)(4) for the limited purpose of determining liability, finding that certifying a limited class would implicate the same problems as certifying a class to adjudicate the entirety of Royal Park's claims. (*Id.* at 35-36).[4]

---

[4] Also accompanying the R&R was an Opinion and Order in which Judge Netburn denied

On February 7, 2018, Royal Park filed objections to the R&R, thereby challenging Judge Netburn's recommendation that the putative class be denied for failure to satisfy the requirements of Rule 23(b)(3). (Dkt. #453, 455-56). On March 8, 2018, Wells Fargo opposed Royal Park's objections (Dkt. #464-65), and on March 21, 2018, Royal Park replied to Wells Fargo's opposition (Dkt. #466).

Along with its objections, Royal Park submitted to the Court materials that it had not submitted to Judge Netburn. (*See* Declaration of Christopher Wood dated February 7, 2018 ("Wood Decl." (Dkt. #456)), Ex. A-E, H-J). By letter dated March 23, 2018, Royal Park requested an evidentiary hearing on the matter. (Dkt. #467). The Court denied the request, noting, in relevant part, that the materials in issue had not been presented to Judge Netburn and that no request had been made to her for an evidentiary hearing. (Dkt. #470 (citing *Frasier* v. *McNeil*, No. 13 Civ. 8548 (PAE) (JCF), 2015 WL 1000047, at *2 (S.D.N.Y. Mar. 5, 2015); *Grant* v. *Bradt*, No. 10 Civ. 394 (RJS), 2012 WL 3764548, at *4 (S.D.N.Y. Aug. 30, 2012)).[5]

---

Wells Fargo's motion to exclude Royal Park's damages expert, who submitted a report in support of class certification. (R&R 4-13). Wells Fargo did not file any objections to the R&R, nor did it appeal from the denial of its motion to exclude.

[5]   It remains the Court's view that considering new evidence or new arguments in reviewing objections to a magistrate judge's ruling is "disfavored absent a 'most compelling reason' for the failure to present such evidence or arguments in the first instance." *In re Consol. RNC Cases*, No. 127, 2009 WL 130178, at *10 (S.D.N.Y. Jan. 8, 2009) (quoting *Hous. Works, Inc.* v. *Turner*, 362 F. Supp. 2d 434, 438 (S.D.N.Y. 2005)). No such proffer was made in this case. That said, even were the Court to consider this additional information — in particular, the materials derived from third-party document productions — the deficiencies identified by Judge Netburn would remain.

## DISCUSSION

## A.    Review of a Magistrate Judge's Report and Recommendation

When deciding whether to adopt a report and recommendation, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Civ. P. 72(b)(3). The Court conducts a *de novo* review of those portions of a report and recommendation to which a party submits a timely objection. *See generally United States* v. *Romano*, 794 F.3d 317, 340 (2d Cir. 2015).

"To accept those portions of the report to which no timely objection has been made, 'a district court need only satisfy itself that there is no clear error on the face of the record.'" *King* v. *Greiner*, No. 02 Civ. 5810 (DLC), 2009 WL 2001439, at *4 (S.D.N.Y. July 8, 2009) (quoting *Wilds* v. *United Parcel Serv., Inc.*, 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003)), *aff'd*, 453 F. App'x 88 (2d Cir. 2011) (summary order); *accord Galeana* v. *Lemongrass on Broadway Corp.*, 120 F. Supp. 3d 306, 310 (S.D.N.Y. 2014). Indeed, a party's failure to object timely to a report and recommendation, after receiving clear notice of the consequences of such a failure, operates as a waiver both of the party's right to object to the report and recommendation and of the right to challenge the report and recommendation on appeal. *See Frank* v. *Johnson*, 968 F.2d 298, 300 (2d Cir. 1992) ("We have adopted the rule that failure to object timely to a report waives any further judicial review of the report.").

**B.      The Court Adopts the R&R's Recommendation to Deny Certification**

1.      **Royal Park Fails to Satisfy Rule 23(b)(3)**

Before certifying a putative class, a district court must decide that it satisfies not only Rule 23(a)'s prerequisites of numerosity, commonality, typicality, and adequacy of representation, but also one of the three criteria of Rule 23(b). *Marisol A.* v. *Giuliani,* 126 F.3d 372, 375-76 (2d Cir. 1997). Royal Park seeks certification under Rule 23(b)(3), which allows class certification where [i] "questions of law or fact common to class members predominate over any questions affecting only individual members," *and* [ii] "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The Supreme Court has described Rule 23(b)(3) "as an 'adventuresome innovation,' … designed for situations 'in which class-action treatment is not as clearly called for.'" *Comcast Corp.* v. *Behrend,* 569 U.S. 27, 34 (2013) (quoting *Wal-Mart Stores, Inc.* v. *Dukes,* 564 U.S. 338, 362 (2011)). Class certification pursuant to Rule 23(b)(3) is justified where it "would achieve economies of time, effort, and expense, and promote … uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prod., Inc.* v. *Windsor,* 521 U.S. 591, 615 (1997) (ellipsis in original). Conversely, a court should deny certification "[w]here individualized questions permeate the litigation," in which case "those 'fatal dissimilarit[ies]' among putative class members 'make use of the class-

action device inefficient or unfair.'" *In re Petrobras Sec.*, 862 F.3d 250, 270 (2d Cir. 2017) (second alteration in original) (quoting *Amgen Inc.* v. *Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 470 (2013)).

### a. Individual Issues Predominate Over Common Issues

Rule 23(b)(3)'s predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Windsor*, 521 U.S. at 623 (citing 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE 518-19). A putative class satisfies this requirement if (i) "resolution of any material 'legal or factual questions … can be achieved through generalized proof,'" and (ii) "these [common] issues are more substantial than the issues subject only to individualized proof." *Petrobras*, 862 F.3d at 270 (alterations in original) (quoting *Mazzei* v. *The Money Store*, 829 F.3d 260, 270 (2d Cir. 2016)). This analysis requires district courts to weigh the prevalence of individual issues (i.e., those demanding evidence that varies among class members) against common issues (i.e., those "susceptible to generalized class-wide proof"). *Id.* (quoting *Tyson Foods, Inc.* v. *Bouaphakeo*, — U.S. —, 136 S. Ct. 1036, 1045 (2016)); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 Civ. 5450 (NRB), 2018 WL 1229761, at *5 (S.D.N.Y. Feb. 28, 2018) ("Ultimately, we ask 'whether issues susceptible to generalized proof outweigh individual issues,' or put differently, whether 'common issues are more substantial than individual ones.'" (internal citations omitted)).

That said, "[i]ndividual questions need not be absent" in order for a court to certify a class under Rule 23(b)(3); the "rule requires only that those questions not predominate over the common questions affecting the class as a whole." *Sykes* v. *Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 81 (2d Cir. 2015) (quoting *Messner* v. *Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012)). Although a court may certify a class even where issues such as damages or individual defenses might not be amenable to generalized proof, "such individual issues are 'factor[s] that [a court] must consider in deciding whether issues susceptible to generalized proof outweigh individual issues[.]" *Johnson* v. *Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015) (first alteration in original) (quoting *McLaughlin* v. *Am. Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008), *abrogated on other grounds by Bridge* v. *Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008)).

The R&R identifies three individual issues that would predominate over any common issues in the litigation: (i) whether each putative class member has standing to bring claims against Wells Fargo for common breaches of the trusts' governing agreements; (ii) whether applicable statutes of limitations render the putative class members' claims untimely; and (iii) whether damages would be calculable on a class-wide basis. (*See* R&R 22-31). These issues are discussed below, after first discussing the single common issue present in this case.

### i.    The Common Issue of Breach

As Judge Netburn recognized in her assessment of Rule 23(a)'s commonality requirement, "questions of whether Wells Fargo breached certain provisions of the underlying agreements are common ones material to the resolution of this litigation." (R&R 19).  To prevail, Royal Park would have to prove breach "on a 'loan-by-loan and trust-by-trust basis.'" *Deutsche Bank*, 2016 WL 439020, at *6 (quoting *Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chi.* v. *Bank of N.Y. Mellon*, 775 F.3d 154, 162 (2d Cir. 2014)).  And Wells Fargo may well be correct that "[t]he trusts have materially different waterfalls and contract terms, imposing different duties and prioritizing payments to different holders in different circumstances over time." (Def. Opp. 18).  These differences — though no doubt relevant to the predominance inquiry, as discussed below — would impact when a given claim accrued and the amount of damages to which an individual plaintiff would be entitled.  They would not, however, impact a determination of whether Wells Fargo breached the relevant agreements or, for that matter, whether Wells Fargo breached its common-law duty of trust.  *Cf. Bank of N.Y. Mellon*, 775 F.3d at 162 (denying class standing for plaintiffs bringing breach of contract and breach of fiduciary duty claims on behalf of investors in trusts in which plaintiffs did not invest).

But even if Wells Fargo committed such breaches, its liability to investors would depend on a variety of factors that would be idiosyncratic to each

putative class member.  These factors include the identity of the beneficial owners of trust certificates, the timing of an investor's acquisition of a trust certificate, jurisdictional differences in the body of law applicable to an investor's claim, and the amount of damages attributable to such claim.  As detailed in the remainder of this section, although these issues individually might not predominate over any issues common to the putative class members, taken together, they overwhelm any common issues.  *See Johnson*, 780 F.3d at 138.

### ii.    The Individual Issue of Standing

Under Article III of the United States Constitution, a federal court may only entertain suits in which the plaintiff has standing, *i.e.*, (i) an "injury in fact" that is "concrete and particularized," (ii) "a causal connection between the injury and the conduct complained of," and (iii) a likelihood "that the injury will be redressed by a favorable decision."  *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotation marks omitted).  In the class action context, each class member need not "submit evidence of personal standing," but a court may not certify a class "that contains members lacking Article III standing."  *Denney* v. *Deutsche Bank AG*, 443 F.3d 253, 263-64 (2d Cir. 2006).  "Put differently, 'Article III's jurisdictional requirements [apply] to each member of a class."  *Calvo* v. *City of New York*, No. 14 Civ. 7246 (VEC), 2017 WL 4231431, at *3 (S.D.N.Y. Sept. 21, 2017) (alteration in original) (quoting *In re Literary Works in Elec. Databases Copyright Litig.*, 509 F.3d 116,

126 (2d Cir. 2007)).  A "class must therefore be defined in such a way that anyone within it would have standing."  *Denney*, 443 F.3d at 264.

The difficulty in determining standing for members of the class here is a consequence of the chain of beneficial ownership of the trust certificates. "[T]he [c]ertificates do not have unique identifiers, they are actively traded on the secondary market without a central clearinghouse to record trades, and many [c]ertificate holders are not the actual beneficiaries."  (R&R 24).  As the R&R notes, in most states, "assignors must manifest an intent to transfer litigation rights," while New York law applies a minority rule under which litigation rights automatically accompany the sale of a certificate.  (*Id.* at 28 (citing *Deutsche Bank*, 2017 WL 1331288, at *7; *Racepoint Partners, LLC* v. *JP Morgan Chase Bank*, No. 06 Civ. 2500 (MGC), 2006 WL 3044416, at *4 (S.D.N.Y. Oct. 26, 2006)).  *See also HSBC*, 2018 WL 679495, at *3 ("The fact that Plaintiffs currently hold the certificates does not establish their standing as to losses incurred by previous certificateholders.").

In light of these ambiguities in ownership and variations in applicable law, multiple courts in this District have acknowledged the tortuous standing analysis for a putative class member in an RMBS trust action:

> First, the Court would have to apply New York's fact-intensive "center of gravity" choice-of-law framework to determine which jurisdiction's law governs a particular assignment.  Under this approach, courts consider five factors in determining which jurisdiction has the "most significant relationship" to a contract dispute: [i] the place of contracting, [ii] the place of negotiation, [iii] the

14

place of performance, [iv] the location of the subject matter and [v] the domicile or place of business of the contracting parties. For each ... class member[], this analysis would be necessary for *each* transfer in the chain from the original certificateholder to the potential class member. Second, the Court would have to apply the law relevant to each transaction to determine whether claims were assigned with the transfer of certificates or retained by the seller. A certificateholder has standing to sue only if every prior transaction in the chain included an assignment of the right to sue along with the underlying certificate.

*HSBC*, 2018 WL 679495, at *4; *see also Deutsche Bank*, 2017 WL 1331288, at *7 ("[I]dentifying class members with contract claims in the face of active aftermarket trading across multiple domestic and international jurisdictions is likely to require a two-part inquiry."). In its objection, Royal Park takes issue with the second step in this analysis — determining whether litigation rights accompanied the transfer of a certificate — by arguing that the record contains no evidence that such may be the case for any of the investors here. (*See* Pl. Obj. 13). But even if it turns out that all of the investors within Royal Park's proposed class have retained the litigation rights linked to their certificates under the law of the relevant jurisdiction, that determination would still require an individualized inquiry for each investor.

Royal Park separately argues that this analytical hurdle need not foreclose certification, as "courts routinely reject the notion that the standing of absent class members is sufficient to defeat predominance[.]" (Pl. Obj. 9). But the portions of the cases on which Royal Park relies for this proposition only highlight the importance of determining certificate ownership, individually, for

15

the purpose of standing; the cited excerpts deal with difficulties in determining whether an individual class member may prevail on the merits or be entitled to damages, and do not address Article III's jurisdictional requirements. *See Briseno* v. *ConAgra Foods, Inc.*, 844 F.3d 1121, 1131 (9th Cir. 2017) ("Rule 23 specifically contemplates the need for … individualized claim determinations *after a finding of liability*." (emphasis added)); *Freeland* v. *Iridium World Commc'ns*, 233 F.R.D. 40, 46 (D.D.C. 2006) ("[A]ny difficulty by individual class members in tracing their particular aftermarket-purchased shares to the Registration Statement is a secondary issue *to be resolved after the predominant issue of [the defendant's] liability has been decided*." (emphasis added)). Although the Court need not necessarily address standing before class certification, *see Winfield* v. *Citibank, N.A.*, 842 F. Supp. 2d 560, 574 (S.D.N.Y. 2012), such analysis here will be ridden with complex, individualized determinations.

As the R&R points out, identifying certificateholders is unlikely without the record of each transfer, as the certificates are only identifiable by a CUSIP number that is common to all other holdings in a given tranche within a trust. (R&R 25). Royal Park contends that courts commonly certify classes in securities fraud cases involving a single CUSIP number. (Pl. Obj. 10). But for the purpose of determining standing, courts have expressly distinguished securities fraud actions from RMBS trust actions, finding that claims in the latter category require individualized inquiries not implicated in the former

category.  *See Bank of N.Y. Mellon*, 775 F.3d at 161-63 (affirming dismissal based on lack of class standing where plaintiffs brought, *inter alia*, breach of contract and fiduciary duty claims related to RMBS trusts in which they did not invest); *Deutsche Bank*, 2017 WL 1331288, at *6 (contrasting "straightforward" analysis of standing for Securities Act claims with more involved analysis for "investors who assigned or acquired [trust certificates] via the secondary market").  The law regarding class certification in the securities fraud context thus does not graft cleanly onto the claims at issue.

Royal Park also submits that it can identify beneficial owners of the trust certificates through records that Royal Park obtained by subpoenaing the Depository Trust Company ("DTC"), which "legally own[s]" the certificates "in 'Book-Entry' form."  (Dkt. #448 at 22 (Memorandum of Law in Support of Class Certification); *see* Pl. Obj. 12)).  Although the R&R notes that these records "only list participant institutions, not the actual beneficial owner,"  (R&R 26 (internal quotation marks and citation omitted)), Royal Park contends that this "ignores" that Royal Park subpoenaed such participants, which have "provided trading records identifying *many* of the beneficial owners of the certificates," (Pl. Obj. 12 (emphasis added)).  Royal Park has not shown, however, that it will be able to determine all of the beneficial owners — nor, more importantly, that these documents reveal the chain of ownership necessary to determine whether a given certificateholder owns the litigation rights associated with their certificates.  And the further discovery required to ascertain such information

only underscores the individualized inquiries required to determine which investors have standing to bring the claims alleged.  Unsurprisingly, Royal Park's own expert conceded that, based on the documentation currently available to Royal Park, constructing a coherent chain of ownership or list of beneficial owners may be impossible.  (R&R 27 (quoting Dkt. #360-17, at ¶ 54)).

### iii.    The Individual Issue of Limitations Periods

Because statutes of limitations differ among jurisdictions, the R&R found that Wells Fargo's "affirmative statute of limitations defense will vary from class member to class member, requiring the Court to make individualized determinations."  (R&R 29).  Under New York's "borrowing statute," N.Y. C.P.L.R. 202, "[w]hen a nonresident sues on a cause of action accruing outside New York," the claim must "be timely under the limitations period of both New York and the jurisdiction where the cause of action accrued."  *Luv N' Care, Ltd.* v. *Goldberg Cohen, LLP*, 703 F. App'x 26, 28 (2d Cir. 2017) (summary order) (quoting *Global Fin. Corp.* v. *Triarc Corp.*, 93 N.Y.2d 525, 528 (1999)).  Thus, whether each investor in the proposed class has a timely claim turns on where the claim accrued, when it accrued, and the applicable statute of limitations in the relevant jurisdiction.  (*See* R&R 30).  Royal Park's expert opined that the investors in the trusts at issue are from at least six states aside from New York, as well as foreign jurisdictions.  (*Id.*).

18

Royal Park argues that "Wells Fargo has never established that it has a meritorious statute of limitations defense against Royal Park or any class member, rendering any purported defense speculative." (Pl. Obj. 15). Yet that merely begs the question, as determining whether Wells Fargo *did have* such a defense would require the very analysis outlined above. And although Royal Park is correct that individual inquiries involved in affirmative defenses, standing alone, might not predominate over common issues, "such individual issues are 'factor[s] that [a court] *must* consider in deciding whether issues susceptible to generalized proof outweigh individual issues[.]" *Johnson*, 780 F.3d at 138 (first alteration in original) (emphasis added). Royal Park's objection to this point falls flat.

### iv.    The Individual Issue of Damages

An additional factor Judge Netburn considered was the analysis necessary to distribute any damages among investors. On this point, the R&R found that because "[i]nvestors bought and sold different tranches of the [c]ertificates at different times," the damages to which each investor would be entitled would vary. (R&R 30-31). Royal Park takes issue with this, arguing that it "conclusively established that damages are calculable on a class-wide basis." (Pl. Obj. 16). The expert report to which Royal Park cites to support this proposition provides that "the primary step to computing damages is assessing the impact of [Wells Fargo]'s alleged actions and inactions on the mortgage loans underlying each [trust]." (Dkt. #360-6, ¶ 50). Yet the report

19

admits that "to apportion damages among" the investors, "it is necessary to understand each [trust's] deal structure to determine how the values of the different" — i.e., individual — "[c]ertificates were affected by losses to the common mortgage loan collateral." (*Id.* at ¶ 54). Thus, although aggregate damages may be calculable on a class-wide basis, dividing those damages among investors would require the sort of individual inquiries that the Court has discretion to take into account within the predominance analysis. *See, e.g.*, *Jacob* v. *Duane Reade, Inc.*, 602 F. App'x 3, 7 (2d Cir. 2015) (summary order) (affirming class decertification as to damages, but not liability, where individualized nature of damages inquiry would defeat predominance); *Breitman* v. *Xerox Educ. Servs., LLC*, No. 12 Civ. 6583 (PAC), 2014 WL 5364103, at *5 (S.D.N.Y. Oct. 22, 2014) (denying certification under Rule 23(b)(3) where, *inter alia*, class members' damages "would necessitate individualized inquiries").

Royal Park argues that "[i]t is black-letter law that differences in class member damages ***never*** bar class certification." (Pl. Obj. 16 (emphasis in original)). The case on which Royal Park relies for this proposition, *Roach* v. *T.L. Cannon Crop.*, 778 F.3d 401 (2d Cir. 2015), however, did not paint with so broad a brush: Although *Roach* held that "individualized damages determinations *alone* cannot preclude certification under Rule 23(b)(3)," it recognized "that damages questions should be considered at the certification stage when weighing predominance issues[.]" *Id.* at 408-09 (emphasis added).

Thus, as with affirmative defenses, individualized damages inquiries remain a factor that a court may consider in undertaking the predominance analysis. *See id.* at 405; *see also Hart* v. *Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447, 472 (S.D.N.Y. 2014) (A court may certify a class "under Rule 23(b)(3) where liability could be determined classwide and either [i] damages were capable of class-wide determination, or [ii] individual damage calculations are simple and mechanical[.]").  And here, the individualized inquiries necessary to distribute damages among investors, along with the individualized questions discussed above, would dwarf the only common question identified in this case.

**b.     The Proposed Class Action Would Not Be Superior to Other Available Methods for Adjudicating the Controversy**

In addition to predominance, Rule 23(b)(3) requires a movant to show "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Rule 23(b)(3) provides a "'nonexhaustive' and nonexclusive" list of factors that a court may consider when deciding whether to certify a class.  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2018 WL 1229761, at *6.  Those factors consist of the following: "the class members' interests in individually controlling the prosecution or defense of separate actions"; "the extent and nature of any litigation concerning the controversy already begun by or against class members"; "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and "the likely difficulties in managing a

class action." Fed. R. Civ. P. 23(b)(3)(A)-(D). Structurally, these factors "seem to apply both to the predominance and superiority inquiry," but "they more clearly implicate the superiority inquiry." *Sykes*, 780 F.3d at 82. The factors encourage courts to "consider the interests of individual members of the class in controlling their own litigations and carrying them on as they see fit." *Windsor*, 521 U.S. at 616 (quoting Fed. R. Civ. P. 23(b)(3) advisory committee's note to 1966 amendment).

The R&R found that a class action would not be superior for two principal reasons: (i) given "the individualized nature of claims in this case[,] … management of the litigation would be difficult, if not near impossible," and (ii) the proposed class members, as investors in RMBS trusts, are generally "highly sophisticated, knowledgeable financial institutions or wealthy private investors" who "would have a strong interest in individually controlling the prosecution of their own actions." (R&R 33-34 (citation omitted)). These considerations do indeed weigh against certification, *see* Fed. R. Civ. P. 23(b)(3)(A), (D), and the Court therefore adopts the R&R's recommendation on this issue, despite several objections raised by Royal Park that are discussed below.

*First*, on the issue of manageability, Royal Park's objection is substantially derivative of its arguments on predominance. (*See* Pl. Obj. 19-20). Indeed, Royal Park all but concedes that if the Court were not to find predominance, it would not find that the case would be manageable as a class

action, by stating, "[a]s predominance goes, so goes manageability." (*Id.* at 19). And Royal Park is correct — given the individualized inquiries described above that certification would necessitate, the Court and the litigants would face great hurdles in managing this litigation and bringing it to resolution in any reasonable period of time.

*Second*, as to the notion that the class would consist of sophisticated plaintiffs with an interest in pursuing their own claims, Royal Park argues that DTC trading records "show dozens of transactions in the two [trusts] for less than $1 million each," rendering "uneconomical" individual suits by "investors with such small investments[.]" (Pl. Obj. 21). To be sure, the Advisory Committee designed Rule 23(b)(3) to allow claims to proceed to court where individual plaintiffs might otherwise lack the economic incentive to file their own complaints. *See Windsor*, 521 U.S. at 617. But that is generally the case where individual plaintiffs stand to gain only meager payouts, a far cry from the financial position of the prospective class members here. *See, e.g., Kottler* v. *Deutsche Bank AG*, No. 08 Civ. 7773 (PAC), 2010 WL 1221809, at *5 (S.D.N.Y. Mar. 29, 2010) (denying class certification where "[c]lass members [were] high net-worth investors with large claims, capable of litigating individually"); *cf. In re Holocaust Victim Assets Litig.*, 302 F. Supp. 2d 89, 96 (E.D.N.Y. 2004) (noting as "not uncommon" awards in class actions "where members of the class get pennies or coupons, the cumulative total of which is

used to justify awarding millions of dollars in legal fees"), *aff'd*, 424 F.3d 132 (2d Cir. 2005).

In short, for many of the same reasons that individual issues would predominate over common issues, a class action would not be a superior method of resolving the claims at issue here.

### 2.   The Court Will Not Certify a Liability-Only Class

Federal Rule of Civil Procedure 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues."  In the alternative to certifying a class for all purposes, Royal Park seeks certification of a class for the limited purpose of deciding Wells Fargo's liability, as Royal Park contends that the "R&R correctly concluded" that the issue is "common to the class."  (Pl. Obj. 23).  Yet that is not what the Judge Netburn concluded and the Court has not adopted such a view; although the issue of Wells Fargo's *breach* of the R&Ws or of its duty of trust may be subject to generalized proof on a class-wide basis, such proof alone would not establish Wells Fargo's *liability*.

Indeed, among other questions bearing on Wells Fargo's ultimate liability, the preliminary issue of standing would remain, as would Wells Fargo's affirmative defenses; as discussed above, both of these questions require individualized inquiries.  And although "a court may properly employ [Rule 23(c)(4)] to separate the issue of liability from damages," this is only so "when it is the 'only' way that a litigation retains its class character, *i.e.*, when

24

common questions predominate only as to the 'particular issues' of which the provision speaks." *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 226 (2d Cir. 2006). For the reasons discussed above, individualized issues would continue to permeate the issue of liability, and the Court therefore declines to certify a class to determine that limited issue.

## CONCLUSION

Given the foregoing, Royal Park's objections to the R&R are OVERRULED and its motion for class certification is DENIED. The Clerk of Court is directed to terminate the motion appearing at docket entry 453. The parties are directed to submit a joint letter within 30 days of the date of this Opinion advising the Court as to how they wish to proceed; whether the stay in this action should remain in effect; and, in light of this Opinion, whether Royal Park will continue to pursue its remaining objections to Judge Netburn's orders. (*See* Dkt. #441).

SO ORDERED.

Dated:     April 17, 2018
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge